# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FRAGOMEN, DEL REY, BERNSEN & LOEWY LLP,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | Civ. No. _____ |
| **v.** | ) ) | |
| **ELAINE L. CHAO, Secretary of Labor, and the U.S. DEPARTMENT OF LABOR,** | ) ) ) | |
| **Defendants.** | ) ) | |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen"), based upon the Complaint, the Declaration of Michael D. Patrick dated August 7, 2008, the supporting Memorandum of Law dated August 8, 2008, and upon all prior papers and proceedings herein, hereby move pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction barring defendants from:

1.  Enforcing 20 C.F.R. § 656.10(b) (the "Regulation") to prohibit employers from consulting with attorneys concerning any aspect of the labor certification process, including whether particular workers who apply for positions in the alien labor certification recruitment process are "qualified" for the position within the meaning of the governing regulations.

2. Enforcing the Regulation to prohibit attorneys from communicating with their employer clients at the time résumés or applications are received about whether applicants may be "qualified" for the position within the meaning of the governing regulations.

3. Enforcing the interpretations outlined in the June 2 Press Release, the June 4 Information Paper, and the June 13 Bulletin (as those terms are defined in the Complaint and the supporting Declaration and Memorandum of Law) as to the permissible role of attorneys for employers in the labor certification process.

4. Enforcing new restrictions directed at the role of attorneys for employers in the labor certification process without following the notice and comment rulemaking procedures set forth in the Administrative Procedure Act.

5. Retaliating against Fragomen or its clients through defendants' enforcement powers based on their exercise of constitutionally protected rights.

6. Auditing PERM applications of Fragomen's clients based upon defendants' view of the attorney-client relationship outlined in defendants' June 2 Press Release, the June 4 Information Paper, and the June 13 Bulletin.

7. Auditing PERM applications specifically on the basis of Fragomen's appearance as counsel for the employer.

8. Demanding that Fragomen or its clients provide confidential information about their attorney-client relationship in the course of the labor certification process.

Dated: August 8, 2008

Respectfully submitted,

COVINGTON & BURLING LLP

Thomas S. Williamson, Jr.
  D.C. Bar No. 217729
Jonathan L. Marcus
  D.C. Bar No. 451172
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 662-6000

Andrew A. Ruffino
(*Pro hac vice* application to be submitted)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000

*Of Counsel:*

Mark A. Grannis, D.C. Bar No. 429268
HARRIS, WILTSHIRE & GRANNIS LLP
1200 Eighteenth Street, N.W.
Washington, D.C. 20036
Tel:  (202) 730-1300

Ira Kurzban
(*Pro hac vice* application to be submitted)
KURZBAN, KURZBAN, WEINGER
AND TETZELI, P.A.
2650 S.W. 27th Avenue
Miami, Florida 33133
Tel: (305) 444-3503

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August ___8___, 2008, I caused a true and correct copy of the

foregoing Motion, along with the accompanying Memorandum in Support, Complaint,

Summons, and Proposed Order, to be served on Defendants by certified mail, return receipt

requested, pursuant to Rule 4 of the Federal Rules of Civil Procedure.

_____
Jason R. Litow
(Attorney for Plaintiff)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FRAGOMEN DEL REY BERNSEN & LOEWY LLP,** | ) ) ) ) | |
| | ) | **Civ. No. _____** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **ELAINE L. CHAO, Secretary of Labor, and the U.S. DEPARTMENT OF LABOR,** | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 662-6000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

I.     THE PARTIES .......................................................................................... 3

II.    THE LABOR CERTIFICATION SYSTEM ........................................... 4

     A.    The Immigration and Nationality Act ...................................... 4

     B.    An Overview of the Implementing Regulations ..................... 4

     C.    The Importance of Legal Advice in the Labor Certification Process .................... 6

     D.    The Department's Enforcement Actions ................................. 7

     E.    The July 16 Agreement and New Certification Form ............ 10

III.    ETHICAL OBLIGATIONS OF ATTORNEYS ...................................... 10

ARGUMENT ....................................................................................................... 11

I.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS. ................ 12

     A.    The Department Exceeded its Statutory Authority by Construing Section 656.10(b)(2) to Prohibit Attorney-Client Communications................................... 12

     B.    The Secretary's Interpretation of Section 656.10(b)(2) Violates the APA........... 17

          1.    The Secretary's Interpretation Is Contrary to the Language, Structure, and Purpose of the Regulation. ................................................. 17

          2.    The Secretary's Interpretation Constitutes Rulemaking Without Notice and Comment. ...................................................... 21

          3.    The Department's Application of its New Interpretation to Previously Filed Applications Is Impermissibly Retroactive. ................. 26

     C.    As Interpreted by DOL, Section 656.10(b)(2) Violates the First Amendment. ...................................................................... 27

          1.    The Regulation, as interpreted, violates an employer's First Amendment right to counsel and an attorney's right to provide counsel. ...................................................................... 27

      2.      The Regulation, as interpreted, discriminates based on viewpoint........... 30

D.    The Regulation, as Interpreted, Impermissibly Conditions Receipt of a Government Benefit on Relinquishment of a First Amendment Right. ............... 34

E.    As Interpreted and Enforced, Section 656.10(b)(2) Violates Fragomen's Fifth Amendment Due Process Right To Engage In Its Chosen Business. .......... 36

II.    THE EQUITIES FAVOR PRELIMINARY INJUNCTIVE RELIEF. ............................ 37

A.    Plaintiff Will Suffer Irreparable Injury Absent Preliminary Relief. ..................... 37

B.    Preliminary Relief Will Not Harm the Department. ............................................... 39

C.    The Public Interest Supports a Preliminary Injunction. ......................................... 40

CONCLUSION ................................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*AFL-CIO v. Donovan*, 757 F.2d 330 (D.C. Cir. 1985) .................................................. 21

*AT&T Co. v. FCC*, 454 F.3d 329 (D.C. Cir. 2006)........................................................ 26

*Alliance for Open Society International, Inc. v. United States Agency for
International Development*, 430 F. Supp. 2d 222 (S.D.N.Y. 2006) ....................... 16

*Alexander v. United States*, 509 U.S. 544 (1993) ........................................................ 30

*American Airways Charters, Inc. v. Regan*, 746 F.2d 865 (D.C. Cir. 1984) .............. 15, 16, 27, 28

*American Bar Association v. FTC*, 430 F.3d 457 (D.C. Cir. 2005)........................................ 13, 14

*American Coke & Coal Chemicals v. EPA*, 452 F.3d 930 (D.C. Cir. 2006) ................. 24

*American Library Association v. Reno*, 33 F.3d 78 (D.C. Cir. 1994)........................................... 31

*Amoco Production Co. v. Watson*, 410 F.3d 722 (D.C. Cir. 2005) ............................... 20

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988).................................. 26

*Buffalo Crushed Stone, Inc. v. Surface Transport Board*, 194 F.3d 125 (D.C. Cir. 1999).......... 17

*CSX Transport, Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005)........................................... 11, 38

*California State Board of Optometry v. FTC*, 910 F.2d 976 (D.C. Cir. 1990)............................. 14

*California Independent System Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004).......... 14

*Caplin & Drysdale v. United States*, 491 U.S. 617 (1989) ........................................... 29

*Chamber of Commerce v. U.S. Department of Labor*, 174 F.3d 206 (D.C. Cir. 1999) ............... 21

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).............. 38

*Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994) ........................................................ 13

*CityFed Finance Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ............... 12

*DKT Memorial Fund Ltd. v. Agency for International Development*,
887 F.2d 275 (D.C. Cir. 1989)................................................................................ 34

*Danielson v. Local 275*, 479 F.2d 1033 (2d Cir. 1973) ............................................... 38

*DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990) ..................................................... 28

*Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000) ..................................................... 27, 28

*Doe v. Gonzalez*, 386 F. Supp. 2d 66 (D. Conn. 2005)................................................. 30

*Doe v. Gonzalez*, 500 F. Supp. 2d 379 (S.D.N.Y. 2007) .............................................. 30

*Doe (Phillips) v. District of Columbia*, 697 F.2d 1115 (D.C. Cir. 1983) ...................... 28

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................... 37

*Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005)........................ 24

*Exportal Ltda v. United States*, 902 F.2d 45 (D.C. Cir. 1990) ..................................... 18

iii

*Fabi Construction Co. v. Secretary of Labor*, 508 F.3d 1077 (D.C. Cir. 2007)..................... 17, 20

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ................................................................. 28

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)............................................................ 13, 14

*Guardsmark, LLC v. NLRB*, 475 F.3d 369 (D.C. Cir. 2007) .......................................... 19

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984) ............. 27

*Henderson v. United States*, 476 U.S. 321 (1986) ..................................................... 19

*International Union, UMW v. Mine Safety & Health Administration*,
   407 F.3d 1250 (D.C. Cir. 2005)........................................................................ 24, 25

*Jacobs v. Schiffer*, 47 F. Supp. 2d 16 (D.D.C. 1999)............................................... 28, 32

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004) ............................. 40

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) .......................... 40

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) ..................................................... 34

*Kooritzky v. Reich*, 17 F.3d 1509 (D.C. Cir. 1994)................................................. 4, 23

*Legal Services Corporation v. Velazquez*, 531 U.S. 533 (2001) .................................. 34, 35

*Leis v. Flynt*, 439 U.S. 438 (1979) .................................................................... 13

*Milavetz, Gallop & Milavetz P.A. v. United States*, 355 B.R. 758 (D. Minn. 2006) ............. 29, 33

*Martin v. Lauer*, 686 F.2d 24 (D.C. Cir. 1982)................................................. 16, 27, 28

*Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) .......................... 39

*Mothershed v. Justices of the Supreme Court*, 410 F.3d 602 (9th Cir. 2005)........................ 28

*NAACP v. Button*, 371 U.S. 415 (1963).............................................................. 29

*Ohralik v. Ohio State Bar Association*, 436 U.S. 447 (1978) ....................................... 13

*Old Dominion Dairy Products, Inc. v. Secretary of Defense*,
   631 F.2d 953 (D.C. Cir. 1980) ........................................................................ 37

*Perry v. Sindermann*, 408 U.S. 593 (1972)......................................................... 34, 36

*Powell v. Alabama*, 287 U.S. 45 (1932) .............................................................. 28

*In re Primus*, 436 U.S. 412 (1978)................................................................... 29

*Public Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7 (D.D.C. 2006) .................................. 21

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .................................................... 30

*Ramirez v. Arlequin*, 447 F.3d 19 (1st Cir. 2006) ................................................... 36

*Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995) ............. 31

*S.A. Storer & Sons Co. v. Secretary of Labor*, 360 F.3d 1363 (D.C. Cir. 2004) .................. 20

*Secretary of Maryland v. J.H. Munson Co.*, 467 U.S. 947 (1984)................................... 30

*Serono Laboratoriess, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) ......................... 11

iv

*Solid Waste Agency v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) ............... 16

*Taylor v. Resolution Trust Corp.*, 56 F.3d 1497 (D.C. Cir. 1995) ................................................ 36

*Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ............................ 21

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994) ...................................................... 17

*Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979) .............................................................. 13

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ......................................... 36

*United States Department of Labor v. Triplett*, 494 U.S. 715 (1990) ........................................... 29

*United States v. Caputo*, 517 F.3d 935 (7th Cir. 2008) ................................................................ 34

*United States v. Ryan-Webster*, 353 F.3d 353 (4th Cir. 2003) .............................................. 4, 25

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ............................................................... 33, 39

*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ............................ 21

*Verizon Telegraph Cos. v. FCC*, 269 F.3d 1098 (D.C. Cir. 2001) ............................................... 27

*Virginia v. America Booksellers Association, Inc.*, 484 U.S. 383 (1988) .................................... 30

*Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997) ........................................................................ 14

*Zal v. Steppe*, 968 F.2d 924 (9th Cir. 1992) ................................................................................. 29

## STATUTES

5 U.S.C. § 553 ................................................................................................................................ 21

5 U.S.C. § 706(2) ............................................................................................................. 12, 17, 21

8 U.S.C. § 1182(a)(5) ............................................................................................................ *passim*

29 U.S.C. § 551 ................................................................................................................................ 3

## ADMINISTRATIVE MATERIALS

20 C.F.R. § 656.10 (2008) ..................................................................................................... *passim*

20 C.F.R. § 656.17 (2008) ............................................................................................................... 5

20 C.F.R. § 656.21 (2008) .......................................................................................................... 4, 5

20 C.F.R. § 656.31 (2008) ............................................................................................................. 31

60 Fed. Reg. 30,467 (June 9, 1995) ....................................................................................... 7, 8, 9

67 Fed. Reg. 30,466 (May 6, 2002) .......................................................................... 20, 21, 22, 24

69 Fed. Reg. 77,326 (Dec. 27, 2004) ...................................................................... 22, 23, 24, 25

*In re Le Petit Prince, Inc.*, 91-INA-354 (BALCA 1993) .............................................................. 20

*In re Robinson*, 2007-PER-00084 (BALCA 2007) ........................................................................ 7

*In re Rojas*, 87-INA-685 (BALCA 1988) ............................................................................... 25, 39

## MISCELLANEOUS

BALCA Deskbook § 23.33 ........................................................................... 5

## PRELIMINARY STATEMENT

Plaintiff Fragomen Del Rey Bernsen & Loewy LLP ("Fragomen") is a law firm that advises employers on immigration matters.  At issue is the Department of Labor's recent interpretation of a regulation permitting the admission of foreign nationals into the United States to fill jobs for which "qualified" domestic job applicants are not available.  The Secretary of Labor ("the Secretary") has interpreted the regulation to prohibit client-employers from consulting their lawyers so that they can obtain the legal advice they need to comply with certain of the Department's regulatory requirements.  Plaintiff seeks a preliminary injunction barring that interpretation because it (a) exceeds the Department's statutory authority; (b) is inconsistent with the regulation; (c) constitutes rulemaking in violation of the Administrative Procedure Act (APA); (d) is impermissibly retroactive; (e) violates the First Amendment; (f) violates Plaintiff's Fifth Amendment due process right to engage in its chosen business; and (g) is causing Plaintiff immediate and irreparable injury that warrants injunctive relief.

