particular applications submitted by Plaintiff.  The audits of the three applications resulted in the

# Exhibit A

**U.S. Department of Labor Employment and Training Administration**
**Office of Foreign Labor Certification**
**August 29, 2008**

**Restatement of PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 CFR § 656.10(b)(2)**

*The Department of Labor recently issued the following documents on the topic of attorney/agent consideration of U.S. workers under the permanent labor certification program: 1) Press Release, titled "U.S. Department of Labor auditing all permanent labor certification applications filed by major immigration law firm," June 2, 2008; 2) Information Paper titled "Frequently asked questions on audit of permanent labor certification applications filed by attorneys at Fragomen, Del Rey, Bernsen & Loewy LLP," June 4, 2008; and 3) PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 CFR § 656.10(b)(2), June 13, 2008 (collectively, the "Consideration Guidance Documents"). The Consideration Guidance Documents set forth the Department's interpretation of 20 CFR § 656.10(b)(2) – in particular, with respect to the role an attorney may play in the employer's recruitment and hiring process. The Department acknowledges that employers often require counsel when applying for permanent labor certification. However, the Department must also ensure that the employer's recruitment and hiring processes are conducted in good faith, in accordance with the permanent labor certification program's statutory and regulatory requirements. Since issuing the Consideration Guidance Documents, the Department has received considerable feedback from employers and employer representatives, including attorneys and agents, that regularly practice in or make use of the PERM Program. After consideration of these comments and suggestions, the Department has decided to issue the following Restatement of the PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 CFR § 656.10(b)(2), which will supersede the Consideration Guidance Documents.*

The Department of Labor has a statutory responsibility to ensure that no foreign worker (or "alien") is admitted for permanent residence based upon an offer of employment absent a finding that there are not sufficient U.S. workers who are able, willing, qualified and available for the work to be undertaken and that the admission of such worker will not adversely affect the wages and working conditions of U.S. workers similarly employed. 8 U.S.C. § 1182(a)(5)(A)(i). The Department fulfills this responsibility by determining the availability of qualified U.S. workers before approving a permanent labor certification application and by ensuring that U.S. workers are fairly considered for all job opportunities that are the subject of a permanent labor certification application. Accordingly, the Department relies on employers who file labor certification applications to recruit and consider U.S. workers in good faith, even where the employer already has a temporarily-admitted foreign national working for the employer.

The Department has long held the view that good faith recruitment requires that an employer's process for considering U.S. workers who respond to certification-related recruitment closely resemble the employer's normal consideration process. In most

situations, that normal hiring process does not involve a role for an attorney or agent (as defined in 20 C.F.R. § 656.3) in assessing the qualifications of applicants to fill the employer's position. It also does not involve any role for the foreign worker or foreign national in any aspect of the consideration process. However, given that the permanent labor certification program imposes recruitment standards on the employer that may deviate from the employer's normal standards of evaluation, the Department understands and appreciates the legitimate role attorneys and agents play in the permanent labor certification process. Additionally, the Department respects the right of employers to consult with their attorney(s) or agent(s) during that process to ensure that they are complying with all applicable legal requirements.

By prohibiting attorneys, agents, and foreign workers from interviewing and considering U.S. workers during the permanent labor certification process, as described in 20 C.F.R. § 656.10 (b)(2)(i) and (ii), the Department does not thereby prohibit attorneys and agents from performing the analyses necessary to counsel their clients on legal questions that may arise with respect to this process. The employer, and not the attorney or agent, must be the first to review an application for employment, and must determine whether a U.S. applicant's qualifications meet the minimum requirements for the position, unless the attorney or agent is the representative of the employer who routinely performs this function for positions for which labor certifications are not filed. By requiring that initial reviews of and final determinations on all applications are made by the employer, the Department seeks to ensure that the consideration process is as close to the employer's non-immigration-related hiring process as possible and that U.S. workers receive full and fair consideration by the employer for the job. Attorneys (and, to the extent it is consistent with state rules governing the practice of law, agents) may, however, provide advice throughout the consideration process on any and all legal questions concerning compliance with governing statutes, regulations, and policies.

