UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRAGOMEN, DEL REY, BERNSEN &       )
LOEWY, LLP,                         )
                                    )
              Plaintiff,            )
                                    )
                                    )
v.                                  )
                                    )        Civil Action No. 08-1387 (RMU)
ELAINE CHAO, Secretary of Labor,    )
and the United States Department    )
of Labor,                           )
                                    )
                                    )
              Defendants.           )
                                    )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants Elaine Chao, Secretary of Labor (the "Secretary"), and the United States

Department of Labor ("Department" or "DOL") (hereinafter collectively referred to as

"Defendants"), respectfully submit this memorandum of law in support of their opposition to

Plaintiff's Motion for a Preliminary Injunction.

### INTRODUCTION

This case arises from a dispute between the Plaintiff, a large immigration law firm, whose

practice is focused on immigration matters of interest to United States corporations, and the

Department, which is charged with, among other responsibilities, ensuring that qualified

American workers are not displaced in the labor market by foreign workers. To that end, the

Department administers the labor certification process, the purpose of which is to ensure that

aliens are not admitted for permanent residence based upon an offer of employment unless there

are not sufficient qualified United States workers who are able, willing, and available for the work to be undertaken.

Plaintiff's Complaint and Motion for Preliminary Injunction are focused almost exclusively on what Plaintiff perceives to be actions by the Department that constitute interference with attorney-client communications. Plaintiff ultimately seeks an order permanently enjoining the Department from enforcing positions it took in three separate, related documents in June 2008, regarding the proper role of attorneys, agents or representatives of employers in the labor certification process. The documents were issued on June 2, 4, and 13, 2008 (referred to collectively as the "Consideration Guidance Documents"). As Plaintiff is now aware, on August 29, 2008, the Department issued "Restatement of PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 C.F.R. § 656.10(b)(2)," attached as Exhibit A, which expressly superseded the Consideration Guidance Documents, and clarified that there are no restraints on the advice that attorneys may provide their clients concerning the labor certification process. Therefore, whatever merit Plaintiff's Complaint and Motion for Preliminary Injunction may have had at the time they were filed, the very nature of the dispute between the parties has changed dramatically. As discussed below, the Court should deny Plaintiff's request for preliminary injunctive relief because Plaintiff cannot meet any of the four elements required for a grant of injunctive relief.

## STATEMENT OF FACTS

### A.    Statutory and Regulatory Background.

For various reasons, corporations doing business in the United States sometimes want to

hire alien workers. However, without an appropriate visa, aliens cannot come to this country for

employment. The Immigration and Nationality Act spells out the intent of Congress that

aliens seeking to work in the United States may not be admitted or, if already admitted, given

permanent resident status, unless: (1) they have an offer of employment from an employer for a

job opening for which no qualified, able, willing, and available American applicants exist; and,

(2) the admission and employment of the alien would not negatively impact the wages and

working conditions of American workers. 8 U.S.C. § 1182(a)(5). See Declaration of William

Carlson ("Carlson Decl.") at ¶ 4, attached. The Secretary is ultimately responsible for

determining if the statutory prerequisites have been met, and must certify the results to the

Department of Homeland Security, which ultimately determines whether to admit an alien into

the country or permit him to remain. The regulations the Department of Labor has developed to

carry out the Secretary's obligation are generally referred to as the labor certification process.

See id. at ¶ 5, 8; 20 C.F.R. Part 656.

Although the Secretary is responsible for certifying that the statutory obligations have

been met, the employer, as the applicant, bears the burden of proof of establishing eligibility for a

visa. 8 U.S.C. § 1361.

The sheer volume of applications for labor certifications prohibits the Department from

being deeply involved in each case. See Carlson Decl. at ¶ 19. Thus, the employers are

responsible in large measure for determining whether or not the labor market has American

workers who are qualified, able, willing and available for employment. See id. at ¶ 18. In the past, when applying for a labor certification, employers were required to submit documentary evidence to the Department showing: the job description; how the opening was advertised; and, all resumes and applications received. See id. at ¶ 16. This information had to accompany the application filed on behalf of the alien the company wished to employ and sponsor for permanent residence under the program. Id. The Department then evaluated each application. Id.

In 2005, the Department moved to an electronic attestation-based system called PERM (Program Electronic Resource Management). See id. at ¶ 18. Employers seeking to hire alien workers are still required to draft a job description, advertise the opening, and collect and maintain resumes and applications. See id. If an employer determines that there are no employable American workers, it submits an electronic application to the Department. Id. at ¶ 19. The computer program screens the application looking for any field that has not been filled out. Id. Any incomplete field will result in an automatic denial. See id. After submission, the Department first investigates to determine if the employer is an actual business. Id. Next, the Department contacts the employer to make sure the business is indeed sponsoring the application. Id. Once the Department has satisfied itself that the application was knowingly submitted by a real entity seeking to employ an alien for actual work, a Department employee reviews each application. Id. After review, the employee makes a recommendation to the Certifying Officer ("CO"). Id. If the CO decides the application deserves labor certification, he or she prints out a certification and sends it to the employer who files it with the United States Department of Homeland Security. Id.

The primary change that the 2005 PERM instituted in the process is that employers are no longer required to submit documentary evidence when applying for a labor certification. See id. at ¶ 18. Employers are, however, required to keep all of the documents for inspection or audit. Id.

The language of the statute and regulations governing labor certification may give the impression that the alien for whom the labor certificate is being sought is outside the United States, with the desire of being admitted in the first instance. However, in reality, most aliens for whom employers are seeking labor certifications are already in the United States working for the petitioning employer. The aliens are typically present on H-1B visas, which allow them to work in this country for a limited period of time. Id. at ¶ 8.

Thus, in the labor certification process the sponsoring employer is usually looking to hire a permanent employee to fill the job an alien is currently performing while on a temporary visa. Id. Often there is a tension caused by the employer's natural desire to permanently hire the temporary alien employee who is already working for the employer, and the statutory obligation to first recruit American workers. Id. The Department has long been aware that some employers have engaged in tactics aimed at avoiding their statutory responsibility to search in good faith for qualified American workers prior to filing a labor certification for an alien. Carlson Decl. at ¶ 23. As the Department stated in the preamble to the 1980 Notice of Proposed Rule Making:

> [I]n some situations, the Certifying Officers have reported that some employers have utilized unusual interviewing or consideration procedures for job opportunities involving job offers to aliens. For example, the attorney for the employer or alien or some nonpersonnel official would conduct the interview and participate in the consideration of U.S. workers applying for the job.

45 Fed. Reg. 4920 (Jan. 22, 1980).

Among other things, the Department was concerned that employers who wished to hire an alien for a particular opening were deviating from traditional hiring practices when considering American workers. This reasonably raised the suspicion that the employers were improperly seeking to skirt their obligations to engage in a genuine and honest effort to recruit American workers. In response to this concern, the final rule adopted in 1980 stated:

> The employer's representative who interviews or considers U.S. workers for the job offered to the alien must be the person who normally interviews or considers, on behalf of the employer, applicants for job opportunities such as that offered the alien, but which do not involve labor certifications.

20 C.F.R. § 656.10(b)(2)(ii) (previously codified at 20 C.F.R. § 656.20(b)(3)(ii)).

To safeguard American workers from unfair recruitment practices, and ensure that inadmissible aliens were not given permanent resident status through the labor certification process, the Department's Board of Alien Labor Certification Appeals ("BALCA"), which reviews denials of labor certifications issued by the Department's COs, read into the INA and implementing regulations an implicit "good faith" recruitment requirement. Carlson Decl. at ¶ 14. See Information Industries, Inc., 88-INA-82 (BALCA 1989) (finding that the regulations require employers to recruit qualified U.S. workers in good faith and reject U.S. applicants solely "for lawful, job related reasons"). The Ninth Circuit articulated the need for this requirement as follows:

> By the terms of the statute, the Department must certify 'there are not sufficient workers who are able, willing, qualified . . . and available' to perform the work in question. . . . To enable the Secretary to make an informed decision based on reliable evidence, the employer has the burden of producing documentation of its recruitment efforts. See Production Tool Corp. v. Employment & Training Admin., 688 F.2d 1161, 1170 (7th Cir.1982). To discharge this burden, the Department requires the employer to show, among other things, that a good faith effort has been made to recruit United States workers for the position and that no

-6-

United States worker has been rejected for reasons unrelated to the job. See, e.g., In re Misak's Gen. Bldg. Contractors, 89 INA 39 (BALCA Oct. 25, 1989); In re Hipoint Dev., Inc., 88 INA 340, 1989 WL 90729 (BALCA May 31, 1989); In re Lin & Associates, Inc., 88 INA 7 (BALCA, Apr. 14, 1989); In re L.A. United Investment Co., 87 INA 738 (BALCA, Apr. 20, 1988). These requirements are reflected in various Department regulations. 20 CFR § 656.21(b)(1)(E), (b)(7), (j)(iv); § 656.24(b)(1), (b)(2).

Warmtex Enterprises v. Martin, 953 F.2d 1133, 1135 (9th Cir. 1992). Thus, the Secretary is prohibited from approving a labor certification when the applicant has not proved that American workers were recruited in good faith.

Accordingly, given this good faith requirement, under 8 U.S.C. § 1182(a)(5) and its implementing regulations, employers seeking to obtain a labor certification are required, inter alia: (1) to recruit American workers in good faith; (2) determine that no American worker is qualified, able, willing or available for employment; and, (3) show that employing an alien will not negatively impact American wages or working conditions. Failure to meet these elements may result in denial of an application for labor certification.

In 2005, the Department introduced the PERM electronic application process, thereby eliminating the need for employers to submit documentation in every labor certification application. See Carlson Decl. at ¶ 18. It also introduced safeguards to help maintain the integrity of the program. See id. at ¶ 20. Among these safeguards, the Department has the authority to audit labor certification applications. Id. Audits may be conducted randomly, or after the review of the application. See also 20 C.F.R. § 656.20(a).

The decision to audit a labor certification application is followed by a letter informing the employer of the audit and the requirement to produce documents related to the recruitment process. 20 C.F.R. 656.20(a)(1). These documents include: evidence the employer advertised

-7-

the position; the resumes or applications received in response to the advertisement; and, other relevant documents used in the recruitment process specified by the Department. Carlson Decl. at ¶ 20. As noted above, the documents required by the Department in an audit are gererally the same documents employers were required to submit with every application prior to PERM's electronic application filing process. Id.

### B.    Factual Background.

Since the inception of the new PERM attestation-based electronic labor certification program in 2005, the Department has worked to maintain the integrity of the program by focusing on ensuring that the recruiting processes of employers who seek labor certifications are as close to the normal, non-labor certification hiring process as possible. See id. at ¶¶ 22-25, 30. The Department takes this approach because in its extensive experience in administering the labor certification program, deviations in the normal hiring process can indicate a lack of good faith on the part of employers in recruiting U.S. workers. See Martin, 953 F.2d at 1135; 20 C.F.R §656.10(b)(2)(ii). Accordingly, the Department has investigated what it perceives to be improper deviations from employers' normal recruiting process. Carlson Decl. at ¶22, 23.

For example, in 2007, a prominent immigration firm created a training video for its clients in which the firm expressly asserted that the role of an immigration attorney in the labor certification process is ultimately to ensure that the employer fails to find any qualified workers (regardless of whether they exist) so that the employer may hire an alien instead of a U.S. worker. Carlson Decl. at ¶ 24. The existence of the video alarmed the Department, and prompted it to conduct audits – and thereby scrutinize for bad faith recruiting practices – all of the labor certification applications filed by the firm. Id.

The Department has remained vigilant in guarding against employers who file labor certifications after failing to recruit U.S. workers in good faith. To that end, the Department has used random and targeted audits of applications it had reviewed. Id. at ¶¶ 21-26. The Department has conducted audits of many labor certification applications, including three particular applications submitted by Plaintiff. The audits of the three applications resulted in the discovery of forms that were created, copyrighted, and apparently distributed by Plaintiff to some of its clients. Id. 25. (Complaint, Exhibits A, B, & C). Department employees were immediately concerned by the discovery of these documents because they raised suspicion within the Department that the employer-clients of Plaintiff were not recruiting American workers in good faith. The language in the forms that caused the Department to be concerned was:

> After interview, should any of the applicants appear to be qualified for the position, please contact a Fragomen attorney immediately to further discuss the candidate's background as it relates to the requirements stated for the position.

Compl. Exhibit A. (emphasis added).