Section 212(a)(5) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(5), provides that an alien seeking admission to the United States to fill a permanent job opening shall not be admitted unless the Secretary "has determined and certifies" that there are no U.S. workers who are "able, willing, qualified ... and available" to do the job.  Pursuant to that statute, the Department of Labor ("the Department" or "DOL") has promulgated regulations to establish standards for these labor certifications.  In a June 2, 2008 press release, the Secretary for the first time interpreted one of those regulations, 20 C.F.R. § 656.10(b) (2008), to prohibit employers from consulting their attorneys in evaluating whether particular U.S. workers are "qualified" within the peculiar meaning of the regulations.  On the basis of that interpretation, the Secretary simultaneously announced that the Department would audit all pending labor certi-

fication applications—more than 2,500 separate cases—filed by one law firm—Fragomen—on behalf of all of its hundreds of employer clients. The decision to audit and thus delay all applications filed by Fragomen was based on three standard forms—voluntarily provided to the Department in response to routine audits of three cases—that suggested to employer-clients that they call Fragomen for legal advice at a given point in the client's recruitment process.

The Department's interpretation of the regulation is invalid on numerous grounds. First, it exceeds the agency's authority under the relevant statute by prohibiting the employer from consulting its lawyer for advice relevant to its compliance with the regulatory scheme. The Department's restriction on attorney-client communications is an extraordinary encroachment on a traditional sphere of state regulation; as such, it should not be deemed to be authorized by Congress in the absence of a clear statement to that effect. Second, the interpretation violates the APA because it has no basis in the language, structure, or purpose of the regulation; constitutes rulemaking without notice and comment; and has been applied retroactively. Third, the regulation as interpreted by the Secretary violates the First Amendment. Finally, the 100 percent audit initiated by the Department violates Fragomen's Fifth Amendment right to pursue a vocation.

Accordingly, Plaintiff asks this Court to issue a preliminary injunction barring the Defendants from enforcing the regulation in a manner that prevents employers from obtaining advice about their legal rights and obligations. While there are limits on the advice attorneys may give their clients, they are ethical limits primarily imposed and enforced by the state bars. Federal agencies are not permitted to impose categorical prohibitions on the legal advice a regulated entity may seek on the presumption that the entity's attorney will act in bad faith to assist its client in circumventing the law. Employers are entitled to seek—and lawyers are obligated to give—unbiased legal advice so that the employer-clients can comply with their regulatory obligations

and exercise their legal rights. A preliminary injunction is warranted because Plaintiff has a sub-stantial likelihood of success on the merits of its claims; absent a preliminary injunction, Plaintiff will suffer immediate and irreparable injury; and a preliminary injunction will not harm Defen-dants and will serve the public interest.

## STATEMENT OF FACTS

### I.     THE PARTIES

Plaintiff Fragomen is a United States law firm with more than 250 attorneys and more than 1,000 professional immigration specialists and staff located in more than 30 offices in the Americas, Asia, and Europe. Founded in 1951, Fragomen has developed a legal practice that centers on providing business-related immigration services to corporate clients. Fragomen is widely recognized as the nation's leading immigration law firm. A significant portion of the firm's practice involves advising employers with respect to the legal requirements for alien labor certification applications pursuant to the INA and the implementing regulations promulgated by the Department. In the past year, Fragomen has filed more than 6,500 alien labor certification applications on behalf of clients, and a large number of those applications are pending before the Department. Declaration of Michael Patrick ("Patrick Decl.") ¶ 7. In addition, as an employer with immigration issues like other employers, Fragomen is also a labor-certification applicant in its own right, and is a client of other immigration lawyers. *Id.* ¶ 10.

Defendant Elaine L. Chao is the United States Secretary of Labor. As the "head" of the co-defendant United States Department of Labor, 29 U.S.C. § 551, the Secretary administers the INA's alien labor certification provisions and the Department's implementing regulations, *see* 8 U.S.C. § 1182(a)(5)(A)(i) (stating that an alien seeking to enter the United States for the purpose of obtaining employment must receive a certification from the Secretary of Labor). Compl. ¶ 14-15.

## II.    THE LABOR CERTIFICATION SYSTEM

### A.    The Immigration and Nationality Act

To remain competitive in the global marketplace, U.S. employers looking for the most qualified professionals sometimes wish to hire skilled foreign nationals.  With respect to "[a]n alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor," Section 212(a)(5) of the INA deems the alien "inadmissible unless the Secretary of Labor" certifies, *inter alia*, that "there are not sufficient workers who are able, willing, *qualified* … and available at the time of application" among the existing United States workforce.  8 U.S.C. § 1182(a)(5)(A)(i)(I) (emphasis added).  In general, the alien must have "a prospective employer in this country, and that employer must petition the [Department] for a 'Labor Certification' on behalf of the alien."  *United States v. Ryan-Webster*, 353 F.3d 353, 355 (4th Cir. 2003) (footnote omitted).  *See also* Patrick Decl. ¶ 11.

### B.    An Overview of the Implementing Regulations

The regulations implementing Section 212(a)(5)'s certification requirements are codified in Title 20 of the Code of Federal Regulations.  Under the regulations, an employer seeking to hire an alien submits an application that "provides the name of the particular alien the employer intends to employ; a description of the alien's qualifications and the job; and documentation of the employer's attempts to recruit American workers."  *Kooritzky v. Reich*, 17 F.3d 1509, 1511 (D.C. Cir. 1994).  The Department's regulations also specify recruitment measures that must be undertaken, *see, e.g.*, 20 C.F.R. § 656.21, and standards for determining whether a given domestic applicant is "qualified" for the position, *see id.* § 656.17.  The regulations seek to ensure that the recruitment process will be conducted in good faith, and that employers will not create a sham recruitment process that is calculated to find all U.S. workers unqualified.  However, an employer has no legal obligation to hire anyone at the end of the process.  Patrick Decl. ¶¶ 12-21.

The regulations use definitions of "qualified" that an employer seeking to fill a position would not ordinarily use. Ordinarily, an employer would seek the most qualified candidate available. But under the regulations, a domestic applicant will be deemed "qualified" if the applicant merely satisfies "the employer's actual *minimum* requirements for the job opportunity," as advertised by the employer. *Id.* § 656.17(i)(1) (emphasis added). A U.S. worker who meets the bare minimum criteria for the position may be viewed as "qualified" even if his or her credentials are demonstrably inferior to the credentials of the foreign national the employer wishes to sponsor. An employer may not disqualify a worker who has a degree that is "equivalent" to the one required, or a degree in a substantially similar field. Nor may an employer request all criteria that it believes are necessary to perform the work, as the Department may determine that such requirements are "unduly restrictive" or involve a "combination of occupations." 20 C.F.R. § 656.17(h). Moreover, even if a domestic applicant falls short of the position's "minimum requirements," the applicant will still be deemed "qualified" if the applicant "can acquire the skills necessary to perform the duties involved in the occupation during a reasonable period of on-the-job training." *Id.* § 656.17(g)(2). *See also* Patrick Decl. ¶¶ 17, 19.

The labor certification process also recognizes that there may be circumstances in which a job applicant otherwise deemed minimally qualified under Department regulations may be rejected because he fails to meet "inherent job requirements"; for example, if his résumé shows untrustworthiness or manifest incompetence, or if he lacks proficiency in English for a job that requires it. But "inherent job requirements" generally may not take into account common characteristics such as work ethic, attitude, or personality. *See, e.g.,* BALCA DESKBOOK § 23.33; *see also* Patrick Decl. ¶ 18.

5

The labor certification process thus requires employers to apply complicated and unfamiliar criteria for evaluating applicants.  It is often the case that an applicant who is "qualified" for purposes of this process is not a person the employer would normally be interested in hiring. It is also often the case that an applicant who possesses the minimum qualifications specified by the employer may nonetheless be rejected if he lacks an "inherent job requirement" accepted by the Department.  Patrick Decl. ¶¶ 18-19.

**C.    The Importance of Legal Advice in the Labor Certification Process**

Because the decision about whether a given job applicant is "qualified" is governed not by normal considerations of suitability for hiring but instead by the dictates of the labor certification regulations, that decision is not a normal hiring decision, but ultimately a specialized legal judgment.  Employers accordingly rely on their attorneys to assist them in getting their decisions right.  The Department's regulations recognize the integral role that attorneys play in guiding their client through the certification process, expressly providing that "[e]mployers may have agents or attorneys represent them throughout the labor certification process."    20 C.F.R. § 656.10(b)(1).  Immigration lawyers historically have advised their clients about matters such as the following:  (1) whether the education and experience requirements and job description are consistent with the Department's complex formulas and regulations; (2) whether a job applicant, based upon his or her résumé, appears to meet the basic requirements for the position construed in light of the Department's regulations, and therefore must be interviewed; (3) whether an applicant who appears minimally qualified under Department regulations may be found ineligible subsequent to an interview because of inherent job requirements; (4) whether a job applicant's degree would be viewed by the Department as equivalent to the degree sought by the employer thereby making the applicant minimally qualified for the job; (5) whether the Department's regulations and precedent would deem an applicant minimally qualified because he or she could re-

ceive on-the-job training; and (6) whether an applicant who appears to be "qualified" also meets the three other criteria required under the statute, namely that the applicant be "able, willing, ... and available." 8 U.S.C. § 1182(a)(5). *See also* Patrick Decl. ¶ 22.

Employers also rely heavily on counsel to guide them through strict timelines for the completion of required tasks, as well as special requirements imposed by the regulations for applications by employers who have had layoffs. *Id.* ¶ 23. The Board of Labor Certification Appeals ("BALCA"), to which an employer may appeal an adverse determination on a particular labor certification application, has confirmed in decisions issued during the last 20 years that employers have a right to consult with their counsel in navigating the labor certification process. *See, e.g., In re Robinson,* 2007-PER-00084 (BALCA 2007) ("Given the legal requirements of the labor certification process, [the employer] might consider engaging an immigration attorney to assist her in understanding and complying with the regulations," which impose "an exacting process" that is "unforgiving of mistakes in filling out the application or misunderstandings about the regulatory requirements"). This view has also been embraced repeatedly in official Department guidance documents, and has long been accepted by experienced labor certification practitioners. Patrick Decl. ¶¶ 23-25.

**D.    The Department's Enforcement Actions**

In a June 2, 2008 press release (the "June 2 Press Release"), the Department announced without warning that it was auditing *all* labor certification applications filed by Fragomen on behalf of employer clients. (Compl. Ex. D.)[1] The Department publicly singled out Fragomen

---

[1] According to the Department, in the absence of an audit, a certification application should be processed within 21 days. *See* 60 Fed. Reg. 30,467 (June 9, 1995). If an application is selected for audit, however, the processing time is extended dramatically. The average processing time is

(continued...)

based on "information indicating that in at least some cases the firm improperly instructed clients who filed permanent labor certification applications to contact their attorney before hiring apparently qualified U.S. workers." *Id.* The Department's "information" was based on forms that Fragomen had provided to certain clients suggesting that the employer contact Fragomen if it determined that a domestic applicant appeared qualified for a position; this was done in order to allow an attorney at the firm to discuss the domestic applicant's qualifications with the client's representative in light of the peculiar requirements of the certification regulations. (Compl. Exs. A-C.); *see also* Patrick Decl. ¶¶ 31-34.

The Department appears never before to have announced *in advance*, by press release, that it was going to audit *all* of a law firm's (or an employer's) applications. The announcement immediately cast a huge cloud of suspicion over Fragomen. The June 2 Press Release shocked the immigration bar and dramatically departed from past practice and settled understandings about the propriety of attorney-client consultation in the context of the labor certification process. Patrick Decl. ¶¶ 35, 38, 52. The next day, in an apparent attempt to explain this abrupt and unsettling action to practitioners, the Department published an Information Paper with responses to what it called "frequently asked questions" about the Press Release. ("June 4 Information Paper" (Compl. Ex. E).[2]) The Department asserted in the Information Paper that "[t]he … regulations specifically prohibit an employer's immigration attorney or agent from participating in considering the qualifications of U.S. workers who apply for positions for which certification is

_____

now over sixteen months. Patrick Decl. ¶ 29. The delay caused by the audit may result in the exhaustion of the maximum duration of non-immigrant status for a foreign national, leading the employer to lose the critical employee.

[2] The Information Paper was released on June 3, 2008, but was dated June 4, 2008.

sought." *Id*. The Department stated its conclusion that such a "rule safeguards against the use of attorneys to find reasons not to hire U.S. workers that the employer would, but for the attorney's involvement, deem qualified." *Id*. According to the Department, the rule barred attorney involvement in consideration of any "particular applicant," but permitted "general advice." *Id*.

On June 13, 2008, the Department amended its position in a PERM Program Guidance Bulletin ("June 13 Bulletin") entitled "Clarification of Scope of Consideration Rule in 20 C.F.R. 656.10(b)(2)."[3] (Compl. Ex. F.) In the June 13 Bulletin, the Department states that if "an employer evaluates a U.S. worker and concludes that the worker is *unqualified*, the employer *may* seek the advice of its attorney … to ensure that its reasons for rejecting the U.S. worker are lawful." (emphasis added). "By contrast, if an employer evaluates a U.S. worker and determines that the worker is minimally *qualified*, the attorney … *may not* thereafter consider the applicants' qualifications." *Id*. (emphasis added). In other words, the Department seeks to prohibit employers from obtaining legal advice if the uncounseled legal conclusion the employer is inclined to reach is the one the Department favors, but permits the employer to seek legal advice if the conclusion is one the Department dislikes. Patrick Decl. ¶¶ 40-41.

The June 13 Bulletin also decrees that attorneys for an employer may not conduct any preliminary screening of résumés received by an employer in connection with a PERM recruitment process. *Id*. ¶ 43. According to the Department, at the time résumés initially are received, attorneys are forbidden from giving advice to their clients about whether particular applicants may be "qualified" within the meaning of the regulations. Compl. Ex. F at 2. By insisting that attorneys not conduct any preliminary review of résumés, the Department is attempting to dictate

---

[3] PERM stands for the "Program Electronic Review Management System," the Department's electronic filing system for alien labor certification applications. *See* Section I(B)(2), *infra*.

at what point and in what form the employer may obtain legal advice, including an initial assessment of, or comments on, the qualifications of any applicants. This interpretation aims to prohibit attorney-client communication about the application of the regulatory standards to particular applicants. *Id.*

### E.    The July 16 Agreement and New Certification Form

The Department's actions pose catastrophic risks to Fragomen's business, and the threat of serious disruptions to its clients' ongoing business affairs. Because of those risks, Fragomen was compelled to enter into an agreement with the Department that became effective on July 16, 2008. (Compl. Ex. G.) In order to obtain the Department's assurance that it would satisfy itself with auditing the 2,500+ cases already under the shadow of the June 2 Press Release, and would not automatically audit all future Fragomen cases, Fragomen was required to promise that it would comply with the unlawful regulatory constraints announced in the June 13 Bulletin until such time as a court determines the issues raised by the Department's actions. Patrick Decl. ¶ 46.