More specifically, the types of actions prohibited by 20 C.F.R. § 656.10(b)(2)(i) and (ii) include:

- Attorneys and agents may receive resumes and applications of U.S. workers who respond to the employer's recruitment efforts; however, they may not conduct any preliminary screening of applications before the employer does so, other than routine clerical or ministerial organizing of resumes which does not include any assessment of, or comments on, the qualifications of any applicants, unless the attorney or agent is the representative of the employer who routinely performs this function for positions for which labor certifications are not filed. The attorney or agent may not withhold from the employer any resumes or applications that it receives from U.S. workers.

- Attorneys and agents may not participate in the interviewing of U.S. worker applicants, unless the attorney or agent is the representative of the employer who routinely performs this function for positions for which labor certifications are not filed. Such involvement has resulted in an impermissible "chilling effect" on the interests of U.S. worker-applicants in the position.

Where the Department finds evidence of potentially improper attorney, agent, or foreign worker involvement in considering U.S. worker applicants, the Department will audit, and may subsequently require supervised recruitment, for those applications to determine whether the employer's recruitment and hiring processes were conducted in good faith and to ensure adherence to all statutory and regulatory requirements.  In evaluating a labor certification application, the Department will look carefully at the manner in which the employer reached its determination that there are no qualified, available, able and willing U.S. workers, including scrutinizing the manner in which the decision was made and whether or not the employer deviated from its normal course of business in evaluating the qualifications of U.S. applicants.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRAGOMEN, DEL REY, BERNSEN<br>& LOEWY, LLP )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ELAINE L. CHAO, Secretary of Labor,<br>and the U.S. Department of Labor, )<br>)<br>Defendants. ) | Civil No. 1:08cv01387 (RMU) |

DECLARATION OF WILLIAM CARLSON

I, William Carlson, declare and state, upon information and belief, as follows:

1.      I am the Administrator of the Office of Foreign Labor Certification ("OFLC").  The

programs for which I have responsibility are organized within the Employment and Training

Administration (ETA) in the United States Department of Labor ("DOL" or the "Department").  I

have held this position since June 2006.  Prior to that time, I was the Regional Administrator in

Boston for the ETA, and before that, from May 2003 to June 2005, I held the position of Chief of

the Division of Foreign Labor Certification.

2.      In my capacity as Administrator, I am responsible for oversight of DOL's adjudication of

all labor certification applications for temporary and permanent employment-based immigration.

3.      I have personal knowledge of the facts contained in this Declaration and, if called to

testify as a witness, I can and will competently testify to the facts stated herein.

4.     Section 212(a)(5)(A)(i) of the Immigration and Nationality Act ("the Act" or "INA"),

codified at 8 U.S.C. § 1182(a)(5)(A)(i), provides that an alien seeking to enter the United States

("U.S.") as a skilled or unskilled immigrant worker is inadmissible unless the Secretary of Labor

certifies to the Secretary of Homeland Security or the Secretary of State that there are not

sufficient U.S. workers who are able, willing, qualified and available for the job offered to the

alien, and that the employment of the alien will not adversely affect the wages and working

conditions of similarly employed U.S. workers.

5.     Approval of the labor certification by the Secretary of Labor is a condition precedent to

the Department of Homeland Security ("DHS") or the Department of State ("DOS") being able to

make admissibility determinations for certain employment-based visas.

6.     Before 1977, the Secretary made her certification decisions based largely on labor market

information.  That approach was rejected in several court decisions which held that those

procedures did not sufficiently address whether U.S. workers were actually "willing" to work for

the specific employer seeking certification.

7.     To deal with that concern, the Department developed new certification procedures, 42 FR

3441 (Jan. 18, 1977), 20 C.F.R. § 656.1 et seq., that required employers to test the domestic labor

market by recruiting U.S. workers.  If an employer's good faith and valid attempt to recruit able,

willing, qualified and available workers was unsuccessful, certification could be granted should

all other requirements be satisfied.

8.     The permanent labor certification process requires that the employer identify the foreign

worker who is the intended beneficiary of the application.  In fact, approximately 80% of

permanent labor certification applications involve foreign workers already employed by the

employer seeking certification.  In other words, many of the positions for which the employer is

required by the INA to recruit U.S. workers typically are not truly "open," but rather may be already being performed by a foreign worker that the employer may wish to permanently hire into the position. Indeed, it is not uncommon for foreign workers to be hired on a temporary basis (e.g., H-1B visa) with the employer's promise that the employer will do everything it can to secure the foreign worker a green card. Under these circumstances, some employers often have little or no incentive to actually find qualified domestic applicants and have a strong incentive for the recruitment to fail.