> Reminder: Immediately review all resumes and contact all applicants for a phone interview who on the face of their resume are potentially qualified for the offered position. After interview, should any of the applicants appear to be qualified for the position, please contact a Fragomen attorney immediately to further discuss the candidate's background as it relates to the requirements stated for the position.

Compl. Exhibit B. (emphasis added).

> Closing the interview: If the applicant meets the requirements and is still interested in the position after the interview (including location and salary), tell the applicant that the company will contact him/her after considering the application (contact FDBL immediately).

Compl. Exhibit C. (emphasis added).

As a result of the concern these forms raised, the Department then scheduled a meeting

with Plaintiff's representatives and asked them about the use of these forms. Carlson Decl. at

¶ 27. During the meeting Plaintiff's representatives conceded that the forms were suspicious, but

they could not tell the Department where the forms were used, nor how frequently they were

used. Id. at ¶¶ 27-29, 30. The Department contemplated an audit of applications filed by

Plaintiff, but was left with no information that could limit the scope of the audit. Id. Because it

could not determine the extent to which the suspicious forms were used, the Department decided

that it would be necessary to audit all labor certification applications filed by Plaintiff.[1] Id. at ¶¶,

30, 32, 38.

During the early stages of the audits, the Department received information that Plaintiff

had stationed employees, generally paralegals, in the human resource department of some of its

clients. Id. at ¶ 31. The Department learned that Plaintiff's employees were possibly screening

and assessing the applications of domestic workers who applied for positions for which labor

certification were being sought. Id. Because the existence of these out-stationed paralegals

raised a question as to whether Plaintiff's clients were engaged in good faith recruiting, this

information gave the Department additional reasons to audit all labor certification applications

filed by Plaintiff. Id.

---

[1] At the time this decision was made on May 12, 2008, nearly 1,300 cases filed by
Fragomen were already being audited for issues unrelated to the concerns raised by the forms,
and another 1,400 pending cases were under analyst review and subsequently issued an Audit
Letter related to the concerns raised by the forms. The Department then received approximately
1,000 new cases between May 12, 2008 and July 15, 2008, for which an audit letter was issued
for issues related to the concerns raised by the forms. When taken together, more than 49 percent
of all pending cases filed by Fragomen through July 15, 2008, were already being audited for
issues unrelated to the concerns raised by the forms. Id. at n. 1.

## ARGUMENT

**I.   Fragomen has not Demonstrated That it Meets the Standard for a Preliminary Injunction.**

### A.   The Standard for Granting Preliminary Injunctive Relief.

A preliminary injunction is an "extraordinary and drastic remedy," and "it is never to be awarded as of right." Munaf v. Geren, – U.S.–, 128 S. Ct. 2207, 2219 (2008) (citations omitted). Rather, injunctive relief is "to be used sparingly, and only in a clear and plain case." Rizzo v. Goode, 423 U.S. 362, 378 (1976) (internal quotation marks and citations omitted). As the Supreme Court has said, "a preliminary injunction . . . should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

In deciding whether to issue a preliminary injunction, the courts consider four factors: (1) whether the moving party has a substantial likelihood of success on the merits; (2) whether the moving party faces irreparable harm absent the preliminary injunction; (3) whether the injunction would substantially injure the opposing party; and (4) whether the injunction furthers the public interest. Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C.Cir. 2007). Any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. Nat'l. Treasury Employees Union v. Yeutter, 918 F.2d 968, 977 (D.C. Cir. 1990).

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (2001). The injunctive relief Plaintiff seeks goes beyond maintaining the status quo, as it would require the Department to abandon its long-standing view that 20 C.F.R. § 656.10

proscribes certain levels of involvement by an employer's immigration attorneys in the labor certification process. See e.g., Scan, Inc., 97-INA-247 (BALCA 1998) (an employer's attorney's involvement in the initial assessment of an applicant's qualifications, when the attorney is not normally involved in the recruitment process, is in violation of the regulations); Rian Cleaners, 96- INA-00012 (BALCA 1997) (employer's attorney found in violation of § 656.20(b)(3)(i) (currently, 20 C.F.R. § 656.10(b)(2)(ii)), when attorney sent interview letter to sole U.S. job applicant and evidence failed to establish that attorney normally interviewed or considered applicants for job opportunities that do not involve labor certifications); Techknits, Inc., 92-INA-0001 (BALCA 1993) (employer's attorney found in violation of regulations when attorney sent letters to prospective U.S. job applicants in order to expedite recruitment); K&S Sportswear, 91-INA-52, (BALCA 1992) (employer's attorney's involvement in the interview and recruitment process of U.S. applicants violated regulations); Taam Shabbos, 90-INA-97 (BALCA 1991) (control by employer's agent over contact, consideration, and rejection of U.S. applicants, when evidence did not demonstrate that agent was normally involved in the process, violated §656.20(b)(3)(ii)).

Plaintiff asserts that the Department is infringing its rights under the First Amendment to the U.S. Constitution by impermissibly regulating the guidance and advice its attorneys may provide its clients concerning the labor certification process. The Department, however, has withdrawn the policy guidance Plaintiff challenges on constitutional grounds and issued new guidance clarifying that Plaintiff is permitted to provide legal advice and guidance to its clients throughout the labor certification process. This new guidance expressly permits the type of attorney consultations and communications described in Plaintiff's Complaint.

-12-

As a result, Plaintiff has no colorable argument that the substantive content of the

Department's guidance, or the way in which the Department is implementing that guidance and

the regulations, violates the Constitution. Further, as discussed below, the Department's decision

to audit Plaintiff's labor certification applications is not reviewable under the Administrative

Procedure Act ("APA") because an audit is not final agency action for purposes of APA review.

Accordingly, Plaintiff cannot meet its burden of showing a substantial likelihood of success on

the merits. Further, for the reasons set forth below, Plaintiff also cannot demonstrate irreparable

harm absent the preliminary injunction, that the injunction would not substantially injure the

Department, or that granting the injunction would further the public interest. Therefore,

Plaintiff's request for a preliminary injunction must be denied.

### B.    Plaintiff Cannot Show a Likelihood of Success on the Merits.

Plaintiff's Complaint and Motion for Preliminary Injunction are focused almost

exclusively on what Plaintiff perceives to be actions by the Department that constitute

interference with attorney-client communications. Plaintiff ultimately seeks a permanent

injunction that will enjoin the Department from enforcing positions it took in the June 2, 4, and

13, 2008 "Consideration Guidance Documents" regarding the proper role of attorneys in the

labor certification process. However, as Plaintiff is now aware, on August 29, 2008, the

Department issued "Restatement of PERM Program Guidance Bulletin on the Clarification of

Scope of Consideration Rule in 20 CFR 656.10(b)(2)" in which the Department expressly

superseded the challenged Consideration Guidance Documents and unequivocally stated that

employers may consult with their agents or attorneys throughout the labor certification process.

Therefore, whatever merit Plaintiff's Complaint and Motion for Preliminary Injunction may have

-13-

had at the time they were filed, the very nature of the dispute between the parties has changed so

that Plaintiff's constitutional challenges are now moot.

Plaintiff has moved for a preliminary injunction barring the Department from taking eight

specific actions:

> 1. Enforcing 20 C.F.R. § 656.10(b) (the "Regulation") to prohibit
> employers from consulting with attorneys concerning any aspect of the labor
> certification process, including whether particular workers who apply for
> positions in the alien labor certification recruitment process are "qualified" for the
> position within the meaning of the governing regulations.

> 2. Enforcing the Regulation to prohibit attorneys from communicating
> with their employer clients at the time resumes or applications are received about
> whether applicants may be "qualified" for the position within the meaning of the
> governing regulations.

> 3. Enforcing the interpretations outlined in the June 2 Press Release, the
> June 4 Information Paper, and the June 13 Bulletin (as those terms are defined in
> the Complaint and the supporting Declaration Memorandum of Law) as to the
> permissible role of attorneys for employers in the labor certification process.

> 4. Enforcing new restrictions directed at the role of attorneys for
> employers in the labor certification process without following the notice and
> comment rulemaking procedures set forth in the Administrative Procedure Act.

> 5. Retaliating against Fragomen or its clients through defendants'
> enforcement powers based on their exercise of constitutionally protected rights.

> 6. Auditing PERM applications of Fragomen's clients based upon
> defendants' view of the attorney-client relationship outlined in defendant's June 2
> Press Release, the June 4 Information Paper, and the June 13 Bulletin.

> 7. Auditing PERM applications specifically on the basis of Fragomen's
> appearance as counsel for the employer.

> 8. Demanding that Fragomen or its clients provide confidential
> information about their attorney-client relationship in the course of the labor
> certification process.

See Plaintiff's Motion for Preliminary Injunction ("Pl.'s Mot.") at 1-2. The Department's

revocation of the June 2 Press Release, the June 4 Information Paper, and the June 13 Bulletin

and its issuance of new guidance clarifying that there are no restrictions on the legal advice an

attorney may provide during the entirety of the labor certification process moots Plaintiff's First

Amendment arguments and its requests for injunctive relief at paragraphs 1, 2, and 3.

Additionally, to the extent Plaintiff relies on a violation of its First Amendment rights in its

requests for injunctive relief at paragraphs 5, 6, and 7 of its Motion for Preliminary Injunction,

those requests for relief must also be denied as moot. The remaining requests for injunctive

relief should be denied because the Department's actions are reasonable and proper under the

governing statute and regulations, and in any event Plaintiff does not satisfy the requirements for

a grant of injunctive relief.

### 1.    Plaintiff's First Amendment Arguments are Moot.

The Constitution limits the exercise of judicial power to actual cases or controversies.

U.S. Const. art. III, § 2. "Article III . . . confines . . . [the courts] to resolving real and substantive

controvers[ies] admitting of specific relief through a decree of a conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state of

facts." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990) (quotation marks omitted).

A case must thus arise from a dispute that is "credible and immediate, and not merely

abstract or speculative." Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997)

(courts must avoid "entangle[ment] in abstract disagreements"). The dispute must be of

"'sufficient immediacy and reality,'" Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1137 n. 3

(D.C. Cir. 1989) (quoting, Golden v. Zwickler, 394 U.S. 103, 11 (1969)), and not based on a

-15-

"'hypothetical state of facts,'" <u>Federal Express Corp. v. Air Line Pilots Ass'n</u>, 67 F.3d 961,

963-64 (D.C. Cir. 1995) (quoting, <u>Aetna Life Ins. Co. of Hartford, Conn. v. Haworth</u>, 300 U.S.

227, 241 (1937)).

    A request for injunctive relief remains live only so long as there is some present harm left

to enjoin. <u>See Renne v. Geary</u>, 501 U.S. 312, 320-21 (1991) ("Past exposure to illegal conduct

does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects") (ellipses in original) (quoting,

<u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974)); <u>Christian Knights of the Ku Klux Klan v.</u>

<u>District of Columbia</u>, 972 F.2d 365, 369 (D.C. Cir. 1992). A request for a preliminary injunction

becomes moot when, because of the defendant's compliance or some other change in

circumstances, nothing remains to be enjoined through a permanent injunction. <u>See National</u>

<u>Kidney Patients Ass'n v. Sullivan</u>, 902 F.2d 51, 54 (D.C. Cir. 1990). The general rule is that

whenever the parties "lack a legally cognizable interest in the outcome," federal courts lack

power to decide the case. <u>Murphy v. Hunt</u>, 455 U.S. 478, 481 (1982). In short, if a case is moot,

there is no live case or controversy, and a court can no longer exercise jurisdiction. <u>See Aetna</u>

<u>Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 239-40 (1937); <u>Honig v. Doe</u>, 484 U.S. 305 (1988).

    There is, however, an exception to the mootness concept: when the underlying

controversy is "capable of repetition, yet evading review," it should not be dismissed as moot.

<u>Southern Pacific Terminal Co. v. ICC</u>, 219 U.S. 498, 515 (1911); <u>see Carroll v. President and</u>

<u>Commissioners of Princess Anne</u>, 393 U.S. 175, 179 (1968). The D.C. Circuit has outlined the

two elements of the <u>Southern Pacific</u> doctrine: "'(1) the challenged action [is] in its duration too

short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable

expectation that the same party would be subjected to the same action again.'" Environmental Defense Fund v. Gorsuch, 713 F.2d 802, 810 (D.C. Cir. 1983) (quoting, Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).