In addition, on July 31, the Department approved a form of "Certification" that Fragomen clients may submit in an effort to remove some of their cases from the Department's special audits. (Compl. Ex. H.) The Certification requires employers to attest, among other things, that in the course of recruitment for their PERM applications, they did not have any of the types of consultations with Fragomen attorneys that are now viewed as prohibited. Thus, the Certification, like the July 16 agreement, reflects the Department's continuing insistence that labor certification applications adhere to the restrictions that Fragomen is challenging as unlawful. Patrick Decl. ¶ 47.

## III.    ETHICAL OBLIGATIONS OF ATTORNEYS

By prohibiting lawyers from advising their clients with respect to their compliance with the Department's certification requirements, the Department compels a lawyer to contravene his

or her ethical obligations to clients. An attorney's relationship with his or her clients is heavily regulated by state ethics rules. For example, in the District of Columbia lawyers owe their clients independent judgment and candid advice. *See, e.g.*, D.C. R. Prof. Conduct 2.1. Lawyers also have a duty to represent their clients zealously and diligently within the bounds of the law; they must advance the lawful objectives of a client through reasonably available means permitted by law and disciplinary rules. *See, e.g.*, D.C. R. Prof. Conduct 1.3. If a lawyer knows that his client is legally permitted to pursue a lawful objective like hiring a particular worker, but the client mistakenly believes otherwise, the lawyer has an obligation to make sure the client understands his rights under the law. The Department's requirement that a lawyer defer to a lay client's unschooled and possibly erroneous view is inconsistent with these obligations. Furthermore, lawyers have a duty to explain legal matters to their clients to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. *See, e.g.*, D.C. R. Prof. Conduct 1.4. An attorney's communication with her client must be comprehensive, to ensure that decisions of the client are made only after the client has been informed of all relevant considerations. As Comment 2 to D.C. Rule 1.4 states, "A client is entitled to whatever information the client wishes about all aspects of the subject matter of the representation." *See also* Patrick Decl. ¶¶ 48-51.

## ARGUMENT

"In considering whether to grant preliminary injunctive relief, the court must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*,

158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Here, a preliminary injunction should be granted because Plaintiff has a strong likelihood of success on the merits and will suffer irreparable harm if Section 656.10(b)(2), as interpreted by the Department, is not enjoined; Defendants, by contrast, will suffer no substantial injury if a preliminary injunction is issued; and the public interest weighs in favor of injunctive relief.

## I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS.

### A.    The Department Exceeded its Statutory Authority by Construing Section 656.10(b)(2) to Prohibit Attorney-Client Communications.

The Department of Labor has authority to promulgate regulations governing the foreign labor certification process pursuant to Section 212(a)(5) of the INA, 8 U.S.C. § 1182(a)(5). As with any statutory delegation of rulemaking authority to an agency, however, that authority is not unlimited. For example, an agency of course is no less constrained by the Constitution than Congress itself. But an agency's authority is further limited because it only has as much authority as Congress has delegated to it. When agencies attempt to regulate conduct that is traditionally governed by state law, courts will require a clear statement from Congress that it intended to authorize such an intrusion on state prerogatives. By prohibiting employers from consulting their lawyers with respect to their understanding of the application of the labor certification regulations in specific circumstances, the Department has taken the extraordinary step of directly regulating attorney-client communications. Because the regulation of the attorney-client relationship is the traditional province of the states, and because the statute lacks any statement from Congress, much less a clear one, authorizing such an extraordinary intrusion, the Department's

interpretation of Section 656.10(b)(2) is "in excess of statutory jurisdiction [or] authority," in violation of the APA, 5 U.S.C. § 706(2)(C).

As the Supreme Court has explained, "[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991) (internal quotation marks omitted). This "plain statement rule" is "an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.* at 461.

By regulating the substance of communications between attorneys and their clients and restricting an employer's access to counsel, the Department's interpretation invades an area long-recognized to be the province of the states. As the Court of Appeals explained in invalidating an attempt by the Federal Trade Commission to regulate attorneys pursuant to a federal consumer protection statute, "It is undisputed that the regulation of the practice of law is traditionally the province of the states … The states have regulated the practice of law throughout the history of the country; the federal government has not." *American Bar Ass'n v. FTC*, 430 F.3d 457, 471-72 (D.C. Cir. 2005). *See also Leis v. Flynt*, 439 U.S. 438, 442 (1979) ("Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions."); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'") (citation omitted).

To be sure, the Department's legitimate need to "protect the integrity of its own processes" allows it to regulate the conduct of attorneys practicing before it. *Touche Ross & Co. v.*

*SEC*, 609 F.2d 570, 581 (2d Cir. 1979); *see also Checkosky v. SEC*, 23 F.3d 452, 456 (D.C. Cir.

1994) ("[A]dministrative agencies have the power, under their general rulemaking authority, to

prescribe standards of practice for attorneys practicing before them and to discipline those who

fail to conform.") (citations omitted).  Such authority does not, however, grant the Department

free rein to interfere with fundamental principles of the attorney-client relationship.  Nothing in

the relevant statute, 8 U.S.C. § 1182(a)(5), suggests—much less provides an "unmistakably

clear" statement (*Gregory, supra*)—that Congress intended to grant such expansive authority to

the Department at the expense of the states.

  For that reason (among many others that we discuss below), the Department's extraordi-

nary restrictions on attorney-client communications cannot stand.  The Court of Appeals has re-

peatedly struck down agency interpretations that encroach upon spheres of state control without

clear statutory authorization.  For example, in *American Bar Association*, 430 F.3d at 472, the

court held that the FTC could not regulate the practice of law because "Congress has not made

an intention to regulate the practice of law 'unmistakably clear' in the language of the [statute]."

(citation omitted)).  By analogy, in *Virginia v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir. 1997), the

court vacated an Environmental Protection Agency rule requiring states to revise plans under the

Clean Air Act, because "[w]e would have to see much clearer language to believe a statute al-

lowed a federal agency to intrude so deeply into state political processes."  And in *California

State Board of Optometry v. FTC*, 910 F.2d 976, 982 (D.C. Cir. 1990), the court held that the

FTC lacked authority to promulgate a rule regulating the practice of optometry because "nothing

in either the language of the Act or its legislative history evidences a congressional intent to alter

the state-federal balance."  *Cf. California Ind. Sys. Op. Corp. v. FERC*, 372 F.3d 395, 399 (D.C.

Cir. 2004) (invalidating agency order requiring replacement of utility's board of directors with

board chosen by agency's own process because Congress did not authorize such an "unprece-dented invasion of internal corporate governance"). There is no reason for a different result here, where the Department has asserted the extraordinary power to restrict attorney-client communi-cations in the absence of any statement from Congress that it may do so.

By asserting the power to determine the circumstances in which the employers it regu-lates may consult counsel for advice, the Department has overstepped its authority in blatant fashion. The Department's invasion of the attorney-client relationship is reminiscent of the at-tempt by the Department of the Treasury to prevent corporations designated as "Cuban nation-als" from retaining counsel. In an opinion authored by then-Judge Ginsburg, the Court of Ap-peals rejected the agency's attempt "to condition a designated Cuban national's bare representa-tion by counsel upon advance government approval" as an unauthorized power-grab. *American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 870 (D.C. Cir. 1984). In doing so, Judge Gins-burg explained that "[t]he nature and purpose of the attorney-client relationship … impel us to review with special care any initiative by an administrative officer to expose to licensing the very creation of that relationship." *Id*. at 872 (footnote omitted). Because Congress had never "enter-tained the notion that an executive officer might extract from highly general statutory language authority to initiate a prior license requirement governing an attorney's response to a client's re-quest for representation," *id*. at 872-73 n.13, Judge Ginsburg concluded that the agency had "gone beyond mere interpretation" and "effectively legislated in an area in which our tradition indicates the lawmakers themselves—Congress—should speak with a clear voice in advance of administrative action," *id*. at 873.

Judge Ginsburg further observed that "the constitutional dimension [of] [the corpora-tion's] access-to-counsel plea" made "the case against the [agency's] position overwhelming."

*Id.* Stressing that "an individual or entity may in fact be denied the most fundamental elements of justice without prompt access to counsel" in "our complex, highly adversarial legal system," *id.* at 872-73, Judge Ginsburg concluded that private parties *"have an undeniable right to retain counsel to ascertain their legal rights,"* *id.* at 873 (quoting *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982) (emphasis in *American Airways Charters*)).  Because the agency's assertion of authority to prevent the formation of an attorney-client relationship "would trench on a right of constitutional dimension," *id.* at 867, Judge Ginsburg invoked the doctrine of constitutional avoidance as an additional basis for holding that the statute did not authorize it, *id.* at 873-74.

The Department's unprecedented restrictions on attorney-client communications are invalid for the same reasons that the Treasury Department's invasion of the attorney-client relationship was held invalid in *American Airways Charters*.  "Even in the absence of a marked constitutional dimension to the problem, sensible construction" of Section 1182(a)(5) "would not encompass" the Department's "current, unprecedented, reading of highly general clauses." *American Airways Charters*, 746 F.2d at 873.  Moreover, as we explain in greater detail in Part I(C) below, the Department's assertion of authority to restrict the advice an employer may receive from its counsel "would trench on a right of constitutional dimension," *id.* at 867, namely, the employer's First Amendment right to obtain legal advice.  As in *American Airways Charters,* the constitutional problems with the Department's interpretation provide another reason not to read Congress to have authorized the Department to regulate the content of attorney-client communications.  Here too, the Supreme Court will require "a clear indication that Congress intended" to "invoke[] the outer limits of [its] power" before the Court will construe a statute in a manner that creates significant constitutional issues. *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).  *See Alliance for Open Soc'y Int'l, Inc. v. United States*

*Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 250 (S.D.N.Y. 2006) (citation omitted) (granting preliminary injunction against agency interpretation of statute that likely violated the First Amendment and citing *Solid Waste Agency* for the proposition that deference will *not* be accorded an agency interpretation that "raises significant constitutional issues" in the absence of a "clear indication from Congress that such interpretation was intended"). This Court should therefore construe Section 1182(a)(5) not to authorize the Department's extraordinary imposition on the attorney-client relationship.

### B.    The Secretary's Interpretation of Section 656.10(b)(2) Violates the APA.

#### 1.    The Secretary's Interpretation Is Contrary to the Language, Structure, and Purpose of the Regulation.

A reviewing court must invalidate an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In addition, an agency's interpretation of its own regulation lacks "controlling weight" if the interpretation "is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*, 194 F.3d 125, 128-29 (D.C. Cir. 1999). Such inconsistency exists where "the plain language of the regulation or 'other indications of the [agency's] intent' require another interpretation." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1080-81 (D.C. Cir. 2007) (citation omitted).

The regulation governing representation of an employer engaged in the evaluation of domestic job applicants begins with an assurance that "[e]mployers may have agents or attorneys represent them *throughout* the labor certification process." 20 C.F.R. § 656.10(b)(1) (emphasis added). The provision further states that "[w]henever … any notice or other document is required to be sent to the employer, the document will be sent to the attorney or agent who has been authorized to represent the employer." *Id.* Thus, the regulatory scheme recognizes the im-

portance of the role of counsel in guiding the employer through all phases of the labor certification process.  Nothing in the regulations suggests, much less provides, that the Department may restrict the employer's access to its counsel.  Subsection (b)(2) contains a restriction on counsel for the *alien*:

> It is contrary to the best interests of U.S. workers to have the alien and/or agents or attorneys for either the employer or the alien participate in interviewing or considering U.S. workers for the job offered the alien.  As the beneficiary of a labor certification application, the alien can not represent the best interests of U.S. workers in the job opportunity.  The alien's agent and/or attorney can not represent the alien effectively and at the same time truly be seeking U.S. workers for the job opportunity.  Therefore, the *alien and/or the alien's agent and/or attorney* may not interview or consider U.S. workers for the job offered to the alien, unless the agent and/or attorney is the employer's representative, as described in paragraph (b)(2)(ii) of this section.

20 C.F.R. § 656.10(b)(2)(i) (emphasis added).  Paragraph (b)(2)(ii), in turn, states that the "employer's representative" referenced in the preceding paragraph "must be the person who normally interviews or considers" applicants for similar positions when no question of labor certification is involved.  *Id*. § 656.10(b)(2)(ii).

Although the first sentence of subsection (b)(2) refers briefly to "the employer's attorney"—in four words that were themselves added without notice or comment, *see* Part I(B)(2), *infra*—that sentence includes no "term of legal significance" to suggest that it effects a prohibition.  *Exportal Ltda v. United States*, 902 F.2d 45, 50 (D.C. Cir. 1990) (finding waiver mandatory because regulation included a term, "[s]hall," that "is mandatory or imperative, not merely precatory").

The only prohibition contained in subsection (b)(2) is set forth in the final sentence of paragraph (b)(2)(i), which specifies that the "*alien*, and/or the *alien*'s agent and/or attorney may not interview or consider U.S. workers for the job offered to the alien."  20 C.F.R.

§ 656.10(b)(2)(i) (emphasis added). Consistent with the longstanding concern about undue influence by the *alien* beneficiary over the labor certification process, the prohibition refers exclusively to the alien beneficiary and his or her agents and attorneys. This juxtaposition of subsection (b)(2)(i)'s opening and closing sentences belies the Department's assertion that the regulations "specifically prohibit an employer's immigration attorney … from participating in considering the qualifications of U.S. workers." *See* June 4 Information Paper (Compl. Ex. E). *Cf. Henderson v. United States*, 476 U.S. 321, 326-27 (1986) (rejecting claim that one Speedy Trial Act exclusion provision was limited to "reasonable" delay periods because "reasonableness" language was not included in provision and "Congress clearly knew how to [so] limit an exclusion" when intended, as evidenced by a separate exclusion provision expressly limited to a "reasonable period of delay"). The Department clearly knew how to prohibit the alien beneficiary from playing a significant role in the recruitment process, but did not include the employer's attorney within that prohibition.

The structure of subsection (b)(2)(i) also refutes the Department's view. Specifically, the provision's reference in the preamble to the employer's attorney is followed by two sentences describing the danger to U.S. workers in allowing the "alien" or alien's agents, "[a]s the beneficiary of a labor certification application," to consider or interview domestic job applicants. 20 C.F.R. § 656.10(b)(2)(i). These intervening sentences present a policy justification for the final sentence's prohibition of the alien and the alien's agents from the recruitment process but, like the prohibition itself, fail to mention the employer's attorney. Given the intervening "change in focus" solely to the alien and his agents and the ultimate limitation of the "direct command" to the alien and his agents, the reference to the employer's attorney is structurally isolated from the prohibition contained in subsection (b)(2)(i) and, therefore, further repudiates the Department's

attempt to read the employer's attorney into the prohibition. *See Guardsmark, LLC v. NLRB*, 475 F.3d 369, 375 (D.C. Cir. 2007) (relying on workplace rule's structure to uphold NLRB's reading that isolated first sentence from the final prohibition).