9.      A fair and complete test of the domestic labor market, however, is necessary for the Secretary to fulfill her statutory responsibility to certify the absence of qualified domestic workers, regardless of whether there is a temporary foreign worker performing the position's duties.

10.     For this reason the permanent labor certification program's regulations describe in some detail both the manner in which the job opportunity must be described by the employer and the nature of the recruitment process that must be used. The regulations are meant to ensure that the job offer is not so narrowly tailored that it excludes domestic applicants who are interested in and qualified for the position. Additionally, the regulations are structured to ensure that the opening is fairly advertised, so that domestic workers can learn about the position.

11.     For example, the regulations require that the job duties and requirements for the position be normal to the occupation (20 C.F.R. § 656.17(h)). Also, the job requirements must represent the employer's actual minimum requirements for the position (20 C.F.R. § 656.17(i)). Specifically, the employer cannot require more training and experience of domestic applicants than was required of the foreign worker when he was hired.  In addition, the employer must place newspaper advertisements on Sundays in newspapers of general circulation.

12.    In developing this regulatory framework, the Department noted that it had a particular

interest in the procedures that the employer would follow in evaluating U.S. worker applicants.

In the preamble to its 1980 Notice of Proposed Rulemaking, the Department noted:

> DOL has found that a bona fide test of the availability of U.S. workers cannot take
> place where the alien beneficiary or the alien's attorney or representative
> participates in the interview(s) or consideration of U.S. workers seeking the job
> offered to the alien.  Additionally, in some situations, the Certifying Officers have
> reported that some employers have utilized unusual interviewing or consideration
> procedures for job opportunities involving job offers to aliens.  For example, the
> attorney for the employer or alien or some nonpersonnel official would conduct
> the interviewee and participate in the consideration of U.S. workers applying for
> the job.

45 FR 4920 (Jan. 22, 1980).

13.    The Final Rule provides that employers must evaluate workers who apply for positions,

for which labor certification is being sought, in the same manner as they consider workers in

non-labor certification situations:

> The employer's representative who interviews or considers U.S. workers for the
> job offered to the alien must be the person who normally interviews or considers,
> on behalf of the employer, applicants for job opportunities such as that offered the
> alien, but which do not involve labor certifications.

20 C.F.R. § 656.10(b)(2)(ii)e.

14.     In addition to the specific regulatory requirements governing the recruitment process, the

Department has taken the general position that the recruitment process must be conducted in

good faith.  The Department's Board of Alien Labor Certification Appeals ("BALCA"), which

reviews denials of labor certification issued by the Department's Certifying Officers ("CO"), has

decided numerous cases identifying employer recruitment practices which, while not explicitly

proscribed by the regulations, are incompatible with the obligation to recruit U.S. workers in

good faith.

15.     Through the late 1990s to 2005, with the implementation of PERM (the re-engineered program further described in paragraph 18), the permanent employment-based program experienced increasing backlogs.  These backlogs were due to a number of factors, including amendments to the INA, which drastically increased the number of applications filed.  By 2002, these backlogs had grown to unacceptable lengths.  In many cases, applications were not adjudicated until years after they were filed.

16.     The delays also were caused in part by the cumbersome application process, which included processing of the application by both the State Workforce Agency ("SWA") and DOL.  Under this model, the employer conducted its recruitment under the direct supervision of the SWA, and the results of that recruitment were reviewed by both the SWA and DOL.  Employers were required to compile documentary evidence concerning advertising, applications received, and other recruiting documents, and submit the documents with their application for labor certification.

17.     The Department and the Executive Branch made a commitment to eradicate the backlogs.  Accordingly, in May 2002, DOL published a Notice of Proposed Rulemaking ("NPRM"), announcing a new approach in the labor certification process that would streamline the review process and eliminate duplicative governmental review through an attestation-based system.  At the same time, the Department shifted resources to process the thousands of permanent labor certification cases still pending (the "Backlogged Cases").  I was in charge of both the regulatory effort to finalize a re-engineered permanent labor certification program regulation and shift to a new processing model, and the effort to establish a process to eliminate the approximately 363,000 Backlogged Cases.

18.     The PERM Final Rule implemented the transition to an attestation-based processing

model, where employers conduct their own recruitment and attested to its results. The rule

became effective March 28, 2005 and is described with the acronym PERM (Program Electronic

Resource Management). This model was significantly different from the traditional DOL-

supervised recruitment process. Under PERM, employers were no longer required to submit

large amounts of documents with each application, but were required to maintain those

documents in the event they were audited.