Neither of the two elements are met in this case. The Department has withdrawn the June 2 Press Release, the June 4 Information Paper, and the June 13 Bulletin and replaced them with new guidance on August 29, 2008, which categorically establishes an employer's right to consult with and receive advice and guidance from its attorneys– such as Plaintiff's attorneys–at all stages of the labor certification process. Under the new guidance which expressly permits the type of attorney consultations and communications described in Plaintiff's Complaint, there are no restrictions placed on the legal advice an attorney may provide an client. Accordingly, Plaintiff's First Amendment arguments are moot and its request for injunctive relief to enforce those rights is similarly moot.

### 2.    The Agency's Interpretation of 20 C.F.R. § 656.10(b)(2) does not Violate the APA.

Plaintiff asserts that "the Secretary's interpretation of Section 656.10(b)(2) violates the APA." See Motion for Preliminary Injunction at 17-27. Plaintiff makes three arguments in this regard: (1) "the Secretary's interpretation is contrary to the language, structure, and purpose of the regulation" (id. at 17-21); (2) "the Secretary's interpretation constitutes rulemaking without notice and comment" (id. at 21-26); and (3) "the Department's application of its new interpretation to previously filed applications is impermissibly retroactive" (id. at 21-26); see also Plaintiff's Complaint at ¶ 92 (Count II) (asserting that the Department's "decision to audit all[] of Fragomen's pending applications because of concerns about the content of Fragomen's

-17-

confidential communications . . . violates the agency's published regulations regarding the circumstances under which PERM applications will be audited."). None of these contentions assert a cognizable claim for relief under the APA.

### a.    Plaintiff's Claims are not Cognizable Because Audits do not Constitute Final Agency Action Under the APA.

Plaintiff's arguments are grounded in what it asserts are violations of the APA. The Court, however, may not reach the merits of Plaintiff's arguments because there has been no final agency action to review under the APA.

Section 10(c) of the APA permits judicial review of final agency action. 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review"). The Court of Appeals for this Circuit has held that the APA's requirement of "final agency action" is not jurisdictional in nature. Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 183 (D.C. Cir. 2006) ("Because § 704's declaration that final agency action is 'subject to judicial review' is not a grant of jurisdiction, even if we were to infer by negative implication that agency conduct not amounting to final agency action is not 'reviewable,' that inference would not deprive a federal court of any jurisdiction it otherwise has."). Nevertheless, the Court further held that the absence of "final agency action" may prevent the litigant from pursuing an APA cause of action. Id. at 188-89 ("[A]lthough the absence of final agency action would not cost federal courts their jurisdiction . . . it would cost [appellant] his APA cause of action.").

In determining whether there has been final agency action, courts look to several factors, specifically: (1) whether the action was a "definitive" statement of the agency's position; (2) whether it had a direct and immediate effect on the day-to-day business of the party affected; and (3) whether analysis of the action is legal or factual in nature. Beverly Enterprises v. Herman, 50 F. Supp. 2d 7, 12 (D. D.C. 1999) (citations omitted). Thus, to find final agency action, it must be demonstrated that "[t]he agency [has] . . . made up its mind, and its decision must have 'inflict[ed] an actual, concrete injury' upon the party seeking judicial review." AT&T v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001) (citing Williamson Cty Regional Planning v. Hamilton Bank, 473 U.S. 172, 193 (1985)).

A decision to undertake further inquiry into an issue, such as a decision to conduct an audit or an investigation, is not "final agency action" as required to state a cause of action under the APA. See, e.g., University of Medicine & Dentistry v. Corrigan, 347 F.3d 57, 69 (3d Cir. 2003) ("The decision to investigate is normally seen as a preliminary step – non-final by definition – leading toward the possibility of a 'final action' in the form of an enforcement or other action."); Association of American Medical Colleges v. United States, 217 F.3d 770, 781 (9th Cir. 1999) ("An investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action.") (citations omitted).

Corrigan presents a situation analogous to the present one. In Corrigan, the court denied the plaintiff hospitals' motion for an injunction seeking to enjoin a proposed audit by the inspector general of the Department of Health and Human Services ("HHS") concerning the hospitals' Medicare billing practices. 347 F.3d at 57, 59. The plaintiffs contended that the inspector general was intending to use an "improper standard" in conducting its planned audit of

-19-

their billing records. Id.[2] In concluding that the decision to initiate an audit was not "final agency action" as required by the APA, the court held:

> The decision to initiate the . . . audit represents a 'definitive position' of the inspector general only in the narrowest sense. The decision is not likely to be reopened, but it is a decision only to investigate, which is by nature a preliminary one. It is the initiation of a process designed to make a determination as to plaintiffs' potential fraud and abuse in the Medicare program. Intermediate decisions made in the course of determining what position will ultimately be taken are not 'determinative' in the appropriate sense.

Id. at 70. Furthermore, the court rejected the hospitals' claim that the decision to initiate an audit had the "status of law" because the hospitals were expected to immediately comply and the audit would have an immediate impact on their day-to-day operations. Id. The court held that the burdens of complying with the audit, which the hospitals contended could cost over one million dollars, were "not the kind of burdens that support a finding of finality." Id. Rather, this burden was a "cost that plaintiffs – recipients of Medicare funding – must face as a 'burden of living under government.'" Corrigan, 347 F.3d at 71 (quoting Federal Trade Comm'n v. Standard Oil Co., 449 U.S. 232, 244 (1980)). The Corrigan court further rejected the argument that the mere "decision to employ a standard incorporating a physical presence requirement" was itself final agency action. Id. at 69. The court found that the decision regarding what standard would be used in conducting the audit was the type of "[i]ntermediate decisions made in the course of

---

[2] Specifically the plaintiffs complained that the audits would be directed at billing that occurred prior to the time HHS amended its rule, which spoke of the requirement that doctors provide "personal and identifiable direction" to resident physicians in order to receive payment under Medicare Part B for such services. Corrigan, 347 F.3d at 61. HHS subsequently amended the rule to indicate that the requirement that the billing doctor provide "personal and identifiable direction" required the physician's actual physical presence. Id. While the plaintiffs asserted that this was a new requirement imposed by the agency, the agency contended "that the rules had always required the physical presence of the physician for Part B payments, even though it was not stated as clearly as under the new rule." Id. at 61-62.

-20-

determining what position will ultimately be taken . . .[,]" and therefore was not "determinative in the appropriate sense." Id. See also Standard Oil Co., 449 U.S. at 242 (holding that burden of responding to agency's charges, although "certainly substantial" was "different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action.").

Similar to the result reached in Corrigan, Plaintiff here cannot challenge the Department's decision to conduct an audit of its pending labor certification applications. The mere decision to conduct an audit, absent any substantive determination that a pending application will be denied, is simply not final agency action. See Pennsylvania v. United States, No. Civ.A. 05-1345, 2006 WL 2708177, at *14 (W.D. Pa. Sept. 19, 2006) ("It is clear from controlling precedent that decisions to conduct an audit do not constitute final agency action for purposes of judicial review under both the APA and the ripeness doctrine."). See also Standard Oil Co., 449 U.S. at 243 (holding that Federal Trade Commission's issuance of a complaint on the belief that agency had violated the law was not final agency action because it was "not a definitive ruling or regulation. It had no legal force or practical effect upon [petitioner's] daily business other than the disruptions that accompany any major litigation."); AT&T, 270 F.3d at 976 (holding that letters of determination issued by EEOC in which EEOC determined that company's policy violated the discrimination law was not final agency action because the agency had not "inflicted any injury upon AT&T by merely expressing its view of the law – a view that has force only to the extent the agency can persuade a court to the same conclusion."); Fund for Animals v. Williams, 391 F. Supp. 2d 132, 138-39 (D. D.C. 2005) (holding that agency's announcement of goals in its five

year strategic plan was not final agency action because it did "not create a binding obligation on

refuge managers to open refuges for hunting . . . .") (footnote omitted).

Furthermore, even if one of the Department's audits results in the denial of an employer's

pending labor certification application, that decision would not be final, because pursuant to 20

C.F.R. § 656.26(a), the employer has the right to challenge that decision administratively by

appealing it to BALCA. The ability of the Plaintiff to seek further administrative review

demonstrates how far from final agency action is the mere decision to audit.[3] See e.g.,

Pennsylvania v. United States, 2006 WL 2708177, at *20 ("In summary, because there appear to

be administrative remedies available to Pennsylvania for review of its challenges to the inspector

general's audit, the Court concludes it lacks jurisdiction to review Pennsylvania's

challenges . . . . ").

Thus, because there has been no final agency action that the Court may review under the

APA, the Court should deny Plaintiff's request that it enjoin the Department from auditing its

PERM applications.

> **b.     Even if the Department's Decision to Initiate the Audits
>          Constitutes Final Agency Action, it is Nonetheless not Subject
>          to Review.**

Even if the Court were to find that the Department's decision to conduct an audit of

Plaintiff's pending labor certification applications constitutes final agency action for purposes of

APA review, judicial review is still not available for two related reasons: (1) the regulation

makes clear that the decision to conduct audits of labor certification applications is committed to

---

[3] See 20 C.F.R. § 656.20 (e)(3) (noting that "failure to request review within 30 days of the date of the [adverse] determination . . . constitutes failure to exhaust administrative remedies.")

the Department's unfettered discretion; and (2) there are no meaningful standards by which to

review the decision. See 20 C.F.R. § 656.20(a) (noting only that "review of the labor

certification application may lead to an audit of the application[;]" and that "certain applications

may be selected randomly for audit and quality control purposes."); Cf. Heckler v. Chaney, 470

U.S. 821, 830 (1985) (noting that courts have no jurisdiction under the APA to review matters

where "a court would have no meaningful standard of review against which to judge the agency's

exercise of discretion."); Saavedra Bruno v. Albright, 197 F.3d 1153, 1157 (D.C. Cir.1999) ("The

validity of agency action may not be tested in court if statutes preclude judicial review or if

'agency action is committed to agency discretion by law.'") (internal quotation marks omitted).[4]

Indeed, enforcement actions, such as the audits at issue in this case, are generally

excluded from APA review because a court would have no meaningful standard against which to

judge the agency's exercise of discretion in deciding how to enforce the statutory provisions. See

Schering Corporation v. Heckler, 779 F.2d 683, 686 (D.C. Cir. 1985) (describing Heckler v.

Chaney as holding that "an agency judgment relating to the exercise of its enforcement power

presumptively lies beyond the reach of APA review as an action 'committed to agency discretion

by law.'") (quoting 5 U.S.C. § 701(a)(2)). Accordingly, even if the Court finds that the

Department's decision to audit all of Fragomen's applications is a final agency decision, the

Court must nonetheless decline to address Plaintiff's challenges to that decision.

---

[4]  See also Lincoln v. Vigil, 508 U.S. 182, 190-91 (1993) (noting that under the APA,
agency action is "not subject to judicial review 'to the extent that' such action 'is committed to
agency discretion by law.'" (citing Block v. Community Nutrition Institute, 467 U.S. 340, 349
(1984)).

   c. **Assuming Review is Available, the Department has hot**
     <u>**Violated the Notice and Comment Provision of the APA.**</u>

  Even assuming that APA review is available, Plaintiff is unlikely to succeed on its claims

that the Department has violated the APA's procedural requirements for notice and comment.

This is so because 20 C.F.R. section 656.10(b)(2)(i), to which four words were added by the

agency, was merely an interpretive rule which is not subject to formal rulemaking, and which is

not being enforced or relied on by the Department in this case.

  Plaintiff contends that the addition of four words to 20 C.F.R. section 656.10(b)(2)(i)

constituted improper agency rulemaking because these words were added after the notice and

comment period had ended. <u>See</u> Plaintiff's Memorandum of Law In Support of Plaintiff's

Motion for Preliminary Injunction ("Pl.'s Memorandum of Law") at 18. Plaintiff's contentions

are without merit.