In addition, "other indications of the [agency's] intent" contradict the Department's reading of Section 656.10(b)(2)(i). *Fabi Constr.*, 508 F.3d at 1080-81 (citation omitted). In fact, decisions of BALCA preceding the PERM regulatory revisions limited the regulation's prohibition on attorney actions—which included an express prohibition in the last sentence of the provision that was identical to the revised regulation at issue here, *see, e.g.,* NPR, 67 Fed. Reg. 30,466, 30,494 (May 6, 2002)—to the alien's attorney. Thus, contrary to the Department's current position, BALCA generally supported the role of an employer's attorney in the recruitment process. *See, e.g., In re Le Petit Prince, Inc.*, 91-INA-354 (BALCA 1993) (reversing denial of labor certification where employer's attorney contacted a job applicant to convey an offer by the employer). [4]

The Secretary's interpretation is (i) incompatible with the regulation's plain language; (ii) inconsistent with the regulatory scheme, which protects the employer's right to consult with counsel "throughout the labor certification process"; and (iii) contrary to other indications of the agency's intent. *See S.A. Storer & Sons Co. v. Sec'y of Labor*, 360 F.3d 1363, 1369-70 (D.C. Cir. 2004); *Amoco Prod. Co. v. Watson*, 410 F.3d 722, 729 (D.C. Cir. 2005); *Fabi Constr.*, 508

---

[4] The employer's need for assistance from counsel in interpreting the labor certification regulations is heightened by the Department's own confusing pronouncements about them. In its June 13 Bulletin, for example, the Department states that "an employer's determination that a U.S. worker is minimally qualified for a position constitutes clear evidence that there are U.S. workers who are *able, willing,* qualified *and available* for the work to be undertaken." Compl. Ex. F (emphasis added.) That statement overlooks the statute's identification of four separate criteria that must be met to preclude an alien from obtaining a labor certification.

F.3d at 1080-81. Accordingly, this Court should find that the agency's actions have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).[5]

## 2. The Secretary's Interpretation Constitutes Rulemaking Without Notice and Comment.

"The Administrative Procedure Act's general rulemaking section, 5 U.S.C. § 553, sets down certain procedural requirements with which agencies must comply in promulgating legislative rules." *Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 752 (D.C. Cir. 2001). Specifically, "there must be publication of a notice of proposed rulemaking; opportunity for public comment on the proposal; and publication of a final rule accompanied by a statement of the rule's basis and purpose." *Id.*; *see also Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999). Accordingly, "[i]f the agency fails to provide this notice and opportunity to comment ..., the 'regulation must fall on procedural grounds, and the substantive validity of the change ... need not be analyzed.'" *Public Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7, 14 (D.D.C. 2006) (quoting *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985)).

On May 6, 2002, the Department issued a notice of proposed rulemaking to establish a new electronic filing system for alien labor certification applications, replacing the traditional supporting documentation with an attestation of recruitment compliance. Notice of Proposed

---

[5] In addition to the language, structure and purpose of the regulation, the Department's interpretation is undermined by the doctrine of constitutional avoidance because, as we explain in Part I(C) below, the Department's restriction on the employer's right to consult an attorney raises serious constitutional questions. *See, e.g., Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 443 n.95 (5th Cir. 1999) ("[A] court will reject an agency interpretation of a statute that would ordinarily receive deference under *Chevron* step-two if it believes the agency's reading raises serious constitutional doubts.") (citation omitted).

Rulemaking (NPR), Program Electronic Review Management System (PERM), 67 Fed. Reg. 30,466 (May 6, 2002).  The NPR, in substance, re-codified those provisions not directly related to the proposed electronic filing procedures.  For example, it proposed to carry forward certain policies designed to minimize the influence of alien beneficiaries who would have an incentive to discourage the hiring of qualified U.S. workers.  *See, e.g., id.* at 30,474 (devoting a section of the PERM Notice to "Alien Influence Over Job Opportunity").  *See also id.* at 30,476 (changing rules to eliminate an alien's right of appeal and allow appeals only by employers).  In the same vein, the PERM Notice proposed to retain without change a decades-old restriction on the extent to which *aliens* and their agents or attorneys could be involved in the recruitment process:

> It is contrary to the best interests of U.S. workers to have the alien and/or agents or *attorneys for the alien* participate in interviewing or considering U.S. workers for the job offered the alien.  As the beneficiary of a labor certification applica-tion, the alien cannot represent the best interests of U.S. workers in the job oppor-tunity.  The alien's agent and/or attorney cannot represent the alien effectively and at the same time truly be seeking U.S. workers for the job opportunity.  Therefore, the alien and/or the alien's agent and/or attorney may not interview or consider U.S. workers for the job offered to the alien, unless the agent and/or at-torney is the employer's representative ....

*Id.* at 30,494 (emphasis added).  Pursuant to APA strictures, the NPR included a 60-day period for public comment on the proposed rule, during which a significant number of interested parties submitted comments.  None of the comments addressed the scope of the employer's right to counsel, presumably because (as the Department later noted) "[t]he NPR[] did not propose any modifications to the provision in the current regulation at 20 CFR 656.20(b)(1) (found in this fi-nal rule at 656.10) that allows employers and aliens to be represented by agents or attorneys."  69 Fed. Reg. 77,326, 77,336 (Dec. 27, 2004) (the "PERM Final Rule").

Two commenters did suggest that attorneys should be the *only* people authorized to help employers through the labor certification process—that is, non-attorney "agents" should no long-

er be allowed to do so—but the Department declined to act on this suggestion because it would have been "a major departure from our longstanding practice allowing representation by attorneys and agents." 69 Fed. Reg. at 77,336. The PERM Final Rule contained no other discussion of attorney representation.

However, in the final version of 20 C.F.R. § 656.10(b)(2)(i), the Department inserted four additional words (emphasized below) that had not appeared in the proposed rule:

> It is contrary to the best interests of U.S. workers to have the alien and/or agents or attorneys for *either the employer or* the alien participate in interviewing or considering U.S. workers for the job offered the alien. As the beneficiary of a labor certification application, the alien can not represent the best interests of U.S. workers in the job opportunity. The alien's agent and/or attorney can not represent the alien effectively and at the same time truly be seeking U.S. workers for the job opportunity. Therefore, the alien and/or the alien's agent and/or attorney may not interview or consider U.S. workers for the job offered to the alien, unless the agent and/or attorney is the employer's representative, as described in paragraph (b)(2)(ii) of this section.

The four words emphasized above—"either the employer or"—were inserted without prior notice into one of the provisions aimed at avoiding undue *alien* influence over the labor certification process, and without any analysis of the key differences between employers and aliens, including the important role that the employer's attorney plays in guiding the employer through the complex labor certification process. These four words are the *only* reference to employers' attorneys in the final version of the Regulation. These four words were not included in either the pre-PERM version of this rule, or in the recodified version of the rule proposed in May 2002.

Even if the words "either the employer or" in the opening sentence of Section 656.10(b)(2)(i) could somehow be read to restrict the employer's right to obtain legal advice, *but see* Part I(B)(1), *supra*, the Department could not draw support for its position from the inclusion of those words because they were inserted into the final version of the rule in violation of the

APA's notice and comment requirements. *Cf. Kooritzky*, 17 F.3d at 1513 ("The Department's notice of proposed rulemaking did not contain the terms of the … rule it later promulgated."). While agencies may promulgate final rules that differ from proposed rules, the proposed rule and the final rule may differ only to the extent the latter is a "logical outgrowth" of the former. *See Int'l Union, UMW v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005); *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). A final rule can be viewed as a "logical outgrowth" of a proposed rule only if interested parties "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *International Union*, 407 F.3d at 1259 (citation and internal quotation marks omitted); *see also American Coke & Coal Chemicals v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006) (noting that the "petitioner must [also] demonstrate that the agency's violation … has resulted in 'prejudice' ") (quoting 5 U.S.C. § 706 (2)). Agencies may not use the rulemaking process "to pull a surprise switcheroo on regulated entities." *Environmental Integrity*, 425 F.3d at 996.

The NPR's proposed Section 656.10(b)(2)(i), which recodified verbatim a regulation that had been in place for more than two decades, referred only to restrictions on the ability of the alien—and the alien's agents or counsel—to consider and interview domestic job applicants in determining their qualifications under the labor certification regime. *See* 67 Fed. Reg. at 30,494. By contrast, the final rule inserted reference to an entirely new and unexpected class of individuals, suggesting that the participation of the employer's attorney in the consideration of domestic employers undermined the interests of U.S. workers. *See* 69 Fed. Reg. at 77,389.

Notably, the final rule provided no rationale for restrictions on a new class—the employer's attorney—for which another section of the final regulation contemplates a role

"*throughout* the labor certification process." 20 C.F.R. § 656.10(b)(1) (emphasis added). Indeed, both courts and the Department had long understood that the employer's attorney plays an important role in advising the employer on the intricacies of the labor certification application procedures. *See, e.g., Ryan-Webster*, 353 F.3d at 356 (noting in factual background that attorneys may file certification application on behalf of employer); *In re Rojas*, 87-INA-685 (BALCA 1988) (noting restrictions on consultation during certification process applied to alien's attorney rather than employer's). Thus, the proposed text of Section 656.10(b)(2)(i) included no information from which interested parties could anticipate extension of the prohibition to a new class of attorneys—the regulated entity's counsel—in the final rule.

In addition, "[w]hile there are circumstances when public comments may raise a foreseeable possibility of agency action," the logical outgrowth test is not satisfied where "no comments suggested" the alteration included in the final rule. *International Union,* 407 F.3d at 1261. This is just such a case. The final rule acknowledges only one public comment relating to Section 656.10(b)(2)(i). After noting that the NPR "did not propose any modifications to the provision in the current regulation … that allows employers and aliens to be represented by agents or attorneys," 69 Fed. Reg. at 77,336, the Department described a comment from interested attorneys who proposed that the Department "eliminate representation of employers and/or aliens *by agents* as provided in the current regulation," *id.* The Department rejected this comment as "a major departure from our longstanding practice allowing representation by attorneys and agents," *id.* (emphasis added). Indeed, the Department concluded that "it would be prudent before making such a major change in our longstanding practice and procedures to issue another proposed rule and consider the comments we would receive on the proposal." *Id.* at 77,336-37. Accordingly, the sole comment to the proposed version of Section 656.10(b)(2)(i) was unrelated to the

25

ability of employers to consult with their attorneys with respect to the consideration of U.S. workers. Moreover, that comment triggered an acknowledgement from the Department that any change to the representation provisions would need to undergo separate notice and comment.

The Department's addition of lawyers for the employer to its restriction on participating in considering U.S. workers was not a "logical outgrowth" of the proposed rule but a radical and unprecedented extension of it. The restriction on aliens and their lawyers does not interfere with the employer's ability to consult its own lawyers to determine its legal rights and obligations under the regulatory scheme. Extending the restriction to lawyers for the employer, by contrast, invades the relationship between the regulated entity and its lawyer. The prohibition on attorney-client communications with respect to the client's compliance with its regulatory obligations would be highly unusual in any context. Remarkably, the Department has imposed this unprecedented prohibition without providing any notice or opportunity for comment in the administrative record.

3.    **The Department's Application of its New Interpretation to Previously Filed Applications Is Impermissibly Retroactive.**

Even if the Department could somehow circumvent the notice and comment requirements for an extraordinary rule change that aims to restrict the employer's relationship with its counsel, *see* Patrick Decl. ¶¶ 37, 52, it cannot apply the rule change retroactively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("A statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). The Department's new interpretation contravenes longstanding industry practice and settled principles governing the attorney-client relationship. *See AT&T Co. v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006) ("'[J]udicial hackles' are raised when 'an agency alters an established rule defining permissible

26

conduct which has been generally recognized and relied on throughout the industry that it regulates.'") (quoting *NLRB v. Majestic Weaving Co.,*, 355 F.2d 854, 860 (2d Cir. 1966) (Friendly, J.)).  Applying that interpretation to conduct that preceded its announcement would therefore violate fundamental fairness and "unduly intrude upon reasonable reliance interests." *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 61 n.12 (1984).  The Department's application of the interpretation to applications for labor certifications filed before it was announced is thus impermissibly retroactive in violation of the APA.  *See Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (an administrative rule that is applied retroactively will violate the APA "when to apply the new rule to past conduct or to prior events would work a manifest injustice") (internal quotation marks omitted).  Publicly declaring that Fragomen's clients would be subject to a prolonged mass audit because Fragomen offered to provide legal advice to its clients about the labor certification scheme at a time when Fragomen had no reason to consider such advice improper is a "manifest injustice" that demands correction by this Court.

   **C.    As Interpreted by DOL, Section 656.10(b)(2) Violates the First Amendment.**

   **1.    The Regulation, as interpreted, violates an employer's First Amendment right to counsel and an attorney's right to provide counsel.**

   "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000).  As discussed above, in *American Airways Charters*, the Court of Appeals held that conditioning a corporation's right to counsel on government approval "would trench on a right of constitutional dimension" and the court therefore refused to read a federal statute to authorize the agency to exercise that power over the regulated entity.  746 F.2d at 867, 873-74.  In discussing the constitutional nature of the right, the court relied on its earlier decision in *Martin*, where it held that private parties "have an undeniable [First Amendment] right to retain counsel to ascer-

tain their legal rights." *Id.* at 873 (quoting *Martin*, 686 F.2d at 32)) (emphasis in *American Airways Charters* omitted).[6]  Moreover, "the right to obtain legal advice does not depend on the purpose for which the advice is sought." *Denius*, 209 F.3d at 954.  Because the regulation, as interpreted by the Department, restricts employers' constitutionally protected "ability to consult with counsel on legal matters," *id.*, the regulation violates the First Amendment.[7]

 This constitutional right encompasses not only the obtaining of legal advice, but also communications between clients and their lawyers about factual matters that bear on the application of laws to a particular situation.  *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) (noting that the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice"; the Court further observed that "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts

---

[6] The *American Airways Charters* court also observed that "due process concerns [are] implicated in the asserted right to choose counsel without interference by officialdom."  746 F.2d at 872.  *See Powell v. Alabama*, 287 U.S. 45, 69 (1932) ("If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and therefore, of due process in the constitutional sense."); *Goldberg v. Kelly*, 397 U.S. 254, 270-71 (1970) (recognizing due process right to counsel in administrative proceeding); *Doe (Phillips) v. District of Columbia*, 697 F.2d 1115, 1119-20 (D.C. Cir. 1983) (recognizing that "every litigant has a powerful interest in being able to retain and consult freely with an attorney" without deciding whether that interest is protected by the Due Process Clause).