19.    Because of the increasing volume of applications, DOL cannot view all supporting

documents that employers collect in connection with a labor certification application. Although

the employer submits less substantiating information, the Department scrutinizes every

application submitted through PERM. The first step is an electronic evaluation that ensures that

each field in the form has been completed. Next, Department employees verify that the

application was submitted by an existing legal entity or real person. After ascertaining the

employer's existence, Department employees contact the employer to confirm that the employer

indeed submitted the labor certification application. The Department employees then make a

recommendation to a CO who either approves or denies that application. In the event of an

approval, the CO sends the labor certification to the sponsoring employer, who then submits it to

DHS with the necessary paperwork. In the event of a denial, the employer may request a

reconsideration of the decision or appeal to the BALCA.

20.    The PERM information technology processing system contains a number of safeguards

designed to both identify and deter employers and aliens from abusing the program. For

example, the Department relies upon random and targeted audits to review the documentation

maintained by employers for their recruitment and assessment of U.S. applicants. Through the

audit process, the Department obtains and reviews evidence of how a job was advertised, how

resumes were received by the employer, whether there were qualified U.S. workers, and other

recruitment documents.  In an audit, the Department evaluates: whether the employer recruited

U.S. workers in good faith; whether U.S. workers were rejected for lawful, job-related reasons;

and whether other regulatory provisions were satisfied.  The documents requested in an audit

include many of the same documents employers were required to submit with every application

prior to the institution of PERM.

21.    Between 2001 and 2005, several attorneys and agents representing employers before the

Department were convicted of unscrupulous and fraudulent practices, including the buying and

selling of labor certifications.

22.    The Department attempted to address some of the problems of program integrity in a

2007 Rule. For example, the Rule prohibited the substitution of aliens on approved labor

certification applications, and it prohibited employers from demanding kickbacks or other

unlawful payments from foreign workers in return for filing labor certification applications. 72

FR 27904 (May 17, 2007).

23.    In late 2007, the Department completed its task of eliminating the backlog in the

permanent labor certification program.  This allowed the Department to shift additional resources

to pre-approval audits of applications to boost program integrity.  In particular, the Department

has focused on the employer's obligation to recruit U.S. workers in good faith in order to

establish a bona fide test of the domestic labor market.  The Department became increasingly

aware that in some cases, the employer had created two disparate systems for evaluating resumes

of applicants for a job.  In one system, involving applications for jobs for which no labor

certification was being sought, U.S. workers were evaluated solely by the employers' human

resources professionals in the normal course of business.  In the other system, where the

employer was seeking to hire an alien through the permanent labor certification process, the resumes of U.S. workers were evaluated or prescreened by an entirely different staff, in some cases consisting solely of immigration lawyers or agents who were outside the human resources department of the employer. This is problematic because Department regulations have for decades expressly required that employers use their normal recruiting process to establish a fair test of the labor market was conducted.

24.    These concerns were heightened in September 2007, when DOL was informed that an immigration law firm had created a training video expressing the view that the role of an immigration attorney in the labor certification process was to ensure that U.S. workers were determined not to be employable under the statute and regulations. The video demonstrated the ways an employer could manipulate the system and avoid hiring qualified U.S. workers. Specifically, the attorney making the presentation stated, "[O]ur goal is clearly not to find a qualified and interested U.S. worker." This video was eventually posted on the internet. (http://www.youtube.com/watch?v=TCbFEgFajGU). This video alarmed not only the Department, but also Congress. Congress made inquiries of DOL regarding its plans to remedy this situation. The video caused the Department grave concern about the validity of the recruitment process for all clients of that firm. Thus, to ensure program integrity and to protect the interests of U.S. workers, DOL instituted an audit of all the applications filed by that firm. The Department issued a news release describing the actions it had taken with respect to the immigration law firm. (http://www.dol.gov/opa/media/press/eta/eta20080955.htm).

25.    As discussed above, one of the integrity measures the Department uses to review the adequacy of the employer's application in permanent labor certification cases is the pre-determination audit. The Department institutes audits on both random and targeted bases.