  Notice and comment are generally required pursuant to the APA when an agency engages

in rulemaking. <u>See</u> 5 U.S.C. § 553(b) ("General notice of proposed rule making shall be

published in the Federal Register . . . ."); 5 U.S.C. § 553(c) ("After notice required by this

section, the agency shall give interested persons an opportunity to participate in the rule making

through submission of written data, views, or arguments . . . ."). However, the APA explicitly

excludes "interpretive rules" and "general statements of policy" from the notice and comment

requirements. <u>See</u> 5 U.S.C. § 553(b)(3)(A) ("Except when notice or hearing is required by

statute, this subsection does not apply – (A) to interpretive rules, general statements of policy, or

rules of agency organization, procedure or practice . . . ."). <u>See also</u> <u>National Latino Media</u>

<u>Coalition v. Federal Communications Comm'n</u>, 816 F.2d 785, 789 (D.C. Cir. 1987) ("The

-24-

distinction between legislative rules and interpretive rules, as we have indicated, has long been recognized. The Administrative Procedure Act expressly states that publication of notice and opportunity for comment are not required for 'interpretative rules' or 'general statements of policy.' 5 U.S.C. § 553(b)(3)(A)(1982)"); <u>Ace Property & Cas. Ins. Co. v. Federal Crop Ins. Corp.</u>, 517 F. Supp. 2d 391, 403 (D.D.C. 2007) ("The notice and comment requirements do not apply . . . to 'interpretive rules'") (citing 5 U.S.C. § 553(b)).[5]

To be an interpretive rule, the rule must "'derive a proposition from an existing document whose meaning compels or logically justifies the proposition." <u>Id.</u> at 404 (citations omitted). In <u>Ace Property & Cas. Ins. Co.</u>, this Court held that the Federal Crop Insurance Corporation's ("FCIC") amendment of its regulation did not constitute formal rulemaking. In 1995, prior to amendment, the agency's regulation provided:

> If the company believes that [FCIC] has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement . . . . except compliance issues, it may within 45 days after receipt of such determination, request, in writing, the Director of Insurance Services to make a final determination addressing the disputed issue. The Director of Insurance Services will render the final administrative determination of the Corporation with respect to the applicable issues.

517 F. Supp. 2d at 404 (quoting 7 C.F.R. § 400.169(a)). In 2000, the agency amended its regulation, without notice and comment, to provide:

> If the company believes that the Corporation has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement . . . except compliance issues, it may request the Deputy Administrator of Insurance

---

[5] While interpretive rules are not binding or controlling authority, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944). Further, while an agency's own label is "not dispositive," it is 'relevant[.]" <u>Ace Property & Cas. Ins. Co.</u>, 517 F. Supp. 2d at 404 (quoting <u>Gen. Motors Corp. v. Ruckelshaus</u>, 742 F.2d 1561, 1565 (D.C. Cir. 1984)).

Services to make a final administrative determination addressing the disputed
action . . . . All requests for a final administrative determination must be in
writing and submitted within 45 days after receipt [of] the disputed action.

Id. While the plaintiffs in Ace Property & Cas. Ins. Co. agreed that the reason for the 2000

amendment was intended to clarify whether the 45-day time period was mandatory, they

contended the agency promulgated the rule in response to a Board decision that interpreted the

45-day limitation as discretionary. Id. at 405. Further, plaintiffs contended that the amendment

"substantially affected their rights" because on one day they had viable claims and on the next,

their claims were barred. Id. The agency countered that it had "consistently interpreted the

regulation as requiring a 45-day limitation period . . . ." It noted that the purpose of the

amendment was to "clarify[ ] the existing 1995 regulation" in light of conflicting Board

interpretations. Id.

In holding that the agency's amendment of its regulation was a permissible interpretive

rule, the Court noted that the use of the word "may" in the pre-amended regulation was

ambiguous, and thus the agency's amendment was merely a clarification:

Indeed, the 2000 amendment is not irreconcilable with the previous version
because it does not proscribe a party's option of requesting a final administrative
decision, but it merely clarifies that this request must be done within the 45-day
period. Moreover, plaintiffs do not dispute that FCIC has consistently interpreted
the 45-day provision as mandatory, despite Board decisions to the contrary.
Accordingly, the 2000 amendment did not create 'major substantive legal
additions,' and it falls within the APA's interpretive rule exception. . . . Therefore,
FCIC was not required to comply with the notice and comment requirements under
the APA, and the court grants the defendant's motion for summary judgment . . . .

Id. at 405.

Here, as in Ace Property & Cas. Ins. Co., the Department's addition of four words to 20

C.F.R. § 656.10(b)(2)(i) did not constitute rule making. Rather, these words merely served to

-26-

clarify the long-standing requirements of the regulation, and expressed the Department's view regarding who can appropriately participate in the determination of whether there are qualified U.S. applicants. Plaintiff cannot dispute that § 656.10(b)(2)(ii) has, at least since 1980, limited the personnel who can "interview[ ]" or "consider[ ]" U.S. workers for the job offered to the alien. The only person who may perform such "interviewing" or "consideration" "must be the person who normally interviews or considers, on behalf of the employer, applicants for job opportunities such as that offered the alien, but which do not involve labor certifications." 20 C.F.R. § 656.10(b)(2)(ii). In adding the four words, at issue here, to section (b)(2)(i), the agency was simply underscoring what has long been a well-understood limitation on attorney or agent involvement in the recruiting process surrounding labor certification applications.

Furthermore, the addition of the four words to subsection (b)(2)(i) in no way imposed any legal obligation on the plaintiff or any other employer. See Ace Property & Cas. Ins. Co., 517 F. Supp. 2d at 405 (holding that amendment to regulation was an interpretive rule because it "did not create 'major substantive legal additions,' . . . ."). Plaintiff itself agrees with this proposition. See Pl.'s Mem. at 18 (asserting that the sentence containing the newly added four words "includes no 'term of legal significance' to suggest that it effects a prohibition.") (quoting Exportal Ltd. v. United States, 902 F.2d 45, 50 (D.C. Cir. 1990)). Rather, the provision merely indicates the agency's view, as clearly provided in 20 C.F.R. § 656.10(b)(2)(ii), that the only person interviewing or considering U.S. workers should be the person who normally performs this role for the employer: "It is contrary to the best interests of U.S. workers to have the alien and/or agents or attorneys for either the employer or the alien participate in interviewing or considering U.S. workers for the job offered the alien." 20 C.F.R. § 656.10(b)(2)(i) (emphasis

-27-

added).  As the plain text of the regulation makes clear, the only limitation expressly contained in

section 656.10(b)(2)(i) is that prohibiting the alien or the alien's agent or attorney from

interviewing or considering U.S. workers, unless that individual is the employer's representative

who normally performs such functions.  Indeed, the Department has not purported to rely on or

enforce the language in section 656.10(b)(2)(i) at any time during its interaction with Plaintiff,

and has expressly relied only on the language in section 656.10(b)(2)(ii), which as noted below,

Plaintiff does not challenge in this suit.  Thus, the Department's addition of the four words to the

text of the regulation was clearly a general statement of its policy, and notice and comment was

not required.  See, e.g., National Latino Media Coalition, 816 F.2d at 789 ("[O]ur determination

that the Commission's statements here amount to an interpretive rule disposes of petitioners'

contention that the statements could not be made without notice and comment.  No such

requirements were applicable."); Ace Property & Cas. Ins. Co., 517 F. Supp. 2d at 405 (holding

that rule fell "within the APA's interpretive rule exception[,]" and thus the agency "was not

required to comply with the notice and comment requirements under the APA . . . .").

In sum, Plaintiff's argument that the Department erred by enforcing new restrictions

directed at the role of attorneys for employers in the labor certification process without following

the notice and comment rulemaking procedures set forth in the APA is without merit.

> **d.      Plaintiff has Waived its Challenge to the Department's
> Construction of 20 C.F.R. § 656.10(b)(2) by Failing to
> Raise any Issue Concerning the Provisions of 20 C.F.R.
> § 656.10(b)(2)(ii).**

Plaintiff asserts that the Department's interpretation of 20 C.F.R. § 656.10(b)(2) is

contrary to the language, structure, and purpose of the regulation.  Even assuming that it has

alleged a proper cause of action under the APA – which, as discussed above, has not – Plaintiff's

argument fails. Plaintiff challenges the Department's construction of section 656.10(b)(2)(i), but

fails to meaningfully challenge the provisions of section 656.10(b)(2)(ii); this failure eviscerates

its arguments.

Section 656.10(b)(2)(ii) provides:

(ii) The employer's representative who interviews or considers U.S. workers for
the job offered to the alien must be the person who normally interviews or
considers, on behalf of the employer, applicants for job opportunities such as that
offered the alien, but which do not involve labor certifications.

20 C.F.R. § 656.10(b)(2)(ii).

BALCA decisions have long and clearly supported the Department's position, in

accordance with section 656.10 (b)(2)(ii)'s identical predecessor provision, 20 C.F.R. § 656.20

(b)(3)(i), that an alien's attorney or agent may not interview or consider U.S. applicants, unless

that attorney or agent is also an employer's representative who normally interviews or considers

applicants for positions which are similar, but do not involve labor certification. See Scan, Inc.,

97-INA-247 (BALCA 1998) (an employer's attorney's involvement in the initial assessment of

an applicant's qualifications, when the attorney is not normally involved in the recruitment

process, is in violation of the regulations); Taam Shabbos, 90-INA-97 (BALCA 1991) (control

by employer's agent over contact, consideration, and rejection of U.S. applicants, when evidence

did not demonstrate that agent was normally involved in the recruitment process in non-labor

certification cases, violated §656.20(b)(3)(ii))). See also Tom O'Brien Nissan, Inc.,

1997-INA-0435 (BALCA 1999) (involvement of an attorney or immigration consultant with

recruitment (instead of employer) would have a chilling effect on recruitment); Rian Cleaners,

96- INA-00012 (BALCA 1997) (employer's attorney found in violation of § 656.20 (b)(3)(ii),

when attorney sent interview letter to sole U.S. job applicant and evidence failed to establish that

attorney normally interviewed or considered applicants for job opportunities that do not involve

labor certifications); Techknits, Inc., 92- INA-0001 (BALCA 1993) (employer's attorney found

in violation of regulations when attorney sent letters to prospective U.S. job applicants in order

to expedite recruitment); K&S Sportswear, 91-INA-52, (BALCA 1992) (employer's attorney

involvement in the interview and recruitment process of U.S. applicants violated

§656.20(b)(3)(ii)); Sharon Lim Lau, 90-INA-103 (BALCA 1992) (holding that this prohibition

extends to an agent or attorney who represents both the employer and the alien, unless that agent

or attorney is routinely involved in that process).[6]

     Not only has Plaintiff failed to address these decisions, it has failed to challenge

BALCA's long-standing and consistent interpretation of section 656.10(b)(2)(ii) to prohibit

employers' attorneys from interviewing and considering U.S. workers for jobs offered to aliens

unless the attorneys normally perform the same functions for the employer in cases not involving

labor certifications. Because Plaintiff failed to raise this issue in either its Complaint or request

for a preliminary injunction, it should be deemed to have waived any argument concerning the

Department's interpretation of that provision. See Casa de Cambio Comdiv S.A., de C.V. v.

United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003) ("[W]e

---

[6] Plaintiff cites In re Le Petit Prince, Inc., 91-INA-354 (BALCA 1993) to support its contention that "contrary to the Department's current position, BALCA generally supported the role of an employer's attorney in the recruitment process." Pl. Mot. at 20. In re Le Petit Prince, Inc., which reversed the denial of a labor certification where an employer's attorney contacted a job applicant to convey an offer by the employer, is inapt because the attorney was not "interviewing] or considering]" the U.S. worker "for the job offered to the alien." 20 C.F.R. § 656.10(b)(2)(ii).

conclude that we need not address Casa's agency theory because it was not properly raised. No mention of this theory appears in Casa's complaint.  Under the circumstances, we hold that Casa waived any claim it may have against the government based on such a theory."); Mients v. United States, 50 Fed. Cl. 665, 671 (2001) ("The court's duty to scour the complaint for any possible basis on which the non-movant might prevail, . . . does not mean that the court must adjudicate every possible cause of action that plaintiff might have pleaded.").

### e.    The Agency's Interpretation of 20 C.F.R. § 656.10(b)(2) is Entitled to Chevron Deference and Should be Upheld.

Even if Plaintiff is deemed to have somehow preserved its challenge to the Department's interpretation of section 656.10(b)(2), the Department's interpretation is entitled to Chevron deference and must therefore be upheld because its construction "is based on a permissible interpretation of the statute."  Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).

In Chevron, the Supreme Court adopted a two-step test for judicial review of administrative agency regulations that interpret federal statutes. The first step is to consider whether Congress speaks directly in the statute to the particular issue: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43.  Where a statute is ambiguous or silent with respect to the issue, a court proceeds to the second step: "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843. Agency regulations will be upheld unless they are "arbitrary, capricious, or manifestly contrary to the statute."  Id. at 844.  Accordingly, "[w]hen a challenge to an agency construction of a

-31-

statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." Id. at 866.