[7] Many other courts have likewise recognized that the First Amendment protects an individual right to consult counsel for legal advice. *See, e.g., Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 611 (9th Cir. 2005); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990); *Jacobs v. Schiffer*, 47 F. Supp. 2d 16, 22 (D.D.C. 1999) (holding that government's "attempt to require an employee to notify his agency employer and obtain permission before communicating any non-public information to his personal lawyer" constitutes a "prior restraint" on speech in violation of the First Amendment), *rev'd in part on other grounds*, 204 F.3d 259, 264-67 (D.C. Cir. 2000) (holding that government's position that it could require employee to obtain preclearance before disclosing information to his attorney was not substantially justified).

with an eye to the legally relevant."); *see also Martin*, 686 F.2d at 32 ("[T]he right to confer with counsel would be hollow if those consulting counsel could not speak freely about their legal problems" because "'sound legal advice … depends on the lawyer being fully informed by the client.'") (quoting *Upjohn*, 449 U.S. at 389). The regulation, as interpreted by the Department, fundamentally compromises the attorney-client relationship between the regulated entity and its counsel by prohibiting the employer from discussing with its counsel legal and factual matters that are central to the employer's compliance with the foreign labor certification scheme.

Moreover, the attorney enjoys a corresponding right in the attorney-client relationship that is infringed by the Department's restriction on the scope of its client consultation in the labor certification process. *See Milavetz, Gallop & Milavetz P.A. v. United States*, 355 B.R. 758, 765 (D. Minn. 2006) ("Attorneys have a First Amendment right … to advise and zealously represent their clients."); *cf. Zal v. Steppe*, 968 F.2d 924, 928 (9th Cir. 1992) ("Of course, it is the right of counsel for every litigant to press his claim.") (internal citation omitted).[8] The Department's prohibition on attorney-client communications in connection with labor certification applications thus violates Fragomen's rights both as an employer and as counsel for other employers.

Fragomen has standing to assert not just its own rights but those of its clients. *See, e.g., United States Dep't of Labor v. Triplett*, 494 U.S. 715, 720-21 (1990) (attorney had standing to assert his clients' Fifth Amendment right to counsel in challenging a Department of Labor re-

---

[8] In *NAACP v. Button*, 371 U.S. 415 (1963), the Supreme Court recognized that the First Amendment protects an attorney's right to associate with clients for the purpose of providing advice about their legal rights. The Court explained that the First Amendment "protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." *Id.* at 429. *See also In re Primus*, 436 U.S. 412, 426 n.17 (1978) (holding that lawyer's "conduct in meeting with [sterilized women on public assistance] to advise them of their legal rights" was protected by the First Amendment).

striction on lawyers' fees in black lung cases); *Caplin & Drysdale v. United States*, 491 U.S. 617, 623 n.3 (1989) (attorney had standing to assert clients' sixth-amendment right to counsel in challenging drug forfeiture statute's effect on clients' ability to retain counsel). Third-party standing has special application "in the First Amendment context," where "'litigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others … to refrain from constitutionally protected speech or expression.'" *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (quoting *Sec'y of Md. v. J.H. Munson Co.*, 467 U.S. 947, 956-57 (1984)) (permitting injured bookseller's challenge to statute impinging book-buyers' First Amendment rights). That rule applies here, where the Department has chilled employers in exercising their First Amendment right to consult counsel.

### 2.    The Regulation, as interpreted, discriminates based on viewpoint.

The Department's prohibition on employers' requesting that their attorneys advise them about the correctness of their preliminary assessment that a U.S. job applicant is qualified within the meaning of the regulations is a flagrant content-based restriction on speech. As such, it is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Moreover, the Department clearly has imposed that prohibition to suppress the employer's attorney from expressing the view that the employer's initial assessment was incorrect.[9] There is no other way to

---

[9] Such *ex ante* suppression of speech constitutes a governmental prior restraint on the First Amendment right to consult counsel for legal advice. *See Doe v. Gonzales*, 500 F. Supp. 2d 379, 397 (S.D.N.Y 2007) (finding that statutory provision barring recipient of National Security Letter from revealing receipt, 28 U.S.C. § 2709, "acts as a prior restraint because it … prohibits speech before it occurs," and invalidating provision under strict scrutiny); *Doe v. Gonzales*, 386 F. Supp. 2d 66, 74 (D. Conn. 2005) (same), *appeal dismissed as moot*, 449 F.3d 415, 420-21 (2d Cir. 2006) (refusing to vacate district court decision). *Cf. Alexander v. United States*, 509 U.S. 544, 550 (1993) ("The term prior restraint is used to describe administrative and judicial orders

(continued…)

explain the one-way ratchet the Department has created by prohibiting consultation when the employer preliminarily concludes that the applicant is qualified but permitting consultation when the employer reaches the opposite conclusion.[10]  The Department's position is akin to permitting a criminal attorney to advise her client to plead guilty, but forbidding her from advising the client to plead not guilty; or permitting a patent lawyer to advise a client that infringement has occurred, but forbidding the lawyer to advise about non-infringement.

The Department's attempt to maximize the number of U.S. job applicants whom the employer will deem qualified by suppressing an attorney's expression of a disfavored viewpoint is flatly unconstitutional.  As the Supreme Court has explained, "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828-29 (1995).  Indeed, "[v]iewpoint discrimination" is "an egregious form of content discrimination" from which the government "must abstain."  *Id.*  At a minimum, any regulation of speech on the basis of the viewpoint it expresses must withstand "strict scrutiny," *American Library Asss'n v. Reno*, 33 F.3d 78, 84 (D.C. Cir. 1994), under which the regulation can "survive constitutional review only if [it] promote[s] a 'compelling interest' and employ[s] 'the least restrictive means to further the articulated interest," *id* (quoting *Sable Comms. of Cal., Inc. v. FCC,*

---

*forbidding* certain communications in advance of the time that such communications are to occur.") (internal quotation and citation omitted) (emphasis in original).

[10] The Department's action to foreclose employers from obtaining advice that a U.S. applicant is unqualified also places attorneys in an untenable position with respect to their ethical obligations. It prevents them from providing their clients independent judgment and candid advice and from correcting their clients' misunderstanding of the law.  The Department's interpretation thus also impermissibly interferes with attorneys' ethical obligations to their clients.  *See* pp. 10-11, *supra.*

492 U.S. 115, 26 (1989). The Department's prohibition cannot withstand any scrutiny, much less strict scrutiny.

Whatever interest the Department will assert here, it cannot be compelling. The administrative record would not support any contention that the speech prohibition serves a compelling need to combat fraud. The Department has not identified a single case in which plaintiff has provided "improper[]" advice, *see* June 4 Information Paper (Compl. Ex. E), much less a pattern or practice of fraud. Nor has the Department offered any support for its assertion that "there is no legitimate reason to consult with immigration attorneys before hiring apparently qualified U.S. workers who have responded to recruitment required by the permanent labor certification program." *Id.* U.S. workers who are "apparently qualified" in the view of the employer are not necessarily qualified within the meaning of the technical regulations, which lawyers are most well-suited to interpret.

Although the government has an interest in preventing corruption of the certification program, that interest is indistinguishable from the government's interest in protecting the integrity of federal programs generally. Such a generalized interest is not the sort of interest that could justify content-based regulation of speech, let alone the suppression of disfavored viewpoints.[11] Indeed, as cases decided in this district illustrate, even when the government has a more particularized interest in restricting speech, such an interest has been found insufficient to justify suppressing that speech in the context of the attorney-client relationship. *See, e.g., Jacobs v. Schif-*

---

[11] The Department possesses a variety of tools to serve that generalized interest in protecting the integrity of its labor certification program, including the authority to refer to other government agencies cases of "possible fraud or willful misrepresentation." *See* 20 C.F.R. § 656.31. If the Department believes these tools to be inadequate, it must ask Congress for additional authority rather than arrogate to itself the authority to prohibit speech.

*fer*, 47 F. Supp. 2d 16, 22 (D.D.C. 1999) (holding that the government's "attempt to require an employee to notify his agency employer and obtain permission before communicating any non-public information to his personal lawyer" constitutes a "prior restraint" on speech in violation of the First Amendment), *rev'd in part on other grounds*, 204 F.3d 259, 264-67 (D.C. Cir. 2000).

Assuming that the Department's interest here is in protecting "qualified" domestic job applicants from overreaching or unscrupulous lawyers, the Department's prohibition on attorney-client communication is not narrowly tailored to serve that interest. The prohibition precludes more speech than necessary, including sound legal advice regarding the requirements of the labor certification regulations. Qualified domestic job applicants could be protected by a consultation restriction targeting attorney advice that is unethical or otherwise abusive, thereby curtailing scheming attorneys without compromising the "broader public interests in the observance of law" "promote[d]" by the First Amendment right to consult and receive good faith legal advice from an attorney. *Upjohn*, 449 U.S. at 389. The First Amendment simply does not permit the Department to invade the attorney-client relationship and prohibit a regulated entity from obtaining legal advice on the presumption that lawyers will act in bad-faith to assist their clients in violating the law.[12]

---

[12] The *Milavetz* decision is instructive. In that case, attorneys challenged a provision of the Bankruptcy Prevention and Consumer Protection Act (BPCA) preventing an attorney from advising a debtor client "to incur more debt in contemplation of a bankruptcy filing," 355 B.R. at 763. The court invalidated the BPCA provision as "a content-based regulation of attorney speech" because "it restricts attorneys from giving particular information and advice to their clients." *Id.* at 764. The court observed that the BPCA provision did not attempt to preclude "false statements" but rather "forbids truthful and possibly efficacious advice." *Id.*

**D.     The Regulation, as Interpreted, Impermissibly Conditions Receipt of a Government Benefit on Relinquishment of a First Amendment Right.**

The labor certification process entrusts certification that an alien may be hired for a permanent position to the Department's discretion.  Nevertheless, "governmental discretion is always constrained by the Constitution."  *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004).  To this end, the Supreme Court

> has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  Thus, "[u]nder the doctrine of 'unconstitutional conditions,' the government may not deny a benefit to a person on a basis that infringes the person's First Amendment rights."  *United States v. Caputo*, 517 F.3d 935, 939 (7th Cir. 2008); *see DKT Mem. Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 287 (D.C. Cir. 1989) (noting that *Perry v. Sindermann* forbade government "imposition of an 'unconstitutional' condition on the receipt of a benefit").

For example, in *Legal Services Corporation v. Velazquez*, 531 U.S. 533 (2001), the Supreme Court invalidated a provision of the Legal Services Corporation ("LSC") Act conditioning funding of legal services for indigent litigants on restriction of the types of claims participating attorneys could bring on the litigants' behalf.  *See id*. at 536-38.  Specifically, the provision "prohibit[ed] legal representation funded by recipients of LSC moneys if the representation involve[d] an effort to amend or otherwise challenge existing welfare law."  *Id*. at 536-37.  In effect, "the Government [sought] to use an existing medium of expression"—the attorney-client

relationship—to confer the benefits of legal representation while, at the same time, seeking "to control it, in a class of cases, in ways which distort[ed] its usual function." *Id.* at 543. Such distortion, the Court reasoned, was "inconsistent with the proposition that attorneys should present all the reasonable and well-grounded arguments necessary for proper resolution of the case" on behalf of their clients. *Id.* at 545. By seeking "to exclude from litigation those arguments and theories Congress finds unacceptable," Congress was imposing a condition that implicated "central First Amendment concerns." *Id.* at 546, 547.

The Court thus found that the greater power to deny a benefit did not include the lesser power to restrict the benefit in an unconstitutional way. Although "Congress was not required to fund an LSC attorney to represent indigent clients," through bestowal of this benefit, the government sought "to define the scope of the litigation it funds to exclude certain vital theories and ideas." *Id.* at 548. "The Constitution," the Court concluded, "does not permit the Government to confine litigants and their attorneys in this manner." *Id.*

As in *Velazquez*, the regulations governing the alien labor certification process "presume[] that private, nongovernmental speech," in the form of legal representation, "is necessary, and a substantial restriction is placed upon it." *Id.* at 544; *see* 20 C.F.R. § 656.10(b)(1) (acknowledging role of employers' attorneys "throughout the labor certification process"). Again, similar to *Velazquez*, the imposed "limitation forecloses advice or legal assistance to question" the government's preferred perspective, *Velazquez*, 531 U.S. at 544, namely, the conclusion that domestic job applicants may be "qualified" for a permanent position offered to an alien, *see* June 13 Bulletin. Indeed, "[r]estricting attorneys in advising their clients and presenting arguments and analyses … distorts … the traditional role of the attorneys." *Velazquez*, 531 U.S. at 544. By initiating an audit of certification applications filed by Fragomen because of a belief that the firm

may have afforded proscribed legal analyses to its clients, the Department has used Section 656.10(b) to condition certification approval on employers' and their attorneys' refraining from exercising their First Amendment rights to legal consultation. "Such interference with constitutional rights is impermissible." *Perry*, 408 U.S. at 597.[13]

### E.    As Interpreted and Enforced, Section 656.10(b)(2) Violates Fragomen's Fifth Amendment Due Process Right To Engage In Its Chosen Business.

The Department's 100% audit of Fragomen applications, initiated without notice and an opportunity to respond, also violated Fragomen's Fifth Amendment due process right to engage in its chosen business under clear precedent in this Circuit. In *Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003), the Court of Appeals explained that the Fifth Amendment protects a right to "follow a chosen profession free from unreasonable governmental interference," and held that "this 'liberty concept' protects corporations as well as individuals." *Id.* at 643 (citation omitted). The Court determined that this principle is implicated not only by formal government restrictions on the practice of a profession, but also by "government stigmatization that broadly precludes individuals or corporations from a chosen trade or business." *Id.* at 644; *see also id.* ("'[G]overnment action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests ... when that preclusion is either sufficiently formal or sufficiently broad.'") (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505 (D.C. Cir. 1995)). The government violates a corporation's Fifth Amendment due

---

[13]    "Under the related doctrine of 'retaliation,' the government may not impose burdens on persons in order to ... punish them [for] exercising protected constitutional rights." *Ramirez v. Arlequin*, 447 F.3d 19, 22 (1st Cir. 2006). The Department's retroactive application of its interpretation of Section 656.10(b)(2) to pre-existing certification applications filed by Fragomen in consultation with its clients is just such retaliatory deterrence of the exercise of a First Amendment right and further mandates the determination that the Department's action is unconstitutional.

process rights when its action harms the company's reputation and the "resulting stigma 'alter[s] [its] status in a tangible way.'" *Trifax*, 314 F.3d at 644 (quoting *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995)).