Recently, the Department's routine audits included several PERM applications filed by attorneys

at the law firm of Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen").  In the course of

these audits, the Department discovered three forms (Attached as Exhibits A, B & C to the

Complaint) that were developed and copyrighted by the Fragomen firm.  The forms were

apparently designed to be used by Fragomen's clients during the process of recruiting and

considering domestic applicants in the context of the permanent labor certification process.  One

of the forms contained the following:

> **Reminder**: Immediately review all resumes and contact all applicants for a phone
> interview who on the face of their resume are potentially qualified for the offered
> position.  After interview, should any of the applicants appear to be qualified for
> the position, please contact a Fragomen attorney immediately to further discuss
> the candidate's background as it relates to the requirements stated for the position.

One of the other forms contains the following notation at the bottom:

> **Closing the interview**: If the applicant meets the requirements and is still
> interested in the position after the interview (including location and salary), tell
> the applicant that the company will contact him/her after considering the
> application (contact FDBL immediately).

26.    The use of these forms raised immediate concerns within the Department, both with

respect to the overarching requirement that recruitment be conducted in good faith, and the

requirement that domestic applicants be considered using "normal" procedures.  The forms were

particularly troubling because they appeared to be biased against deeming U.S. workers qualified,

imposing extra burdens on HR staff in the event that they deem U.S. worker applicants qualified,

and they raised questions about whether the employers were acting in good faith.  The forms do

not direct clients to call their attorneys when they deem workers unqualified, which is the

circumstance in which the employer would be most likely to run afoul of program rules and thus

require legal counsel. Rather, the forms instruct the HR staff using the forms to call Fragomen

attorneys only in the event they deem a U.S. worker qualified, a determination that could not possibly run afoul of program requirements. These forms, copyrighted and distributed by Fragomen, raised concerns that Fragomen was acting as, and perhaps marketing itself as, a specialist in disqualifying U.S. workers that employers would otherwise deem qualified if evaluated solely through their normal hiring process. The Department was concerned that such practices might well have an adverse impact on the wages and working conditions of U.S. workers and violate the Secretary's responsibilities under the INA. While Fragomen has every right to provide its clients legal counsel on all aspects of PERM program operations, the tenor of the forms raised questions about whether the employer-clients using the forms were using their normal recruitment process to evaluate U.S. workers and engaging more generally in good-faith recruitment.

27.    Because of good faith recruiting concerns, the existence of the forms would have been sufficient to justify an immediate audit of all Fragomen-filed applications. However, the Department chose to first meet with Fragomen representatives to discuss the use of the forms on two occasions in May of 2008. The purpose of the meetings was to determine whether there was a legitimate purpose for the instruction on the forms. In fact, the Department's Solicitor personally attended the second meeting to inquire what purpose the forms served and whether there was a legitimate need for them. The Fragomen representatives stated that the forms were not used in every office (though they did not know where they were used), nor were they frequently used (although they did not know how frequently). Fragomen conceded that the forms could be viewed with suspicion because of the language used, but maintained that the forms could have legitimate uses. In the end they agreed the forms were inappropriate, and agreed to discontinue the forms.

28.     In the course of these discussions, the Department asked how the forms were used. Fragomen insisted that their attorneys were not trying to dissuade employers from their judgments concerning the qualification of domestic workers, but could not deny that the language on the forms suggested that precisely such conversations could occur.  They indicated that the purpose of conversations between the employer and a Fragomen attorney at this stage would be for the attorney to "explain the consequences" of finding a domestic worker qualified.  By that, we understood Fragomen meant that they wanted to explain to their employer-clients that there is no legal obligation actually to hire qualified U.S. workers that respond to recruitment.  They further wished to explain to the employer's HR staff if they were certain that the U.S. worker they had identified was able, willing, qualified, and available, the employer would not be able to file a permanent labor certification application based on the recruitment.  The employer could, however, start the recruitment over again after a short period of time elapsed, and if, as hoped, no qualified domestic workers responded, they could file a permanent labor certification application based on that recruitment.  The Department agreed that such advice would be legally permissible, but expressed skepticism that the representations of the attorneys about the purpose and effect of the forms were accurate since the forms expressly said the purpose of the instruction to call Fragomen attorneys was to initiate a discussion about worker qualifications.  As the Department's most recent guidance makes clear, Fragomen attorneys have every right to provide their clients advice about the legal requirements concerning the evaluation of worker qualifications.  However, Fragomen's perceived dissembling about the purpose and effect of the forms heightened the Department's concerns that underlying improper activity might be taking place.  Indeed, the Fragomen representatives did not deny that the forms, on their face, raised legitimate issues. The representatives refused to comment on the language in the forms as it

relates to the Department's long standing regulatory prohibition on disparate treatment of U.S. workers in the recruitment process involving labor certification applications. The attorneys merely expressed the view that the Department never enforces that particular requirement. They also failed to timely identify which Fragomen offices used the concededly inappropriate forms.