The Supreme Court reaffirmed the vitality of Chevron's deference analysis in National Cable & Telecommunications Association v. Brand X Internet Services, 545 U.S. 967 (2005) (Brand X), explaining that "Chevron's premise is that it is for the agencies, not courts, to fill statutory gaps." Id. at 982. If a statute is ambiguous, the agency's interpretation is controlling even if a court has already construed the statute, unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." Id. If the statute is not plain and unambiguous, the agency's interpretation must be upheld if it is permissible. Id. at 980.

More recently, in Federal Express Corp. v. Holowecki, 128 S. Ct. 1147 (2008), the Supreme Court emphasized that judicial deference to administrative interpretations is required, without regard to the formality of the agency's interpretation, whenever the agency can be fairly viewed as interpreting an ambiguous statute that it administers. Id. at 1156.

Title 8 section 1182(a)(5) of the United States Code provides that an alien seeking to enter the United States for the purpose of obtaining employment is inadmissible unless the Secretary of Labor has determined and certified that there are "not sufficient" American workers who are qualified, able, willing, and available to do the work, and that the employment of the alien will not adversely affect the wages and working conditions of workers in the United States who are similarly qualified. 8 U.S. C. § 1182(a)(5)(A)(i). The statute does not specify how the

-32-

Secretary is to accomplish these goals; that determination is left to the regulations promulgated at 20 C.F.R. Part 656, and the Secretary's reasonable interpretation of those regulations.

It is readily apparent that in construing 20 C.F.R. § 656.10(b)(2)(ii) and its predecessor regulation, 20 C.F.R. § 656.20 (b)(3)(i), the Department and BALCA have consistently limited an attorney's involvement in the interview and recruitment of U.S. applicants, regardless of whether the attorney represents the employer or the alien in the labor certification process. Under Chevron's settled principles, the Department's long-standing construction of section 656.10(b)(2)(ii) to preclude any outside attorneys from interviewing or considering U.S. workers for the job offered to the alien worker, unless they are normally involved in the recruitment process in non-labor certification cases, is entitled to Chevron deference because it is a permissible interpretation and implementation of the statutory labor certification procedures.

Because Plaintiff fails to address section 656.10(b)(2)(ii)'s provisions and the long line of BALCA precedential decisions upholding them, and its challenge to the Department's construction of section 656.10(b)(2) "fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress," Chevron, 487 U.S. at 866, its request to enjoin the Department from enforcing those provisions must be rejected.[7]

---

[7] In light of BALCA's long-standing and consistent construction of section 656.10(b)(2)(ii)'s provisions – which Plaintiffs have not challenged – Plaintiff's contention that the Department's interpretation of the regulation is "new" and "impermissibly retroactive" as applied to previously filed applications is meritless.

-33-

## f.    The Audits Were Properly Instituted.

Assuming that Plaintiff's claims concerning the Department's decision to audit are amenable to judicial review, the Court should reject them. The decision to conduct the audits was premised on the Department's legitimate need under 8 U.S.C. § 1182(a)(5) and the implementing regulations to ensure that Plaintiff's employer-clients were conducting their labor certification procedures in good faith.

As detailed in the statement of facts, supra at 3-10, while conducting routine audits, the Department discovered several forms created by Plaintiff, the existence of which suggested that American workers, who were applying for jobs in the labor certification process, were being evaluated in a manner that improperly differed from the evaluation process used when an employer evaluated applicants for non-labor certification jobs. The Department was justifiably concerned that the employers who used the forms were not recruiting in good faith. The disclosure to the Department of the forms was sufficient to trigger an audit of all Fragomen-filed applications because of the reasonable suspicion of bad faith recruiting. Before taking such a action, however, the Department met with Plaintiff on two occasions to gain more information about the forms, but did not receive a satisfactory explanation from Plaintiff.

As noted, Plaintiff gave no information to the Department that would have permitted it to narrow the scope of the audit. After initiating the audit of all Plaintiff's applications, the Department learned that Plaintiff may have stationed paralegals to work in the human resources offices of clients. The Department learned that one or more of these paralegals may have been prescreening resumes and applications that were submitted for vacancies in which labor certification was being sought. This gave rise to additional concern that some of Plaintiff's

-34-

clients were not recruiting in good faith in cases in which labor certifications were being sought.

Accordingly, the decision to audit was not made in retaliation or for any inappropriate reason, as

alleged by Plaintiffs. Rather, it was a proper and appropriate attempt by the Department to

discharge its statutory obligation to ensure integrity in the labor certification process.

### 3.    Plaintiff's Due Process Arguments are Without Merit.

#### a.    Plaintiff's Substantive Due Process Claims.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be

deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V.

Plaintiff, in its motion for a preliminary injunction contends that "the Department caused

immediate and debilitating injury to Fragomen's reputation" and that the "stigma" of certification

audits threatens the Plaintiff's future commercial business to such an extent that its "right to

follow a chosen profession" has been harmed. Pl. Mem. at 36-37.[8]

A litigant's alleged due process rights may be classified as either substantive or

procedural in nature. Plaintiff alleges that the Department, by initiating an audit of its labor

certification applications, has infringed its putative substantive due process right to "follow a

chosen profession." Plaintiff is mistaken.

The substantive component of due process "provides heightened protection against

government interference with certain fundamental rights and liberty interests." Washington v.

---

[8]   Indeed, a person's "right to . . . follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' . . . concept of the Fifth Amendment." Greene v. McElroy, 360 U.S. 474 (1959); see also Kartseva v. Dep't of State, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (acknowledging a "constitutionally protected 'right to follow a chosen trade or profession' "(quoting Cafeteria & Restaurant Workers Local 473 v. McElroy, 367 U.S. 886, 895-96 (1961)).

-35-

Glucksberg, 521 U.S. 702, 720 (1997) (emphasis added). Examples of fundamental rights include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, [and] to use contraception." Id.

Contrary to Plaintiff's assertions, the Department's decision to conduct a permissible and justified audit of its applications, pursuant to 20 C.F.R. § 656.20, does not implicate a due process right. Even if it did, the Department's actions cannot reasonably be found to have impaired Plaintiff's professional standing within the legal community. Indeed, labor certification applications, submitted by a numerous companies, are selected for audit by the Department in the normal course. In short, there can be no substantive due process deprivation claim in the context of a permissible audit by the Department.

In support of its position that its fundamental due process rights have been violated, Plaintiff relies on Trifax Corp v. District of Columbia, 314 F.3d 641 (D.C. Cir. 2003), in which a contractor that was providing health care services to District of Columbia and federal agencies was audited due to concerns about the plaintiff's performance. The government had issued a report critical of the plaintiff in Trifax, in which it alleged that the plaintiff had violated requirements of the public contract. Plaintiff sued, alleging that it suffered a "broad preclusion" from government contracting due to the government's claims in violation of 42 U.S.C. § 1983. The United States Court of Appeals affirmed the lower court's summary judgment in favor of the defendants.

Although the court in Trifax conducted a due process analysis of plaintiff's claims, this Court need not do so in this case. First, unlike in Trifax, the case does not involve a claim under 42 U.S.C. § 1983. In addition, in this case Plaintiff has not alleged that the Department's audits

-36-

(which are permissible under its regulations) have prevented Plaintiff from participating in the labor certification process. Indeed, the United States Supreme Court has expressly stated that a liberty interest in the right to practice one's profession is only implicated where there is a "complete prohibition of the right to engage in a calling. . . ." Conn v. Gabbert, 526 U.S. 286, 287 (1999). Plaintiff has not been even temporarily precluded from participating in the certification process, much less debarred pursuant to 20 C.F.R. § 656.31(f). In short, there is no substantive due process deprivation under these circumstances.

### b.    Plaintiff's Procedural Due Process Claims.

Although Plaintiff's motion for a preliminary injunction makes no specific allegation concerning a deprivation of procedural due process, Plaintiff contends that "the Department took this action [the audits] without providing any notice to Fragomen or an opportunity to defend itself." Pl.'s Mem. at 37. To the extent that Plaintiff may be deemed to have raised a procedural due process claim, it must be rejected.

The Fifth Amendment provides individuals with procedural protections before certain liberty or property interests may be infringed. However, not all deprivations of liberty or property fall within the ambit of the Fifth Amendment's Due Process Clause. Board of Regents v. Roth, 408 U.S. 564 (1972). Before a court concludes that a government actor has violated a right to due process, it must conclude that some process was actually due. Despite Plaintiff's assertions to the contrary, Plaintiff was accorded all of the rights afforded to it by the applicable regulations. Indeed, as discussed above, the absence of "final agency action" prevents Plaintiff from pursuing an APA claim at this time. Trudeau, 456 F.3d at 188-89. A mere decision to

-37-

conduct an audit or investigation is not "final agency action" as required by the APA. Corrigan, 347 F.3d at 69.

In addition, nowhere within 20 C.F.R. § 656.10 is there a right for a company to contest the Department's decision to initiate an audit in one or more cases. Under the governing regulation, the Department's discretion to conduct audits is extremely broad. The regulation states only that, "[r]eview of the labor certification application may lead to an audit of the application. Furthermore, certain applications may be selected randomly for audit and quality control purposes." 20 C.F.R. § 656.20(a). Additionally, the Department twice invited Plaintiff to the Department, to discuss its applications before instituting the audit.

Moreover, 20 C.F.R. § 656.20(a)(3)(ii) explains that in the context of the decision to initiate an audit, "[t]he administrative-judicial review procedure provided in § 656.26 is not available." Section 656.26 addresses BALCA's review of denials of labor certifications, and specifically anticipates that employers will be represented by counsel, as well as the possible participation of amicus curiae. 20 C.F.R. § 656.20(a)(4)(i). Therefore, apart from the APA problems discussed above, and contrary to its assertions, it is clear that Plaintiff has no legal expectation of an opportunity to "defend itself" from the mere decision by the Department to initiate an audit. Accordingly, Plaintiff is unable to demonstrate any likelihood of success on the merits in any due process claim.

## C.    **Plaintiff Cannot Demonstrate Irreparable Harm.**

In order to show irreparable harm, a plaintiff must demonstrate that the injury it will suffer is "both certain and great; it must be actual not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). When a plaintiff is able to show a significant likelihood of

-38-

success on the merits, but has not adequately shown that it will suffer irreparable harm absent a preliminary injunction, this failure, in itself, is sufficient to defeat a request for a preliminary injunction. <u>Magee v. Greenspan</u>, 808 F. Supp. 847, 851 (D.D.C. 1991).

Plaintiff claims that the Department's interpretation of the regulation "portends serious intangible economic injuries, such as lost reputation and goodwill." Pl.'s Mem. at 38. Because Plaintiff asserts only that the Department's interpretation of its regulation "portends" harm, and Plaintiff fails to allege any <u>certain</u>, <u>great</u> or <u>actual</u> harm, the irreparable injury showing remains merely theoretical. <u>Wisconsin Gas</u>, 758 F.2d at 674. Moreover, under the agreement entered into between the parties on July 16, 2008, Plaintiff cannot show any harm to its business in the future. Carlson Decl. ¶ 32, 34, 37. Accordingly, the Court should find that Plaintiff has failed to meet its burden of demonstrating irreparable injury on this basis.

Plaintiff also claims that it could suffer economic injury at an unspecified time in the future. Plaintiff asserts that there is an "imminent danger" that its clients may terminate representation, and it speculates that some "lost business" may result. These vague assertions of harm are too speculative, and inadequate in any event, for Plaintiff to meet its burden of showing irreparable harm. Although this is a case arising under the APA, rather than in the context of claims for money damages, it bears noting that the law of this Circuit holds that economic harm generally does not justify preliminary injunctive relief by itself. Indeed,"the plaintiff must quite literally find himself being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm." <u>Elite Entertainment, Inc. v. Reshammiya</u>, 2008 U.S. Dist. LEXIS 31580, *7 (D.D.C. April 18, 2008) (citing <u>Williams v. State Univ. of N.Y.</u>, 635 F. Supp. 1243, 1248 (E.D.N.Y. 1986)).