The Department's targeting of all Fragomen applications for audit violated Fragomen's due process rights under the standard set out in *Trifax*. By announcing a 100 percent audit of Fragomen cases while making no mention of other law firms, the Department caused immediate and debilitating injury to Fragomen's reputation, greatly hindering its ability to compete and threatening its continued practice of immigration law. Moreover, the Department took this action without providing any notice to Fragomen or an opportunity to defend itself. *See Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953 (D.C. Cir. 1980) (holding that Department of Defense denied contractor due process when it "effectively foreclosed [the contractor's] freedom to take advantage of other Government employment opportunities," by making a finding, without notice or an opportunity to respond, that appellant "lacked integrity"). The stigma created by the Department's 100% audit initiative has threatened Fragomen's very existence and thus violated its constitutionally protected "liberty to engage in its chosen business." *Trifax*, 314 F.3d at 642.

## II.    THE EQUITIES FAVOR PRELIMINARY INJUNCTIVE RELIEF.

Enforcement of Section 656.10(b), as interpreted, will cause Plaintiff harm for which there is no adequate remedy at law. The Department will not suffer significant injury if a preliminary injunction is issued, and the public interest favors such relief.

### A.    Plaintiff Will Suffer Irreparable Injury Absent Preliminary Relief.

First, as explained above, enforcement of Section 656.10(b)(2), as interpreted, violates the First Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74

(1976) (plurality opinion) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). As the Court of Appeals has explained, "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (quoting *Bronx Household of Faith v. Board of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003)). Because the Department's prohibition on attorney-client communications with respect to a U.S. applicant who the employer preliminarily believes is qualified "directly limits speech" necessary to the right to counsel, the harm it causes is both "irreparable" and "presumed." In any event, the loss of First Amendment rights here is demonstrated and concrete. As Fragomen has explained, the Department's prohibition already has disabled it from providing sound legal advice to clients in a wide range of circumstances in which the client needs assistance in navigating the complex certification process. *See* Patrick Decl. ¶ 57. A preliminary injunction is necessary to put a stop to the Department's egregious speech prohibition, an ongoing First Amendment violation for which there is no adequate legal remedy. *See, e.g., Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or inadequate.").[14]

Second, the singling-out of more than 2,000 labor certification applications filed by Fragomen on behalf of its employer clients for an audit under the Department's interpretation of Section 656.10(b)(2) portends serious intangible economic injuries, such as lost reputation and goodwill, that qualify as irreparable harm. *See, e.g., Danielson, supra*; *CSX Transp.*, 406 F.3d at 673-74 (relying on *Danielson* to find irreparable injury where "[i]t would be exceedingly specu-

---

[14] Moreover, damages are not available against the Department on account of its sovereign immunity.

lative ... to place a dollar figure on" the expected injury); *cf. Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 77-78 (D.D.C. 2001) (finding irreparable harm in threatened forced disclosure of customers' confidential information because "this development might well lead to a loss of trust and goodwill").[15]  Moreover, the sheer volume of the special audits poses the clear and imminent danger that Fragomen's clients will terminate their representation by the firm before Fragomen has an opportunity to establish its innocence, thereby threatening the survival of the firm's practice.  In fact, as a result of the Department's unlawful actions, Fragomen already has lost business from clients as well as opportunities to compete for new business.  Fragomen also has been hampered in responding to legitimate client inquiries for legal advice that clients need to navigate the PERM process.  Patrick Decl. ¶¶ 54-58.  The Department's unprecedented invasion of the attorney-client relationship should be enjoined immediately.

### B.    Preliminary Relief Will Not Harm the Department.

If enforcement of the Department's new interpretation of Section 656.10(b)(2) is enjoined pending resolution of the merits, the Department and domestic job applicants will suffer no substantial injury; indeed, the Department's resources will not be diverted from its existing programs.  An injunction would simply result in continuation of the attorney consultation process in effect for the past 25 years:  permitting consultations between the employer and its attorney regarding whether applicants are "qualified" within the meaning of the regulations while excluding the alien's attorney.  *See Rojas*, 87-INA-685.

---

[15]  The Department's actions have caused incalculable harm to the reputation for probity that Fragomen has maintained since 1951.  Fragomen has relied on that reputation to compete successfully in the market for immigration-related legal services.  The Department's actions have forced Fragomen to defend its reputation worldwide, in communications with clients, other leaders of the bar, and in the media.

**C.    The Public Interest Supports a Preliminary Injunction.**

First, the Department can claim no public interest in the enforcement of an unconstitutional regulation or policy. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional ordinance."); *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) (noting "there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties") (internal quotation omitted). Second, any "injury" to the public interest would be speculative given the lack of any evidence that immigration attorneys systematically assist employers seeking an alien labor certification in improperly finding recruited domestic job applicants "unqualified." Finally, enforcement of an interpretation of Section 656.10(b)(2) that restricts the employer's ability to solicit legal advice will undermine the "broader public interests in the observance of law" "promote[d]" by attorney provision of legal advice. *Upjohn*, 449 U.S. at 389.

## CONCLUSION

For the reasons stated above, the Court should enjoin Defendants from enforcing their interpretation of Section 656.10(b)(2) to restrict employers' rights to consult with counsel throughout the labor certification process pending adjudication of the merits of Plaintiff's claims. The Department should also be enjoined from further implementation of its policy of auditing 100 percent of all PERM applications filed by Fragomen on behalf of clients; from proceeding with the audits it previously initiated based on its unlawful interpretation of the PERM regulations; from further retaliating against Plaintiff through its enforcement powers based on Plaintiff's exercise of constitutionally protected rights; and from demanding that Plaintiff Fragomen or its clients provide privileged or confidential information about their attorney-client relationship in the course of the labor certification process.

40

Dated: August 8, 2008

COVINGTON & BURLING LLP

Thomas S. Williamson, Jr.
 D.C. Bar No. 217729
Jonathan L. Marcus
 D.C. Bar No. 451172
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 662-6000

Andrew A. Ruffino
(*Pro hac vice* application to be submitted)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000

*Of Counsel:*

Mark A. Grannis, D.C. Bar No. 429268
HARRIS, WILTSHIRE & GRANNIS LLP
1200 Eighteenth Street, N.W.
Washington, D.C. 20036
Tel: (202) 730-1300

Ira J. Kurzban
(*Pro hac vice* application to be submitted)
KURZBAN, KURZBAN, WEINGER
AND TETZELI, P.A.
2650 S.W. 27th Avenue
Miami, Florida 33133
Tel: (305) 444-3503

*Attorneys for Plaintiff*

41

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRAGOMEN, DEL REY, BERNSEN & LOEWY LLP, | ) ) ) ) | |
| Plaintiff, | ) ) | Civ. No. _____ |
| v. | ) ) | |
| ELAINE L. CHAO, Secretary of Labor, and the U.S. DEPARTMENT OF LABOR, | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF MICHAEL D. PATRICK

MICHAEL D. PATRICK declares pursuant to 28 U.S.C. § 1746:

1.    I am a partner in the law firm Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen"), the plaintiff in this action.   I respectfully submit this declaration to provide information to the Court in support of plaintiff's motion for a preliminary injunction.   This declaration is based on my personal knowledge and on information in the possession of my firm. Everything stated herein is true to the best of my knowledge, information, and belief.

A.    My Background

2.    I received my undergraduate degree from Syracuse University in 1975 and my law degree from Hofstra University Law School in 1978.  I am a member in good standing of the bar of the State of New York.

3.      Prior to joining Fragomen as a partner in 1990, I was a founding partner of Campbell, Patrick & Chin (1986-1990) and I served as a Special Assistant United States Attorney and Chief of the Immigration Unit of the United States Attorney's Office for the Southern District of New York (1981-1986), where I represented the Immigration and Naturalization Service, the State Department, the Department of Labor, and other federal agencies in the federal courts.  Prior to joining the U.S. Attorney's Office, I was an Assistant Corporation Counsel for The City of New York (1978-1981).

4.      At Fragomen, I am Co-Chair of the firm's Corporate Compliance Committee, General Counsel for Risk Management, and a member of the firm's Finance and Executive Committees.  My practice includes representing corporate clients and individuals in immigration-related audits and investigations.

5.      I am the author of a bimonthly immigration column in *The New York Law Journal* and a frequent speaker on immigration topics before bar associations, international trade organizations, and human resource groups.  I am also actively involved in the immigration bar, having served as Chair of the Federal Bar Association's Immigration Law Section (1989-1992), Chair of the New York Chapter of the American Immigration Lawyers Association ("AILA") (1993-94), Co-Chair of AILA's 1993 Mid-Year Program on Employment-Based Immigration, and a member of the Immigration and Nationality Law Committees of The Association of the Bar of the City of New York ("ABCNY") and the New York County Lawyers' Association.

6.      I currently serve as Co-Chair of the Committee on Immigration Litigation of the Commercial and Federal Litigation Section of the New York State Bar Association, and I serve on the International Security Affairs Committee (2007-2008) of the ABCNY.  I am also a member of the American Bar Association, the International Bar Association, the Federal Bar

- 2 -

Council (Trustee, 2007 – present), AILA, and the American Foreign Lawyers Association (Treasurer, 2004-2008). I received the Dean's Award for Distinguished Hofstra Law School Alumni in May 2000 and am listed in the current editions of Best Lawyers In America, SuperLawyers, Chambers USA: America's Leading Business Lawyers, and the International Who's Who of Corporate Immigration Lawyers.

B.    Background on Fragomen

7.    Fragomen is one of the nation's leading providers of business-related legal representation to corporate clients. Founded in 1951, Fragomen now has over 250 attorneys and over 1,000 professional immigration specialists and staff located in more than 30 offices in the Americas, Asia, and Europe. More than 200 Fragomen attorneys work in 15 offices across the United States, including in Washington, D.C. Fragomen works with its clients to facilitate the hiring and transfer of employees worldwide. Fragomen's comprehensive U.S. immigration and visa services include preparation of all temporary visa petitions and applications for permanent residence, immigration policy guidance, strategic planning advice, program support, and counseling and representation on compliance issues. As a provider of immigration-related legal services, Fragomen files many applications for permanent labor certification with the Department. In the last 12 months, Fragomen has filed more than 6,500 labor certification applications on behalf of its clients.

8.    Many Fragomen attorneys have previously served in key positions with government agencies involved with immigration, including Counsel to the Immigration Subcommittee of the U.S. House of Representatives; Director of Information for the American Immigration Lawyers' Association; Legal Advisor to the Advisory Opinion Office of the U.S.

Department of State; Counsel to the Department of Labor's Board of Alien Labor Certification Appeals; Chief of the Immigration Unit of the United States Attorney's Office for the Southern District of New York; District Counsel for the former Immigration and Naturalization Service; Assistant District Counsel and Acting Deputy District Counsel for the Immigration & Naturalization Service, New York District; Attorney Advisor for the New York Immigration Court; and District Adjudication Officer for the USCIS.

9.      Fragomen's reputation as the country's leading immigration law practice has been recognized in many publications, including (a) *The International Who's Who of Business Lawyers,* which has named Fragomen the Global Corporate Immigration Law Firm of the Year for the past four consecutive years; (b) *Best Lawyers in America*, which has ranked Fragomen as the number one firm in the United States in immigration law; and (c) *Chambers*, which gave Fragomen the highest possible ranking in the immigration category.

10.     In addition, as an employer with immigration issues like other employers, Fragomen is also a labor certification sponsor in its own right, and is a client of other immigration lawyers.

C.      Overview of the Labor Certification Process

11.     To remain competitive in the global marketplace, U.S. employers looking for the most qualified professionals to run their businesses sometimes find it advantageous to hire skilled foreign nationals for some positions.  Under Section 212(a)(5) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(5), U.S. employers may hire foreign nationals for a permanent position if they can obtain from the Department, after testing the U.S. labor market, a certification that there are not enough workers in the United States who are "able,

willing, qualified … and available" to fill the position, and thereafter obtain approval from the United States Citizenship and Immigration Services.

12.     To implement the statute, the Department has promulgated regulations that establish rules governing applications for such certifications, including rules for evaluating whether a U.S. applicant for a position is "qualified." Being "qualified" under the Department's regulations does not mean that the applicant is the best qualified person to do the job; in this regulatory context, it means that the applicant is "minimally qualified" to perform the functions of the job. The Department's regulations also provide that employers may be represented by counsel "throughout the labor certification process." 20 C.F.R. § 650.10(b)(1). Experienced and knowledgeable immigration attorneys help employers navigate and comply with this often confusing and complicated process.

13.     Under INA Section 212(a)(5), an employer who wishes to hire a foreign national for a permanent position must obtain a certification from the Secretary of Labor that there are not workers in the United States who are "able, willing, qualified … and available" for the position. This requirement has existed since 1965 (Pub. L. No. 89-236, 79 Stat. 911, Oct. 3, 1965).

14.     The Department has promulgated regulations, codified in Title 20 of the Code of Federal Regulations, to implement the statute. The regulations explain that employers must engage in recruitment efforts to test the U.S. labor market and determine whether any qualified workers are available for the position before they proceed with a labor certification application. The regulations address, among other issues, what types of recruitment measures must be undertaken, and what standards the employer must use to evaluate whether a U.S. applicant for a position is "qualified" for purposes of a labor certification.

15.    The regulations require employers to apply a meaning of "qualified" that differs substantially from the standards employers typically use when they decide whether actually to offer a job to an applicant.  For example, for labor certification purposes, an applicant is "qualified" if he or she meets the "**minimum**," objectively measurable requirements specified in an official job description, such as the required type of educational degree or the required minimum number of years of experience with a specific demonstrated skill.    20 C.F.R. § 656.17(i).  The labor certification standards focus on "minimum" ability to fill a position even though in normal business practice most companies are not looking to hire someone "minimally" competent, but rather look for the most qualified individual.

16.    Under the Department's labor certification regulations, during the recruitment process an employer may not list all of the educational and experience requirements that may be relevant for the position, absent a showing of unusual "business necessity."  The employer typically may only list those requirements that are established through a highly complex formula set forth in the Department's computerized database – O*Net – based on specifically defined job titles and vocational preference systems.  The formula used to determine the job requirements listed in the job posting must be described on the application submitted to the Department, and the Department views even the most minor typographical error on the form as a basis to deny the application.