29.    The Fragomen representatives failed to provide the Department with a sufficiently satisfactory explanation for the use of the forms. They never mentioned the right to counsel and indeed denied that Fragomen attorneys were providing any legal advice about qualifications during these calls. In part because the representations of the attorneys were not consistent with the forms themselves, and in part because the attorneys refused to identify where the forms had been used, the Department concluded that a comprehensive audit of the applications filed by Fragomen was necessary to carry out the responsibilities assigned to the Secretary of Labor under 8 USC § 1182(a)(5), and to determine whether employers operating under the Fragomen instructions were using their normal recruitment process and recruiting for domestic workers in good faith.[1]

30.    Audits are the principal means by which the Department verifies employer compliance with program requirements, thus maintaining program integrity in the PERM program. PERM applications are filed without supporting documentation, and the Department relies on employer attestations of compliance with program and regulatory requirements. Audits are the means by

---

[1]    At the time this decision was made on May 12, 2008, nearly 1,300 cases filed by Fragomen were already being audited for issues unrelated to the concerns raised by the forms, and another 1,400 pending cases were under analyst review and subsequently issued an Audit Letter related to the concerns raised by the forms. The Department then received approximately 1,000 new cases between May 12, 2008 and July 15, 2008, for which an audit letter was issued for issues related to the concerns raised by the forms. When taken together, more than 49 percent of all pending cases filed by Fragomen through July 15, 2008, were already being audited for issues unrelated to the concerns raised by the forms. Fragomen is well aware of these facts, but deliberately exaggerated the impact of the Department's audit in its filings with this Court, repeatedly stating that more than 2,500 applications were placed in audit because of the Department's actions, and misleadingly implying that all 2,500 would be released from audit if Fragomen received the relief it was seeking from the court.

which DOL tests the veracity of those attestations, and are the means by which DOL secures the documentation that supports the attestations. The documents required in an audit are no more onerous, than those DOL previously required employers to provide to support their labor certification applications before the new PERM rules were implemented. Audits may be conducted on a random basis or based on targeting for specific program concerns. Audits were the means by which the Department identified the existence of the Fragomen forms. Based upon the circumstances and the subsequent meeting, the Department decided it was necessary to audit all of Fragomen's pending applications because that was the only means by which we could identify the cases in which the forms and similar instructions may have been utilized, particularly in the absence of any identifying information being supplied by Fragomen.

31.    During the period of the audits, the Department received information that Fragomen had outstationed employees, generally paralegals, at several of its clients. The Department learned that Fragomen employees were possibly screening and assessing the applications of domestic workers who applied for positions for which permanent labor certification was being sought. The Department set out to explore the nature and scope of this activity both in the context of the employer's obligation to recruit in good faith as well as its obligation, pursuant to 20 C.F.R. § 656.10(b)(2)(ii) to utilize the same recruiting practices in the labor certification recruiting as it does in normal hiring. To the extent this screening is both done by paralegals and involves providing legal advice (as Fragomen now asserts that it does), it might also constitute the unauthorized practice of law. To this end, the Department inquired of Fragomen on June 12, 2008 whether "any Fragomen office is providing an initial review or pre-screening of resumes and/or applications." Fragomen did not respond until July 18, 2008. When Fragomen responded, it labeled the Department's straightforward inquiry "difficult and troubling." Despite

the fact that no client-specific information had been requested, Fragomen refused to comply with

the Department's legitimate request for information, instead frivolously invoking the attorney-

client privilege.

32.    Following the initiation of the audits, the Department began a dialogue with Fragomen

about how to limit the scope of the audits.  On July 16, 2008, these negotiations culminated in an

agreement concerning prospective treatment of cases filed by the firm.  Fragomen agreed to: 1)

discontinue the use of the recruitment forms; 2) comply with the Department's labor certification

process, including the Department's interpretation of 20 C.F.R. § 656.10(b)(2); 3) not prescreen

domestic applicants other than the clerical organizing of resumes; 4) not withhold from

employers resumes submitted by U.S. workers; 5) not participate in interviews of U.S. workers;

and, 6) not attempt to dissuade employers from their initial determination that a domestic

applicant is qualified.