Here, there is no conceivable argument that a law firm of "over 250 attorneys and over 1000 professional immigration specialists and staff located in more than 30 offices in the Americas, Asia Pacific and Europe" (Fragomen website) has been so harmed. Furthermore, Plaintiff explains that its services include global immigration services, technology and in-house program solutions, export control compliance, I-9/IRCA compliance, LCA compliance, U.S. Consular representation, mergers and acquisition support, U.S. Government affairs and business visitor visas and passports. (Fragomen website). It is therefore unlikely that the audits at issue in this case, or the narrow limitation within 20 C.F.R. §656.10(b)(2)(ii) concerning unusual involvement of third party agents in an employer-client's hiring process, creates "irreparable injury" to Plaintiff.[9]

Finally, whatever injury Plaintiff may have suffered as a result of the Department's decision that a one-hundred percent audit was necessary, Plaintiff has likely overstated the number of its labor certification applications that went into audits based upon the Department's challenged actions. Indeed, Plaintiff has apparently overlooked that "when taken together, more

---

[9] A recent case decided by the Court of Appeals for the District of Columbia is analogous to this case. In National Propane Gas Association v. United States Department of Homeland Security, 534 F. Supp. 2d 16 (D.D.C. 2008), the plaintiffs comprised a group of associations from the propane and natural gas industry who brought an action against defendants, the United States Department of Homeland Security, challenging the Chemical Facility Anti-Terrorism Standards (CFATS) final rules regulating certain propane facilities. Those rules required that any facility that possessed more than 60,000 pounds of propane must timely submit an information form by a date certain, or be subject to audits and inspections. The plaintiffs moved for a preliminary injunction, seeking to enjoin enforcement of the regulations. The court denied the preliminary injunction, explaining that although the audits may cost the plaintiffs money, "mere injuries, however substantial, in terms of money . . . are not enough to constitute irreparable harm." Id. at 19 (citing, Wisconsin Gas Co. at 674).

-40-

than 49 percent of all pending cases filed by Fragomen through July 15, 2008, were already being audited for issues unrelated to the concerns raised by the forms." See Carlson Decl. at n.1.

Accordingly, Plaintiff is unable to show that the decision of the Department to audit its pending labor certification cases will cause it irreparable harm. Therefore, were the Court to conclude that Plaintiff is likely to succeed on the merits in this case, it should still deny Plaintiff's motion for a preliminary injunction because Plaintiff's failure to show irreparable injury "effectively decides the preliminary injunction issue" in this case. See Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir. 1998).

**D.    A Preliminary Injunction will Harm the Department of Labor and Would Not Further a Public Interest.**

If this Court finds that Plaintiff has failed to demonstrate irreparable harm absent a preliminary injunction-- despite any possible likelihood Plaintiff has of succeeding on the merits-- the Court need not address the final two elements of a preliminary injunction: harm to the Defendant, and harm to the public interest. See Tenacre Found v. INS, 892 F.Supp. 289, 294, n.6 (D.D.C. 1995). Plaintiff's analysis of the public interest component fails to acknowledge that its claim of potential economic harm in the future must be weighed against the potential harm to the entire labor certification process and to the American labor force.

The legislative history of the INA makes clear that there is a significant public interest involved in regulating the alien labor certification process. Congress enacted the predecessor provision to 8 U.S.C. section 1182(a)(5)(A)) for the specific purpose of excluding aliens who were competing for domestic jobs that qualified United States workers could fill. Cheung v. District Director, INS, 641 F2d. 666, 669 (9th Cir., 1981); S. Rep. No. 748, 89th Cong., 1st Sess.

15, reprinted in 1965 U.S. Code Cong. & Ad. News 3328, 3333-34. Congress' consistent policy
has been to "provide for the protection of American labor against an influx of aliens entering the
United States for the purpose of performing skilled or unskilled labor where the economy of
individual localities is not capable of absorbing them at the time they desire to enter this
country." See H.R. Rep. No. 1365, 82d Cong., 2d Sess. 27 (1952) at 51. Indeed, the legislative
history of the 1952 INA recognized the historical problem of aliens entering the country to work
cheaply, while displacing American workers. Id.

In 1965, 8 U.S.C. section 1182(a)(5)(A)'s predecessor statute was amended to its present
form, to deny aliens entry into the United States absent the affirmative finding by the Secretary
that the statute's stated conditions were satisfied. Moreover, as the statute makes clear, a primary
purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are
therefore admitted to work in this country only if they "will not adversely affect the wages and
working conditions of the workers in the United States similarly employed." 8 U. S. C. §
1182(a)(14). See S. Rep. No. 748, 89th Cong., 1st Sess., 15 (1965).[10]

In short, Congress has long recognized, the danger in permitting aliens unfettered access
to the American employment sector. As noted, audits are the means by which the Department
tests the veracity of the employer's attestations in the labor certification process, and they are the

---

[10] The legislative history firmly establishes a strong congressional intent

> to protect the American labor market from an influx of both skilled and
> unskilled foreign labor . . . who would likely displace a qualified American
> worker or whose employment in the United States would adversely affect
> the wages and working conditions of workers similarly employed in the
> United States.

S. REP. No. 748, 89th Cong., 1st Sess. 15 (1965).

-42-

means by which the Department secures necessary supporting documentation. In essence, Plaintiff is asking this Court to enjoin the Secretary of Labor from enforcing lawful regulations that were drafted to implement the intent of Congress.

A grant of injunctive relief by this Court would jeopardize the integrity of the labor certification process and endanger those American workers who are otherwise qualified for the same positions sought by alien workers. The judiciary cannot afford to ignore such an all important consideration because an injunction would harm an agency's enforcement authority and endanger the public interest. See Hunter v. Federal Energy Regulatory Commission, 527 F. Supp. 2d 9, 21 (D.D.C. 2007).

Plaintiff has made only bare allegations of "lost reputation and goodwill" and "lost business from clients as well as opportunities to compete for new business." However, these contentions are not supported by any recitation of specific facts. Plaintiff has not detailed how its reputation has been damaged, especially in consideration of any additional audits that may be initiated against competing law firms within the labor certification industry. Moreover, Plaintiff has failed to quantify the amount of business it has already allegedly lost in terms of actual dollars; there is no mention of specific clients that have terminated the business relationship or potential future clients that have refused to retain the Plaintiff solely due to the pending audits. Indeed, Plaintiff has failed to describe the amount of its labor certification business it has lost in proportion to its other substantial and numerous immigration practice areas. Finally, Plaintiff has not produced any sort of economic analysis or report which predicts any monetary loss of future business within a reasonable degree of professional certainty. In short, the Plaintiff's economic claims, set forth in only one paragraph, are speculative and conclusory. These the claims are

inadequate to be helpful in any meaningful balancing of the relative equities. The Government, on the other hand, has demonstrated the harm that would result if the preliminary injunction is granted. Accordingly, the Court should find that granting Plantiff's motion for a preliminary injunction would harm Defendants, and it would harm, rather than benefit the public.

## CONCLUSION

For the foregoing reasons, Defendants respectfully ask this Court to deny Plaintiff's request for a preliminary injunction.

Dated August 29, 2008

Respectfully submitted,

/s/ David J. Kline
DAVID J. KLINE
\Director

/s/ Joshua E. Braunstein
JOSHUA E. BRAUNSTEIN
Assistant Director

/s/ Eric R. Quick
ERIK R. QUICK, D.C. BAR #447935
JONATHAN D. WADSEN
LYLE D. JENTZER
Attorneys
United States Department of Justice
Office of Immigration Litigation
District Court Section
Civil Division
450 5th Street, NW
Washington, DC 20001
Telephone: (202) 353-9162
Facsimile: (202) 305-7000

COUNSEL FOR THE FEDERAL DEFENDANTS

# Exhibit A

**U.S. Department of Labor Employment and Training Administration**
**Office of Foreign Labor Certification**
**August 29, 2008**

**Restatement of PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 CFR § 656.10(b)(2)**

*The Department of Labor recently issued the following documents on the topic of attorney/agent consideration of U.S. workers under the permanent labor certification program: 1) Press Release, titled "U.S. Department of Labor auditing all permanent labor certification applications filed by major immigration law firm," June 2, 2008; 2) Information Paper titled "Frequently asked questions on audit of permanent labor certification applications filed by attorneys at Fragomen, Del Rey, Bernsen & Loewy LLP," June 4, 2008; and 3) PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 CFR § 656.10(b)(2), June 13, 2008 (collectively, the "Consideration Guidance Documents"). The Consideration Guidance Documents set forth the Department's interpretation of 20 CFR § 656.10(b)(2) – in particular, with respect to the role an attorney may play in the employer's recruitment and hiring process. The Department acknowledges that employers often require counsel when applying for permanent labor certification. However, the Department must also ensure that the employer's recruitment and hiring processes are conducted in good faith, in accordance with the permanent labor certification program's statutory and regulatory requirements. Since issuing the Consideration Guidance Documents, the Department has received considerable feedback from employers and employer representatives, including attorneys and agents, that regularly practice in or make use of the PERM Program. After consideration of these comments and suggestions, the Department has decided to issue the following Restatement of the PERM Program Guidance Bulletin on the Clarification of Scope of Consideration Rule in 20 CFR § 656.10(b)(2), which will supersede the Consideration Guidance Documents.*

The Department of Labor has a statutory responsibility to ensure that no foreign worker (or "alien") is admitted for permanent residence based upon an offer of employment absent a finding that there are not sufficient U.S. workers who are able, willing, qualified and available for the work to be undertaken and that the admission of such worker will not adversely affect the wages and working conditions of U.S. workers similarly employed. 8 U.S.C. § 1182(a)(5)(A)(i). The Department fulfills this responsibility by determining the availability of qualified U.S. workers before approving a permanent labor certification application and by ensuring that U.S. workers are fairly considered for all job opportunities that are the subject of a permanent labor certification application. Accordingly, the Department relies on employers who file labor certification applications to recruit and consider U.S. workers in good faith, even where the employer already has a temporarily-admitted foreign national working for the employer.

The Department has long held the view that good faith recruitment requires that an employer's process for considering U.S. workers who respond to certification-related recruitment closely resemble the employer's normal consideration process. In most

situations, that normal hiring process does not involve a role for an attorney or agent (as defined in 20 C.F.R. § 656.3) in assessing the qualifications of applicants to fill the employer's position.  It also does not involve any role for the foreign worker or foreign national in any aspect of the consideration process.  However, given that the permanent labor certification program imposes recruitment standards on the employer that may deviate from the employer's normal standards of evaluation, the Department understands and appreciates the legitimate role attorneys and agents play in the permanent labor certification process.  Additionally, the Department respects the right of employers to consult with their attorney(s) or agent(s) during that process to ensure that they are complying with all applicable legal requirements.

By prohibiting attorneys, agents, and foreign workers from interviewing and considering U.S. workers during the permanent labor certification process, as described in 20 C.F.R. § 656.10 (b)(2)(i) and (ii), the Department does not thereby prohibit attorneys and agents from performing the analyses necessary to counsel their clients on legal questions that may arise with respect to this process.  The employer, and not the attorney or agent, must be the first to review an application for employment, and must determine whether a U.S. applicant's qualifications meet the minimum requirements for the position, unless the attorney or agent is the representative of the employer who routinely performs this function for positions for which labor certifications are not filed.  By requiring that initial reviews of and final determinations on all applications are made by the employer, the Department seeks to ensure that the consideration process is as close to the employer's non-immigration-related hiring process as possible and that U.S. workers receive full and fair consideration by the employer for the job.  Attorneys (and, to the extent it is consistent with state rules governing the practice of law, agents) may, however, provide advice throughout the consideration process on any and all legal questions concerning compliance with governing statutes, regulations, and policies.

More specifically, the types of actions prohibited by 20 C.F.R. § 656.10(b)(2)(i) and (ii) include:

- Attorneys and agents may receive resumes and applications of U.S. workers who respond to the employer's recruitment efforts; however, they may not conduct any preliminary screening of applications before the employer does so, other than routine clerical or ministerial organizing of resumes which does not include any assessment of, or comments on, the qualifications of any applicants, unless the attorney or agent is the representative of the employer who routinely performs this function for positions for which labor certifications are not filed.  The attorney or agent may not withhold from the employer any resumes or applications that it receives from U.S. workers.

- Attorneys and agents may not participate in the interviewing of U.S. worker applicants, unless the attorney or agent is the representative of the employer who routinely performs this function for positions for which labor certifications are not filed.  Such involvement has resulted in an impermissible "chilling effect" on the interests of U.S. worker-applicants in the position.