17.    A U.S. worker who meets the bare minimum criteria for the position may be viewed as "qualified" even if his or her credentials are demonstrably inferior to the credentials of the foreign national the employer wishes to sponsor.  For example, if the U.S. applicant finished last in his class academically at a poorly regarded university and the foreign national finished first in his class at a prestigious university, but both received the same degree, this

would not be a basis for finding that the U.S. applicant is not "qualified" under the regulations for purposes of a degree requirement. Employers also must treat as "qualified" a U.S. applicant who does not yet have the minimum skills necessary for the position but could acquire them in a reasonable period of time through on-the-job training. 20 C.F.R. § 656.17(g)(2). The regulations do not provide explicit guidance as to what a "reasonable" period of on-the-job training would be. An employer also may not disqualify a worker who has a degree that is "equivalent" to the one required, or a degree in a substantially similar field.

18.    The labor certification process recognizes that there may be circumstances where a job applicant otherwise deemed minimally qualified under DOL regulations may be rejected because there are inherent job requirements. These requirements may take into account (for example) lack of trustworthiness, lack of proficiency in English, poor references, smoking, and demonstrable incompetence at the interview. But "inherent job requirements" generally may not take into account common characteristics such as work ethic, attitude, or personality. *See, e.g.,* BALCA DESKBOOK § 23.33.

19.    The labor certification process thus requires employers to apply complicated and unfamiliar criteria for evaluating applicants. It is often the case that an applicant who is "qualified" for purposes of this process is not a person the employer would be interested in hiring. It is also often the case that an applicant who is "qualified" under the procedure set forth in DOL regulations nevertheless may be rejected if an "inherent job requirement" is accepted by the DOL. Moreover, whether the applicant is "qualified" is only one of the many legal questions presented in the context of any given application. A job applicant must not only be "minimally qualified" for the position; he must also be "able, willing … and available" for the position.

D.    The Importance of Legal Advice in the Labor Certification Process

20.    Employers have a legitimate and important need for advice from counsel in order to understand, navigate, and fully comply with the requirements of the confusing labor certification process.

21.    The labor certification process was designed to test the employment market to determine whether a foreign national may be certified for permanent employment. **There is no requirement in the statute or the regulations that an employer hire U.S. workers, even if a U.S. applicant is determined to be "qualified."** During the recruitment process, if the employer determines that a U.S. worker who applies for the position is "qualified" and is "able, willing, … and available" under the criteria established by the regulations, the employer may – but is not required to – offer that worker the job.

22.    Because the decision about whether a given job applicant is "qualified" is governed not by normal considerations of suitability for hiring but instead by the dictates of the labor certification regulations, that decision ultimately is a specialized legal judgment rather than a normal hiring decision.  Employers therefore rely on their attorneys to assist them in getting their decisions right.  Immigration lawyers historically have advised their clients about matters such as: (1) whether the education and experience requirements and job description are consistent with the Department's complex formulas and regulations; (2) whether a job applicant, based upon his or her résumé, appears to meet the basic requirements for the position construed in light of the DOL regulations, and therefore must be contacted and possibly interviewed; (3) whether an applicant who appears minimally qualified under DOL regulations may be found ineligible subsequent to an interview because of inherent job requirements; (4) whether a job applicant's degree would be viewed by the DOL as equivalent to the degree sought by the

employer thereby making the applicant minimally qualified for the job; (5) whether DOL regulations and precedent would deem an applicant minimally qualified because he or she could receive on-the-job training; and (6) whether an applicant who appears to be "qualified" also meets the three other criteria required under the statute, *i.e.*, "able, willing, … and available."

23.    Employers also rely heavily on counsel to guide them through (among other matters) special requirements imposed by the regulations for applications by employers who have had layoffs, and strict timelines for the completion of required tasks, such as placing advertisements, interviewing applicants, and submitting applications that are not in conformance with normal business practices. In light of the strict timelines, it is typical for an employer to get legal advice throughout the recruitment process.

24.    An employer may appeal an adverse determination by the Department on a particular labor certification application to the Board of Labor Certification Appeals ("BALCA"). Even BALCA, the Department's own administrative court, has confirmed in decisions issued during the last 20 years that employers have a right to consult with their counsel in navigating the labor certification process. This view has also been embraced repeatedly in official Department guidance documents, and has long been understood by experienced labor certification practitioners.

25.    For example, BALCA recently described PERM as "an exacting process, and unforgiving of mistakes in filling out the application or misunderstandings about the regulatory requirements." *In re Robinson*, 2007-PER-00084 (BALCA 2007). In that case, BALCA expressly advised an employer that, "[g]iven the legal requirements of the labor certification process, [the employer] might consider engaging an immigration attorney to assist her in understanding and complying with the regulations." *Id.*

E.    The PERM Program

26.    On May 6, 2002, the Department issued a Notice of Proposed Rulemaking in which it proposed a new system to expedite the processing of labor certification applications: Program Electronic Review Management or "PERM." *See* 67 Fed. Reg. 30466 (May 6, 2002) (the "PERM Notice"). Under the regulations proposed in the PERM Notice, applications for a labor certification would be filed electronically with an attestation by the employer that it complied with the Department's recruitment requirements but without physically attaching voluminous supporting documentation. The requirements for the labor certification process, however, became even more complex. Traditional issues regarding the permissible range of experience and education for a "qualified" worker remained in force. Legal criteria involving when a job was "unduly restrictive," involved dual occupations, or could be justified by "business necessity" remained. The determination of alternate job requirements and when a candidate could be considered for on-the-job training similarly remained in force. So too, did the legal determination of when an applicant would be considered "minimally qualified" and when resumes had to be reviewed and considered by the employer.

27.    The PERM process, however, added a new layer of complexity by requiring a complicated formula for various submissions to the Department, new deadlines for pre-recruitment efforts, different formulas for advertising and recruitment, and a complex computerized system for determining the appropriate experience and education for a particular position. Even the submission of PERM's electronic application requires the involvement of legal counsel – the Department has taken the position that a typographical error or an inadvertent omission in the application is sufficient to invalidate it, thereby wasting months of expensive prescribed recruitment efforts.

28.    After filing, the Department retained the authority to select some cases for "audit":

> After an application … has been determined to be acceptable for filing, a computer system will review the application based upon various selection criteria that will allow more problematic applications to be identified for audit. Additionally, we anticipate that some applications will be randomly selected for an audit without regard to the results of the computer analysis as a quality control measure.

PERM Notice, 67 Fed. Reg. at 30467.  In the event of an audit, the employer would submit materials supporting the application, and the Department would evaluate the application on the merits.

29.    Although the primary objective of PERM and the audit system was to streamline the application process by eliminating the need to review extensive documentation for each and every application, the audit process could easily undermine any streamlining.  One unintended consequence of this system was to open an enormous gap in the processing times for labor certification applications, depending upon whether the application was selected for audit or not.  The PERM Notice stated the Department's expectation that applications not selected for audit generally would be processed within 21 days.  67 Fed. Reg. at 30467.  However, if an application is selected for audit, the timetable slows down dramatically.  In actual practice under the PERM system, applications that are designated for audit frequently take longer than a year to process.  At a July 15, 2008 "Stakeholders" public meeting, the Department announced that it was "currently working on audited cases with priority dates of March 2007," thus recognizing a minimum 16-month delay.  Accordingly, although the designation of a particular application for audit was intended as an administrative safeguard to ensure that employers' attestations were

true and correct, under current practice an audit designation effectively puts an application into limbo for a protracted period of time.

30.    The additional delay caused by an audit may result in the foreign national's exhausting the maximum duration of non-immigrant status, and may cause the employer to lose a critical employee. The delay may also create other difficulties. For example, it may be important for the employee to have permanent resident status to travel internationally or to acquire a security clearance. In some cases, the foreign national must become a permanent resident to sponsor a spouse or to secure permanent residence for a child. PERM processing delays may also force the employer to incur additional expenses to secure extensions and visas for the foreign national abroad.

F.    The Department's Restriction Denying the Right to Counsel

31.    Fragomen has been advising its clients about the PERM process since the program's inception in 2005. In some cases, some Fragomen lawyers have prepared forms for clients to use to document their evaluations of job applicants who respond to the mandatory recruitment effort that precedes the filing of a PERM application. Fragomen voluntarily produced three such forms, copies of which are attached hereto as Exhibits A, B, and C, in response to routine DOL audits of labor certification applications. These three forms are not identical, but each contains a statement advising clients to call their Fragomen lawyer if the recruitment process produces a job applicant who appears to the client to be "qualified." Such consultation permits Fragomen and the client representative to discuss the applicant's qualifications in light of the governing law on the meaning of "qualified" for labor certification purposes, as well as the other legal standards ("able, willing, … and available"), BALCA

precedent decisions, DOL memoranda, and other guidance from DOL, and to discuss possible next steps under the law.

32.     On or about May 7, 2008, a meeting took place at the Department in Washington, D.C., at the request of the Department, between representatives of the Department and some attorneys from our firm. At that meeting, representatives of the Department produced copies of Exhibits A, B, and C (without prior notice) and asked the Fragomen attorneys what they "made of this." The Department expressed concern that these papers suggested Fragomen had engaged in a "pattern or practice" of unlawful behavior by communicating with clients who believed they had found qualified U.S. job applicants.

33.     At a second meeting held at the Department on May 19, 2008, which I personally attended, the Solicitor of the Department told representatives of our firm that he could not understand why an employer would want or need to speak with an attorney after forming an opinion that a U.S. job applicant was "qualified" for purposes of the labor certification process.

34.     A third meeting with the Department regarding Exhibits A, B, and C was scheduled for Friday, June 6, 2008. However, on June 2 – several days prior to the scheduled meeting – the Department issued a press release (the "June 2 Press Release") announcing that it had begun to audit all permanent labor certification applications filed by Fragomen on behalf of all of the firm's clients. The release further stated that the Department was taking this action because it had "information indicating that in at least some cases the firm improperly instructed clients who filed permanent labor certification applications to contact their attorney before hiring apparently qualified U.S. workers." A copy of the June 2 Press Release, obtained from the Department's web site, is attached as Exhibit D.

35.    The June 2 Press Release also announced a new and textually implausible interpretation of the Department's regulations on the role of counsel in the labor certification process:

> The department's regulations **specifically prohibit an employer's immigration attorney or agent from participating in considering the qualifications of U.S. workers** who apply for positions for which certification is sought, unless the attorney is normally involved in the employer's routine hiring process. Where an employer does not normally involve immigration attorneys in its hiring process, there is **no legitimate reason to consult with immigration attorneys** before hiring apparently qualified U.S. workers who have responded to recruitment required by the permanent labor certification program.

Exhibit D (emphasis added). This statement flatly contradicted the express assurance in section 656.10(b)(1) that employers may be represented by counsel "throughout the labor certification process," as well as years of BALCA decisions and other agency guidance on the role of attorneys in that process. There was no basis whatsoever for the Department's assertion that the need to resolve a live question of immigration law does not constitute a "legitimate reason to consult with an immigration attorney."

36.    The Department declared its intention to audit all 2,500+ cases filed by Fragomen without any individualized determinations as to whether particular applications filed on behalf of particular clients or by particular Fragomen attorneys involved a use of the forms to which the Department objects.

37.    In its press release, the Department singled out Fragomen, and therefore also the employers Fragomen represents, even though the Department was purporting to announce a rule of general applicability for PERM applications, and even though it was challenging settled practices and understandings that are widely shared in the immigration bar.

The injurious effects of the Department's unlawful conduct thus have disproportionately damaged our firm's business operations and professional standing.

G.    The June 4 Information Paper

38.    Just one day later, in response to an outcry from stunned employers and members of the immigration bar, the Department issued an "Information Paper."    (The Information Paper was released on June 3, but was dated June 4, so it will be referred to herein as the "June 4 Information Paper.")    This document set forth answers to what the Department claimed were "Frequently Asked Questions" about the June 2 Press Release.    The June 4 Information Paper included the following statement (emphasis added):

> The Department's **regulations specifically prohibit an employer's immigration attorney or agent** from participating in considering the qualifications of U.S. workers who apply for positions for which certification is sought, unless the attorney is normally involved in the employer's routine hiring process.    Where an employer does not normally involve immigration attorneys in its hiring process, there is **no legitimate reason to consult with immigration attorneys** before hiring apparently qualified U.S. workers who have responded to recruitment required by the permanent labor certification program.    The Department's rule safeguards against the use of attorneys to find reasons not to hire U.S. workers that the employer would, but for the attorney's involvement, deem qualified.    **The rule applies only to consideration of particular applicants, and does not bar employers from seeking general advice on the meaning of "qualified" in the context of a labor certification application.**

A copy of this June 4 Information Paper, obtained from the Department's web site, is attached hereto as Exhibit E.

39.    The June 4 Information Paper recited some of the same misstatements of the law that were contained in the June 2 Press Release.    The Information Paper added the new

assertion that attorneys may provide "general advice" to an employer about the meaning of the term "qualified" under the PERM regulations, but are forbidden from advising on whether the facts and credentials presented by any "particular applicant" meet the legal criteria under the Department's regulations for being "qualified." This pronouncement thus purported to regulate the content and timing of the legal advice that attorneys could provide to employer clients during the PERM process. This rule, like the rule announced in the June 2 Press Release, lacked any support in the regulations or the authorizing statute, and was contrary to established practice and past agency guidance.

H.    The June 13 Program Guidance Bulletin

      40.    A bit more than a week later, on Friday, June 13, 2008, the Department changed course again when it released a PERM Program Guidance Bulletin (the "June 13 Bulletin") entitled "Clarification of Scope of Consideration Rule in 20 CFR 656.10(b)(2)." A copy of the June 13 Bulletin, obtained from the Department's web site, is attached as Exhibit F. While the June 4 Information Paper purported to ban all attorney-client consultations about whether "particular applicants" are "qualified" under the regulations, the June 13 Bulletin announced an overtly viewpoint-based restriction on attorney-client communications. The June 13 Bulletin states, in pertinent part:

> After an employer evaluates a U.S. worker and concludes that the worker is **unqualified, the employer may seek the advice** of its attorney or agent to ensure that its reasons for rejecting the U.S. worker are lawful, and the attorney or agent may review the qualifications of the U.S. worker to the extent necessary to provide that advice. By contrast, if an employer evaluates a U.S. worker and determines that the worker is **minimally qualified, the attorney, agent, or foreign worker may not thereafter consider**

- 16 -

> ***the applicants' qualifications*** and attempt to substitute his or her
> own judgment for that of the employer.

Exhibit F (emphasis added).  This interpretation prohibits an attorney from offering his or her

legal opinion of whether the employer has properly applied the criteria in the regulations

concerning the meaning of "qualified," but only if the employer's initial assessment is that the

applicant is qualified.  If the employer makes the opposite initial assessment, the employer has a

protected right to receive legal advice on precisely the same issue.