33.    Following the announcement of the Fragomen audits, a number of questions were raised

about the appropriate role of the employer's immigration attorney in the evaluation of

applications submitted by U.S. workers as part of the permanent labor certification process.  In

response to these questions, on June 13, 2008, the Department issued a Program Guidance

Bulletin which offered clarification of these issues.  After the issuance of the June 13 Guidance,

additional issues arose concerning the scope of the activities it covered.  We received a number

of letters and met with the American Immigration Lawyers Association ("AILA").  AILA

indicated that the Bulletin was substantially helpful, but suggested that further clarifications were

necessary.  The Department agreed at that time to issue further clarifications after considering

their comments.  After a thorough review of these matters, the Department concluded that a

further clarification was necessary.  This clarification was issued on August 29, 2008.

34.     The August Bulletin acknowledges that employers have the unrestricted ability to consult with their attorney about how the labor certification process operates and what their responsibilities are under it.

35.     Two specific activities are proscribed under 20 C.F.R. § 656.10(b)(2).  First, in the context of the labor certification process, no one, whether they are an attorney or not, should screen applications submitted by U.S. workers before those applications are reviewed by the employer's human resource staff, unless that person normally performs that same function for the employer in non-labor certification hiring.  A key component of the labor certification process is a bona fide test of the labor market.  This requires that employers recruit domestic workers in good faith.  Nothing is more central to good faith recruiting than the use of normal recruiting procedures.

36.     Second, interviews of U.S. worker applicants should be conducted by the staff the employer normally uses to conduct such interviews.  Specifically, those interviews should not be conducted by the immigration attorney for the employer or alien beneficiary, unless that attorney normally performs that function for non labor certification positions.  It has been the Department's experience that use of the employer's immigration lawyer as an interviewer has a chilling effect on the willingness of domestic workers to pursue their applications.

37.     To the extent that the Department is continuing to audit Fragomen applications for compliance with 20 C.F.R. § 656.10(b)(2), it will enforce only these specific requirements, as well as the requirement that recruitment be conducted through a normal recruiting process and in good faith. Consistent with its most recent guidance interpreting 20 C.F.R. § 656.10(b)(2), the Department will not enforce any restrictions on attorney advice.

38.      Fragomen has admitted to the Department in a letter dated August 12, 2008, that since

March 28, 2005, it has outstationed Fragomen employees with at least 11 employer-clients to participate in their permanent labor certification application process. Fragomen further admitted that at least one outstationed Fragomen employee has pre-screened the resumes of U.S. workers and sorted them on the basis of qualifications. Until the Department can ascertain which Fragomen-filed applications that are currently undergoing audit were subject to such abnormal recruitment processes and precisely what those recruitment processes entailed, it cannot consistent with its statutory duties broadly release all Fragomen-filed applications from audit. The Department is committed to working diligently to limit the scope of its audit to those applications that were subject to such abnormal recruitment processes. The speed with which this narrowing of the audits can be completed is in the hands of Fragomen and its clients, which are in possession of the information the Department will need to focus in on the most problematic applications. Absent such specific information, pre-certification audits are the tool the Department normally uses to identify a small number of actually problematic applications from among a larger number that are subject to potential questions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, belief and recollection.

DATED: August 29, 2008

WILLIAM L. CARLSON, Ph.D.
Administrator
Office of Foreign Labor Certification
Employment and Training Administration
U.S. Department of Labor

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

FRAGOMEN, DEL REY, BERNSEN    )
LOEWY, LLP,   )
   )
        Plaintiff,   )
   )   **Civil Action No. 08-1387 (RMU)**
   )
v.   )
   )
**ELAINE CHAO, Secretary of Labor,**   )
**and the United States Department**   )
**of Labor,**   )
   )
   )
        Defendants.   )
_____)

## [PROPOSED] ORDER

This matter having come before the Court on Plaintiff's Motion for Preliminary Injunction,

Defendants' opposition to Plaintiff's motion, and Plaintiff's reply, if any, it is hereby

**ORDERED** that Plaintiff's Motion for Preliminary Injunction is **DENIED.**

**SO ORDERED** on this _____ day of _____, 2008.

_____
RICARDO M. URBINA
United States District Judge