Where the Department finds evidence of potentially improper attorney, agent, or foreign worker involvement in considering U.S. worker applicants, the Department will audit, and may subsequently require supervised recruitment, for those applications to determine whether the employer's recruitment and hiring processes were conducted in good faith and to ensure adherence to all statutory and regulatory requirements. In evaluating a labor certification application, the Department will look carefully at the manner in which the employer reached its determination that there are no qualified, available, able and willing U.S. workers, including scrutinizing the manner in which the decision was made and whether or not the employer deviated from its normal course of business in evaluating the qualifications of U.S. applicants.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>FRAGOMEN, DEL REY, BERNSEN )<br> & LOEWY, LLP )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>ELAINE L. CHAO, Secretary of Labor, )<br> and the U.S. Department of Labor, )<br> )<br>Defendants. )<br>_____ ) | Civil No. 1:08cv01387 (RMU) |

DECLARATION OF WILLIAM CARLSON

I, William Carlson, declare and state, upon information and belief, as follows:

1.      I am the Administrator of the Office of Foreign Labor Certification ("OFLC").  The programs for which I have responsibility are organized within the Employment and Training Administration (ETA) in the United States Department of Labor ("DOL" or the "Department").  I have held this position since June 2006.  Prior to that time, I was the Regional Administrator in Boston for the ETA, and before that, from May 2003 to June 2005, I held the position of Chief of the Division of Foreign Labor Certification.

2.      In my capacity as Administrator, I am responsible for oversight of DOL's adjudication of all labor certification applications for temporary and permanent employment-based immigration.

3.      I have personal knowledge of the facts contained in this Declaration and, if called to testify as a witness, I can and will competently testify to the facts stated herein.

4.      Section 212(a)(5)(A)(i) of the Immigration and Nationality Act ("the Act" or "INA"),

codified at 8 U.S.C. § 1182(a)(5)(A)(i), provides that an alien seeking to enter the United States

("U.S.") as a skilled or unskilled immigrant worker is inadmissible unless the Secretary of Labor

certifies to the Secretary of Homeland Security or the Secretary of State that there are not

sufficient U.S. workers who are able, willing, qualified and available for the job offered to the

alien, and that the employment of the alien will not adversely affect the wages and working

conditions of similarly employed U.S. workers.

5.      Approval of the labor certification by the Secretary of Labor is a condition precedent to

the Department of Homeland Security ("DHS") or the Department of State ("DOS") being able to

make admissibility determinations for certain employment-based visas.

6.      Before 1977, the Secretary made her certification decisions based largely on labor market

information.  That approach was rejected in several court decisions which held that those

procedures did not sufficiently address whether U.S. workers were actually "willing" to work for

the specific employer seeking certification.

7.      To deal with that concern, the Department developed new certification procedures, 42 FR

3441 (Jan. 18, 1977), 20 C.F.R. § 656.1 et seq., that required employers to test the domestic labor

market by recruiting U.S. workers.  If an employer's good faith and valid attempt to recruit able,

willing, qualified and available workers was unsuccessful, certification could be granted should

all other requirements be satisfied.

8.      The permanent labor certification process requires that the employer identify the foreign

worker who is the intended beneficiary of the application.  In fact, approximately 80% of

permanent labor certification applications involve foreign workers already employed by the

employer seeking certification.  In other words, many of the positions for which the employer is

required by the INA to recruit U.S. workers typically are not truly "open," but rather may be already being performed by a foreign worker that the employer may wish to permanently hire into the position. Indeed, it is not uncommon for foreign workers to be hired on a temporary basis (e.g., H-1B visa) with the employer's promise that the employer will do everything it can to secure the foreign worker a green card. Under these circumstances, some employers often have little or no incentive to actually find qualified domestic applicants and have a strong incentive for the recruitment to fail.

9.      A fair and complete test of the domestic labor market, however, is necessary for the Secretary to fulfill her statutory responsibility to certify the absence of qualified domestic workers, regardless of whether there is a temporary foreign worker performing the position's duties.

10.     For this reason the permanent labor certification program's regulations describe in some detail both the manner in which the job opportunity must be described by the employer and the nature of the recruitment process that must be used. The regulations are meant to ensure that the job offer is not so narrowly tailored that it excludes domestic applicants who are interested in and qualified for the position. Additionally, the regulations are structured to ensure that the opening is fairly advertised, so that domestic workers can learn about the position.

11.     For example, the regulations require that the job duties and requirements for the position be normal to the occupation (20 C.F.R. § 656.17(h)). Also, the job requirements must represent the employer's actual minimum requirements for the position (20 C.F.R. § 656.17(i)). Specifically, the employer cannot require more training and experience of domestic applicants than was required of the foreign worker when he was hired. In addition, the employer must place newspaper advertisements on Sundays in newspapers of general circulation.

12.    In developing this regulatory framework, the Department noted that it had a particular

interest in the procedures that the employer would follow in evaluating U.S. worker applicants.

In the preamble to its 1980 Notice of Proposed Rulemaking, the Department noted:

> DOL has found that a bona fide test of the availability of U.S. workers cannot take
> place where the alien beneficiary or the alien's attorney or representative
> participates in the interview(s) or consideration of U.S. workers seeking the job
> offered to the alien.  Additionally, in some situations, the Certifying Officers have
> reported that some employers have utilized unusual interviewing or consideration
> procedures for job opportunities involving job offers to aliens.  For example, the
> attorney for the employer or alien or some nonpersonnel official would conduct
> the interviewee and participate in the consideration of U.S. workers applying for
> the job.

45 FR 4920 (Jan. 22, 1980).

13.    The Final Rule provides that employers must evaluate workers who apply for positions,

for which labor certification is being sought, in the same manner as they consider workers in

non-labor certification situations:

> The employer's representative who interviews or considers U.S. workers for the
> job offered to the alien must be the person who normally interviews or considers,
> on behalf of the employer, applicants for job opportunities such as that offered the
> alien, but which do not involve labor certifications.

20 C.F.R. § 656.10(b)(2)(ii)e.

14.     In addition to the specific regulatory requirements governing the recruitment process, the

Department has taken the general position that the recruitment process must be conducted in

good faith.  The Department's Board of Alien Labor Certification Appeals ("BALCA"), which

reviews denials of labor certification issued by the Department's Certifying Officers ("CO"), has

decided numerous cases identifying employer recruitment practices which, while not explicitly

proscribed by the regulations, are incompatible with the obligation to recruit U.S. workers in

good faith.

15.     Through the late 1990s to 2005, with the implementation of PERM (the re-engineered program further described in paragraph 18), the permanent employment-based program experienced increasing backlogs.  These backlogs were due to a number of factors, including amendments to the INA, which drastically increased the number of applications filed.  By 2002, these backlogs had grown to unacceptable lengths.  In many cases, applications were not adjudicated until years after they were filed.

16.     The delays also were caused in part by the cumbersome application process, which included processing of the application by both the State Workforce Agency ("SWA") and DOL.  Under this model, the employer conducted its recruitment under the direct supervision of the SWA, and the results of that recruitment were reviewed by both the SWA and DOL.  Employers were required to compile documentary evidence concerning advertising, applications received, and other recruiting documents, and submit the documents with their application for labor certification.

17.     The Department and the Executive Branch made a commitment to eradicate the backlogs.  Accordingly, in May 2002, DOL published a Notice of Proposed Rulemaking ("NPRM"), announcing a new approach in the labor certification process that would streamline the review process and eliminate duplicative governmental review through an attestation-based system.  At the same time, the Department shifted resources to process the thousands of permanent labor certification cases still pending (the "Backlogged Cases").  I was in charge of both the regulatory effort to finalize a re-engineered permanent labor certification program regulation and shift to a new processing model, and the effort to establish a process to eliminate the approximately 363,000 Backlogged Cases.

18.     The PERM Final Rule implemented the transition to an attestation-based processing

model, where employers conduct their own recruitment and attested to its results. The rule

became effective March 28, 2005 and is described with the acronym PERM (Program Electronic

Resource Management). This model was significantly different from the traditional DOL-

supervised recruitment process. Under PERM, employers were no longer required to submit

large amounts of documents with each application, but were required to maintain those

documents in the event they were audited.

19.     Because of the increasing volume of applications, DOL cannot view all supporting

documents that employers collect in connection with a labor certification application. Although

the employer submits less substantiating information, the Department scrutinizes every

application submitted through PERM. The first step is an electronic evaluation that ensures that

each field in the form has been completed. Next, Department employees verify that the

application was submitted by an existing legal entity or real person. After ascertaining the

employer's existence, Department employees contact the employer to confirm that the employer

indeed submitted the labor certification application. The Department employees then make a

recommendation to a CO who either approves or denies that application. In the event of an

approval, the CO sends the labor certification to the sponsoring employer, who then submits it to

DHS with the necessary paperwork. In the event of a denial, the employer may request a

reconsideration of the decision or appeal to the BALCA.

20.     The PERM information technology processing system contains a number of safeguards

designed to both identify and deter employers and aliens from abusing the program. For

example, the Department relies upon random and targeted audits to review the documentation

maintained by employers for their recruitment and assessment of U.S. applicants. Through the

audit process, the Department obtains and reviews evidence of how a job was advertised, how

resumes were received by the employer, whether there were qualified U.S. workers, and other

recruitment documents.  In an audit, the Department evaluates: whether the employer recruited

U.S. workers in good faith; whether U.S. workers were rejected for lawful, job-related reasons;

and whether other regulatory provisions were satisfied.  The documents requested in an audit

include many of the same documents employers were required to submit with every application

prior to the institution of PERM.

21.    Between 2001 and 2005, several attorneys and agents representing employers before the

Department were convicted of unscrupulous and fraudulent practices, including the buying and

selling of labor certifications.

22.    The Department attempted to address some of the problems of program integrity in a

2007 Rule. For example, the Rule prohibited the substitution of aliens on approved labor

certification applications, and it prohibited employers from demanding kickbacks or other

unlawful payments from foreign workers in return for filing labor certification applications. 72

FR 27904 (May 17, 2007).

23.    In late 2007, the Department completed its task of eliminating the backlog in the

permanent labor certification program.  This allowed the Department to shift additional resources

to pre-approval audits of applications to boost program integrity.  In particular, the Department

has focused on the employer's obligation to recruit U.S. workers in good faith in order to

establish a bona fide test of the domestic labor market.  The Department became increasingly

aware that in some cases, the employer had created two disparate systems for evaluating resumes

of applicants for a job.  In one system, involving applications for jobs for which no labor

certification was being sought, U.S. workers were evaluated solely by the employers' human

resources professionals in the normal course of business.  In the other system, where the

employer was seeking to hire an alien through the permanent labor certification process, the resumes of U.S. workers were evaluated or prescreened by an entirely different staff, in some cases consisting solely of immigration lawyers or agents who were outside the human resources department of the employer.  This is problematic because Department regulations have for decades expressly required that employers use their normal recruiting process to establish a fair test of the labor market was conducted.

24.     These concerns were heightened in September 2007, when DOL was informed that an immigration law firm had created a training video expressing the view that the role of an immigration attorney in the labor certification process was to ensure that U.S. workers were determined not to be employable under the statute and regulations.  The video demonstrated the ways an employer could manipulate the system and avoid hiring qualified U.S. workers. Specifically, the attorney making the presentation stated, "[O]ur goal is clearly not to find a qualified and interested U.S. worker."  This video was eventually posted on the internet. (http://www.youtube.com/watch?v=TCbFEgFajGU).  This video alarmed not only the Department, but also Congress.  Congress made inquiries of DOL regarding its plans to remedy this situation.  The video caused the Department grave concern about the validity of the recruitment process for all clients of that firm.  Thus, to ensure program integrity and to protect the interests of U.S. workers, DOL instituted an audit of all the applications filed by that firm. The Department issued a news release describing the actions it had taken with respect to the immigration law firm. (http://www.dol.gov/opa/media/press/eta/eta20080955.htm).

25.     As discussed above, one of the integrity measures the Department uses to review the adequacy of the employer's application in permanent labor certification cases is the pre-determination audit.  The Department institutes audits on both random and targeted bases.

Recently, the Department's routine audits included several PERM applications filed by attorneys at the law firm of Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen"). In the course of these audits, the Department discovered three forms (Attached as Exhibits A, B & C to the Complaint) that were developed and copyrighted by the Fragomen firm. The forms were apparently designed to be used by Fragomen's clients during the process of recruiting and considering domestic applicants in the context of the permanent labor certification process. One of the forms contained the following:

> **Reminder**: Immediately review all resumes and contact all applicants for a phone interview who on the face of their resume are potentially qualified for the offered position. After interview, should any of the applicants appear to be qualified for the position, please contact a Fragomen attorney immediately to further discuss the candidate's background as it relates to the requirements stated for the position.