  41. In other words, under the Department's view of its regulatory power, if an

employer's hiring manager concludes tentatively that a given applicant may be "minimally

qualified" under the Department's peculiar and counter-intuitive meaning of the word, he may

*not* consult with his lawyer to determine whether he is applying the law correctly.

  42. The June 13 Bulletin also ignored essential elements of the statute upon

which the Department's authority is based.  Under the statute, the test for a labor certification

turns on whether there are U.S. workers who are "able, willing, qualified … and available" for

the position.  8 U.S.C. § 1182(a)(5).  But the June 13 Bulletin stated: "In the Department's view,

an employer's determination that a U.S. worker is minimally qualified for a position constitutes

clear evidence that there are U.S. workers who are able, willing, qualified and available for the

work to be undertaken."  Thus, the June 13 Bulletin sought to stifle any further attorney-client

consultation about whether the labor certification can still be pursued after there is a preliminary

assessment by the employer that an applicant is "qualified," without regard to whether the

applicant also is "able, willing, … and available" for the position.

  43. The June 13 Bulletin also decreed that attorneys for an employer may not

conduct any preliminary screening of résumés received by an employer in connection with a

PERM recruitment process. According to the Department, at the time résumés initially are received, attorneys are forbidden from giving advice to their clients about whether particular applicants may be "qualified" within the meaning of the regulations. Through this interpretation, the Department attempted to dictate at what point and in what form the employer obtains legal advice, and to prohibit attorney-client communication about the application of immigration law rules to particular facts.

44.     The Department's prohibitions on attorney consultation in the context of résumé screening, like the other new restrictions announced in the June 2 Press Release and the June 4 Information Paper, find no support in the text of section 656.10(b) or in the Immigration and Nationality Act.

I.     The Department's Demands for Information

45.     The Department also sought to impinge on the attorney-client relationship by sending correspondence demanding that Fragomen reveal information about whether lawyers or paralegals in the various Fragomen U.S. offices have advised their clients on the screening of résumés in PERM cases. Fragomen has objected to these inquiries, pointing out that the Department's request effectively asks Fragomen to violate its ethical obligations to its clients. The Department has threatened to institute debarment proceedings or impose other sanctions on Fragomen if it fails to comply with the Department's improper requests.

J.     The July 16 Agreement and the Certification

46.     The Department's actions posed catastrophic risks to Fragomen's business, and a risk of serious disruptions to its clients' ongoing business affairs. Because of those risks, Fragomen was compelled to enter into an agreement with the Department that

became effective on July 16, 2008 (the "July 16 Agreement"). In order to obtain the Department's assurance that it would satisfy itself with auditing the 2,500+ cases already under the shadow of the June 2 Press Release, and would not automatically audit all future Fragomen cases, Fragomen was required to promise the Department that it would comply with the unlawful regulatory constraints announced in the June 13 Bulletin until such time as a court determines the issues raised by the Department's actions. A copy of the July 16 Agreement between Fragomen and the Department is attached as Exhibit G.

47.    In addition, on July 31, 2008, the Department approved a form of "Certification" that Fragomen clients may submit in an effort to remove some of their cases from the Department's 2,500+ Fragomen special audits. A copy of the approved Certification form is attached hereto as Exhibit H. The Certification requires employers to attest, among things, that in the course of recruitment for their PERM applications, they did not have any of the types of consultations with Fragomen attorneys that are now viewed as prohibited. The Certification, like the July 16 Agreement, reflects the Department's continuing insistence that labor certification applications adhere to the restrictions that plaintiff herein is challenging as unlawful.

K.    The Department Seeks to Prevent Lawyers from Fulfilling Important Ethical Obligations

48.    The Department's actions also constitute an unwarranted and inappropriate interference with the ethical duties imposed on attorneys by professional responsibility rules.

49.    Lawyers owe their clients independent judgment and candid advice. *See, e.g.,* D.C. Rules of Professional Conduct, Rule 2.1. By purporting to authorize lawyers to give only one of two possible answers to a client's inquiries, the Department's rules force Fragomen

and other lawyers to choose between discharging their professional responsibilities and complying with the Department's spurious rules.

50.     Lawyers have a duty to represent their clients zealously and diligently within the bounds of the law; they may not fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules. *See, e.g.,* D.C. Rules of Professional Conduct, Rule 1.3. If a lawyer knows that his client is legally permitted to pursue his lawful objectives, but the client mistakenly believes otherwise, the lawyer has an obligation to make sure the client understands his rights under the law. Deferring to a lay client's unschooled and possibly erroneous view is inconsistent with these obligations. The Department's new constraints on the attorney-client relationship thus place Fragomen lawyers and other ethical attorneys on the horns of a dilemma. The Department's restrictions seek to forbid attorneys from doing what professional responsibility rules obligate them to do.

51.     Lawyers have a duty to explain legal matters to their clients to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. *See, e.g.,* D.C. Rules of Professional Conduct, Rule 1.4. An attorney's communication with his client must be comprehensive, to ensure that decisions of the client are made only after the client has been informed of all relevant considerations. As Comment 2 to D.C. Rule 1.4 states, "A client is entitled to whatever information the client wishes about all aspects of the subject matter of the representation ...." *Id.* If enforced, the Department's new edicts would prohibit an employer's attorney from informing the employer that his lay opinion on worker qualification under the regulations is legally incorrect. Such a ban necessarily would condemn clients to make legal decisions in ignorance of the legal rules about which they expect to receive advice from counsel.

L.    Aftermath of the Department's Unlawful Actions

52.    The Department's unreasonable and unlawful actions have sparked an outcry among members of the immigration bar and informed commentators.  For example:

(a)    The American Immigration Lawyers' Association ("AILA") – the leading bar association for U.S. immigration lawyers – stated in a communication to the Secretary:  "Contrary to the implication in the [the Department's announcements], attorneys are permitted to do more than simply provide general information on the meaning of 'qualified.'  An intrinsic part of the right to counsel is the right to receive advice on the application of the law to specific facts.  DOL cannot change this right to counsel, ingrained through decades of practice in the presence of the same regulatory language, via press release."  Letter from AILA to Secretary of Labor Elaine L. Chao, June 4, 2008, available at http://www.aila.org/content/default. aspx?docid+25594.

(b)    Two prominent immigration practitioners, in an article analyzing the Department's actions, asked incredulously:  "What sins have the firm's attorneys allegedly committed that warrant such drastic administrative action?  According to the DOL, some lawyers at the firm, heaven forbid, wrote to their clients and instructed them to consult with counsel during a key phase of the labor certification recruitment process."  Angelo A. Paparelli & Ted J. Chiappari, "U.S. Labor Department to Immigration Lawyers:  You're All Just Potted Plants," NATIONAL LAW JOURNAL, June 23, 2008, available at http://www.entertheusa.com/publications/ 0807_article_pottedplants.pdf.

(c)    *The American Lawyer* had similar difficulty understanding the Department's position:  "Is it really possible that a company could be violating federal law if it consults its lawyers about a hiring decision?  As bizarre as it sounds, that's the position the U.S.

Department of Labor is taking in a recent action targeting the nation's largest corporate immigration firm, Fragomen, Del Rey, Bernsen & Loewy." Susan Beck, "FOOTNOTE: The Legal Details Behind the News," AMERICAN LAWYER DAILY, June 10, 2008, available at http://amlawdaily.typepad.com/amlawdaily/2008/06/post.html.

(d)     A column in an influential immigration publication explained: "The ... DOL documents are replete with misstatements, misconstructions and outright whoppers. ... The PERM rule at 20 CFR 656.10(b)(2)(i) says attorneys may not 'interview or consider' US workers, it does NOT (and cannot) prohibit attorneys from counseling employers about the proper legal procedure and standards to apply to particular applicants." Comment, "DOL Puts Foot in Mouth," IMMIGRATION DAILY, June 5, 2008, available at http://www.ilw.com/immigdaily/digest/2008,0605.shtm#comment. This column also explained how the Department's actions are likely to frustrate the very political objectives that apparently motivated its recent actions: "If DOL harasses large employers enough, they will simply move the jobs overseas. Far from ensuring that American workers have access to jobs, DOL's actions, if continued along this trajectory, will only ensure that American jobs are destroyed. Moving the jobs overseas will be an inconvenience for large employers for sure, but the impact on the lives of US workers will be catastrophic." *Id.*

M.     Plaintiff Faces Serious, Immediate, Irreparable Harm

53.     Fragomen has an urgent need for prompt injunctive relief.

54.     The Department's unlawful interpretation of the Regulation, and the 100 percent audit policy it has applied based on its unlawful interpretation to applications handled by

Fragomen, have irreparably harmed Fragomen by thwarting its ability to continue providing key services to its clients, and to do business as an immigration law firm.

55.     The Department's actions have had serious, immediate consequences for Fragomen because Fragomen has been singled out, increasing the likelihood that Fragomen clients will leave the firm and take their business to other law firms, despite the fact that Fragomen's actions are not only consistent with the actions of thousands of immigration lawyers across the country, but also have been squarely within the decades-old boundaries of accepted Labor Certification (now PERM) employer conduct.  The harm Fragomen faces is irreparable because of the deprivation of its First Amendment rights and its lost opportunities to provide fully informed legal advice to its clients.  In addition, because of the extraordinary volume of applications (more than 2,500) that the Department has deemed subject to its sweeping audit, it is not inconceivable that the firm could be put out of business before it even has a chance to demonstrate that it committed no improper conduct, and to present its statutory and constitutional arguments to an appropriate adjudicator.

56.     As a result of the Department's unlawful actions, Fragomen has lost business from clients as well as opportunities to compete for new business.  Since 1951, Fragomen has enjoyed a reputation as a highly ethical firm with a compliance orientation as a differentiator in the marketplace.  The firm's reputation has been sullied worldwide by the Department's press release and additional publicity.

57.     The Department's actions also have jeopardized the ability of Fragomen's clients to continue realizing the important contributions that foreign national employees make to the success of their businesses.  In the brief period since the Department announced its new interpretation, Fragomen has already been severely hampered in responding to legitimate client

inquiries.  In one case, an employer conducting PERM recruitment interviewed a U.S. applicant who could not start working for several months.  The employer inquired whether the applicant was considered "available" under the regulations, but Fragomen was prevented from providing complete advice based on the Department's new interpretation.  In another case, an employer interviewed a U.S. applicant who did freelance work and planned to continue such work if hired by the employer.  The employer did not allow freelance work, and wanted to know whether he should nonetheless consider the U.S. applicant.  Fragomen could not provide complete advice under the Department's new interpretation.  In a third case, a U.S. applicant worked for a client of an employer, and the employer requested guidance about balancing agreements with clients not to poach employees against labor certification considerations.  Fragomen could not provide a complete response under the Department's new interpretation.  In these situations, and in countless others that will undoubtedly arise, Fragomen's clients are prevented from receiving the detailed legal advice that they need to navigate the PERM process.

58.    Fragomen and its clients face an immediate loss of the constitutional right to counsel.  In addition, PERM applications filed by Fragomen and many Fragomen clients have been put into protracted limbo as a result of the new interpretation.  Fragomen and its clients face uncertainty, business injury, and competitive disadvantage as a result of the Department's actions with respect to pending PERM applications.

59.    In addition, restrictions on the ability of private plaintiffs to recover monetary damages from government agencies leave Fragomen without an adequate remedy at law.

60.    The Department's actions have thrust on Fragomen and Fragomen clients, other immigration law firms, and other employers an immediate dilemma to choose between

complying with newly imposed, overly intrusive restrictions or risking serious penalties for violation of the Department's edicts.

61.    The Department has indicated that it may seek debarment remedies against the firm's attorneys and the firm based on the Department's belief that Fragomen did not previously act consistently with the Department's new interpretation of the Regulation.  The Department's regulations purport to authorize the Department to institute debarment without any pre-deprivation hearing.  *See*  20 C.F.R. § 656.31(f)(2).

62.    The Department has threatened to institute debarment proceedings or impose other sanctions on Fragomen if it fails to comply with the Department's improper requests for information about Fragomen's confidential communications and dealings with its clients.

**[Remainder of page intentionally left blank.]**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of August 2008

Michael D. Patrick

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRAGOMEN, DEL REY, BERNSEN & LOEWY LLP, )<br><br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ELAINE L. CHAO, Secretary of Labor, )<br>and the U.S. DEPARTMENT OF LABOR, )<br>)<br>Defendants. )<br>) | Civ. No. _____ |

## PROPOSED ORDER

This matter coming upon to be heard on Plaintiff Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen")'s motion for preliminary injunction dated August 8, 2008, the Court having held hearings on said motion on _____, 2008, the Court having considered the submissions of the parties, and due notice having been given

IT IS HEREBY ORDERED as follows pursuant to Federal Rule of Civil Procedure 65(d):

1.    Plaintiff's motion for a preliminary motion is GRANTED;

2.    Pending a final disposition of this action, Defendants are hereby barred from:

- 2 -

a.  Enforcing 20 C.F.R. § 656.10(b) (the "Regulation") to prohibit employers from consulting with attorneys concerning any aspect of the labor certification process, including whether particular workers who apply for positions in the alien labor certification recruitment process are "qualified" for the position within the meaning of the governing regulations;

b.  Enforcing the Regulation to prohibit attorneys from communicating with their employer clients at the time résumés or applications are received about whether applicants may be "qualified" for the position within the meaning of the governing regulations;

c.  Enforcing the interpretations outlined in the June 2 Press Release (attached to the Complaint as Exhibit D), the June 4 Information Paper (attached to the Complaint as Exhibit E), and the June 13 Bulletin (attached to the Complaint as Exhibit F) as to the permissible role of attorneys for employers in the labor certification process;

d.  Enforcing new restrictions directed at the role of attorneys for employers in the labor certification process without following the notice and comment rulemaking procedures set forth in the Administrative Procedure Act;

e.  Retaliating against Fragomen or its clients through its enforcement powers based on their exercise of constitutionally protected rights;

- 3 -

   f.  Auditing PERM applications of Fragomen's clients based upon the Department's view of the attorney-client relationship outlined in the Department's June 2 Press Release, the June 4 Information Paper, and the June 13 Bulletin;

   g.  Auditing PERM applications specifically on the basis of Fragomen's appearance as counsel for the employer; and

   h.  Demanding that Fragomen or its clients provide confidential information about their attorney-client relationship in the course of the labor certification process.

Dated: _____, 2008

_____
                       U.S.D.J.

- 4 -

To:

Gregory F. Jacob, Esq.
Solicitor of Labor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210

Jeffrey A. Taylor, Esq.
U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530

Michael B. Mukasey, Esq.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530