One of the other forms contains the following notation at the bottom:

> **Closing the interview**: If the applicant meets the requirements and is still interested in the position after the interview (including location and salary), tell the applicant that the company will contact him/her after considering the application (contact FDBL immediately).

26.     The use of these forms raised immediate concerns within the Department, both with respect to the overarching requirement that recruitment be conducted in good faith, and the requirement that domestic applicants be considered using "normal" procedures. The forms were particularly troubling because they appeared to be biased against deeming U.S. workers qualified, imposing extra burdens on HR staff in the event that they deem U.S. worker applicants qualified, and they raised questions about whether the employers were acting in good faith. The forms do not direct clients to call their attorneys when they deem workers unqualified, which is the circumstance in which the employer would be most likely to run afoul of program rules and thus require legal counsel. Rather, the forms instruct the HR staff using the forms to call Fragomen

attorneys only in the event they deem a U.S. worker qualified, a determination that could not possibly run afoul of program requirements. These forms, copyrighted and distributed by Fragomen, raised concerns that Fragomen was acting as, and perhaps marketing itself as, a specialist in disqualifying U.S. workers that employers would otherwise deem qualified if evaluated solely through their normal hiring process. The Department was concerned that such practices might well have an adverse impact on the wages and working conditions of U.S. workers and violate the Secretary's responsibilities under the INA. While Fragomen has every right to provide its clients legal counsel on all aspects of PERM program operations, the tenor of the forms raised questions about whether the employer-clients using the forms were using their normal recruitment process to evaluate U.S. workers and engaging more generally in good-faith recruitment.

27.   Because of good faith recruiting concerns, the existence of the forms would have been sufficient to justify an immediate audit of all Fragomen-filed applications. However, the Department chose to first meet with Fragomen representatives to discuss the use of the forms on two occasions in May of 2008. The purpose of the meetings was to determine whether there was a legitimate purpose for the instruction on the forms. In fact, the Department's Solicitor personally attended the second meeting to inquire what purpose the forms served and whether there was a legitimate need for them. The Fragomen representatives stated that the forms were not used in every office (though they did not know where they were used), nor were they frequently used (although they did not know how frequently). Fragomen conceded that the forms could be viewed with suspicion because of the language used, but maintained that the forms could have legitimate uses. In the end they agreed the forms were inappropriate, and agreed to discontinue the forms.

28.     In the course of these discussions, the Department asked how the forms were used. Fragomen insisted that their attorneys were not trying to dissuade employers from their judgments concerning the qualification of domestic workers, but could not deny that the language on the forms suggested that precisely such conversations could occur. They indicated that the purpose of conversations between the employer and a Fragomen attorney at this stage would be for the attorney to "explain the consequences" of finding a domestic worker qualified. By that, we understood Fragomen meant that they wanted to explain to their employer-clients that there is no legal obligation actually to hire qualified U.S. workers that respond to recruitment. They further wished to explain to the employer's HR staff if they were certain that the U.S. worker they had identified was able, willing, qualified, and available, the employer would not be able to file a permanent labor certification application based on the recruitment. The employer could, however, start the recruitment over again after a short period of time elapsed, and if, as hoped, no qualified domestic workers responded, they could file a permanent labor certification application based on that recruitment. The Department agreed that such advice would be legally permissible, but expressed skepticism that the representations of the attorneys about the purpose and effect of the forms were accurate since the forms expressly said the purpose of the instruction to call Fragomen attorneys was to initiate a discussion about worker qualifications. As the Department's most recent guidance makes clear, Fragomen attorneys have every right to provide their clients advice about the legal requirements concerning the evaluation of worker qualifications. However, Fragomen's perceived dissembling about the purpose and effect of the forms heightened the Department's concerns that underlying improper activity might be taking place. Indeed, the Fragomen representatives did not deny that the forms, on their face, raised legitimate issues. The representatives refused to comment on the language in the forms as it

relates to the Department's long standing regulatory prohibition on disparate treatment of U.S. workers in the recruitment process involving labor certification applications. The attorneys merely expressed the view that the Department never enforces that particular requirement. They also failed to timely identify which Fragomen offices used the concededly inappropriate forms.

29.     The Fragomen representatives failed to provide the Department with a sufficiently satisfactory explanation for the use of the forms. They never mentioned the right to counsel and indeed denied that Fragomen attorneys were providing any legal advice about qualifications during these calls. In part because the representations of the attorneys were not consistent with the forms themselves, and in part because the attorneys refused to identify where the forms had been used, the Department concluded that a comprehensive audit of the applications filed by Fragomen was necessary to carry out the responsibilities assigned to the Secretary of Labor under 8 USC § 1182(a)(5), and to determine whether employers operating under the Fragomen instructions were using their normal recruitment process and recruiting for domestic workers in good faith.[1]

30.     Audits are the principal means by which the Department verifies employer compliance with program requirements, thus maintaining program integrity in the PERM program. PERM applications are filed without supporting documentation, and the Department relies on employer attestations of compliance with program and regulatory requirements. Audits are the means by

---

[1] At the time this decision was made on May 12, 2008, nearly 1,300 cases filed by Fragomen were already being audited for issues unrelated to the concerns raised by the forms, and another 1,400 pending cases were under analyst review and subsequently issued an Audit Letter related to the concerns raised by the forms. The Department then received approximately 1,000 new cases between May 12, 2008 and July 15, 2008, for which an audit letter was issued for issues related to the concerns raised by the forms. When taken together, more than 49 percent of all pending cases filed by Fragomen through July 15, 2008, were already being audited for issues unrelated to the concerns raised by the forms. Fragomen is well aware of these facts, but deliberately exaggerated the impact of the Department's audit in its filings with this Court, repeatedly stating that more than 2,500 applications were placed in audit because of the Department's actions, and misleadingly implying that all 2,500 would be released from audit if Fragomen received the relief it was seeking from the court.

which DOL tests the veracity of those attestations, and are the means by which DOL secures the documentation that supports the attestations. The documents required in an audit are no more onerous, than those DOL previously required employers to provide to support their labor certification applications before the new PERM rules were implemented. Audits may be conducted on a random basis or based on targeting for specific program concerns. Audits were the means by which the Department identified the existence of the Fragomen forms. Based upon the circumstances and the subsequent meeting, the Department decided it was necessary to audit all of Fragomen's pending applications because that was the only means by which we could identify the cases in which the forms and similar instructions may have been utilized, particularly in the absence of any identifying information being supplied by Fragomen.

31.     During the period of the audits, the Department received information that Fragomen had outstationed employees, generally paralegals, at several of its clients. The Department learned that Fragomen employees were possibly screening and assessing the applications of domestic workers who applied for positions for which permanent labor certification was being sought. The Department set out to explore the nature and scope of this activity both in the context of the employer's obligation to recruit in good faith as well as its obligation, pursuant to 20 C.F.R. § 656.10(b)(2)(ii) to utilize the same recruiting practices in the labor certification recruiting as it does in normal hiring. To the extent this screening is both done by paralegals and involves providing legal advice (as Fragomen now asserts that it does), it might also constitute the unauthorized practice of law. To this end, the Department inquired of Fragomen on June 12, 2008 whether "any Fragomen office is providing an initial review or pre-screening of resumes and/or applications." Fragomen did not respond until July 18, 2008. When Fragomen responded, it labeled the Department's straightforward inquiry "difficult and troubling." Despite

the fact that no client-specific information had been requested, Fragomen refused to comply with the Department's legitimate request for information, instead frivolously invoking the attorney-client privilege.

32.    Following the initiation of the audits, the Department began a dialogue with Fragomen about how to limit the scope of the audits.  On July 16, 2008, these negotiations culminated in an agreement concerning prospective treatment of cases filed by the firm.  Fragomen agreed to: 1) discontinue the use of the recruitment forms; 2) comply with the Department's labor certification process, including the Department's interpretation of 20 C.F.R. § 656.10(b)(2); 3) not prescreen domestic applicants other than the clerical organizing of resumes; 4) not withhold from employers resumes submitted by U.S. workers; 5) not participate in interviews of U.S. workers; and, 6) not attempt to dissuade employers from their initial determination that a domestic applicant is qualified.

33.    Following the announcement of the Fragomen audits, a number of questions were raised about the appropriate role of the employer's immigration attorney in the evaluation of applications submitted by U.S. workers as part of the permanent labor certification process.  In response to these questions, on June 13, 2008, the Department issued a Program Guidance Bulletin which offered clarification of these issues.  After the issuance of the June 13 Guidance, additional issues arose concerning the scope of the activities it covered.  We received a number of letters and met with the American Immigration Lawyers Association ("AILA").  AILA indicated that the Bulletin was substantially helpful, but suggested that further clarifications were necessary.  The Department agreed at that time to issue further clarifications after considering their comments.  After a thorough review of these matters, the Department concluded that a further clarification was necessary.  This clarification was issued on August 29, 2008.

34.    The August Bulletin acknowledges that employers have the unrestricted ability to consult with their attorney about how the labor certification process operates and what their responsibilities are under it.

35.    Two specific activities are proscribed under 20 C.F.R. § 656.10(b)(2).  First, in the context of the labor certification process, no one, whether they are an attorney or not, should screen applications submitted by U.S. workers before those applications are reviewed by the employer's human resource staff, unless that person normally performs that same function for the employer in non-labor certification hiring.  A key component of the labor certification process is a bona fide test of the labor market.  This requires that employers recruit domestic workers in good faith.  Nothing is more central to good faith recruiting than the use of normal recruiting procedures.

36.    Second, interviews of U.S. worker applicants should be conducted by the staff the employer normally uses to conduct such interviews.  Specifically, those interviews should not be conducted by the immigration attorney for the employer or alien beneficiary, unless that attorney normally performs that function for non labor certification positions.  It has been the Department's experience that use of the employer's immigration lawyer as an interviewer has a chilling effect on the willingness of domestic workers to pursue their applications.

37.    To the extent that the Department is continuing to audit Fragomen applications for compliance with 20 C.F.R. § 656.10(b)(2), it will enforce only these specific requirements, as well as the requirement that recruitment be conducted through a normal recruiting process and in good faith. Consistent with its most recent guidance interpreting 20 C.F.R. § 656.10(b)(2), the Department will not enforce any restrictions on attorney advice.

38.    Fragomen has admitted to the Department in a letter dated August 12, 2008, that since

March 28, 2005, it has outstationed Fragomen employees with at least 11 employer-clients to participate in their permanent labor certification application process. Fragomen further admitted that at least one outstationed Fragomen employee has pre-screened the resumes of U.S. workers and sorted them on the basis of qualifications. Until the Department can ascertain which Fragomen-filed applications that are currently undergoing audit were subject to such abnormal recruitment processes and precisely what those recruitment processes entailed, it cannot consistent with its statutory duties broadly release all Fragomen-filed applications from audit. The Department is committed to working diligently to limit the scope of its audit to those applications that were subject to such abnormal recruitment processes. The speed with which this narrowing of the audits can be completed is in the hands of Fragomen and its clients, which are in possession of the information the Department will need to focus in on the most problematic applications. Absent such specific information, pre-certification audits are the tool the Department normally uses to identify a small number of actually problematic applications from among a larger number that are subject to potential questions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, belief and recollection.

DATED: August 29, 2008

WILLIAM L. CARLSON, Ph.D.
Administrator
Office of Foreign Labor Certification
Employment and Training Administration
U.S. Department of Labor

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **FRAGOMEN, DEL REY, BERNSEN &** ) | |
| **LOEWY, LLP**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Civil Action No. 08-1387 (RMU)** |
| ) | |
| v. ) | |
| ) | |
| **ELAINE CHAO, Secretary of Labor,** ) | |
| **and the United States Department** ) | |
| **of Labor,** ) | |
| ) | |
| ) | |
| Defendants. ) | |

_____)

## [PROPOSED] ORDER

This matter having come before the Court on Plaintiff's Motion for Preliminary Injunction,

Defendants' opposition to Plaintiff's motion, and Plaintiff's reply, if any, it is hereby

**ORDERED** that Plaintiff's Motion for Preliminary Injunction is **DENIED.**

**SO ORDERED** on this _____ day of _____, 2008.

_____
RICARDO M. URBINA
United States District Judge